# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

|  |  |
| --- | --- |
| IN RE HD SUPPLY HOLDINGS, INC. SECURITIES LITIGATION | CONSOLIDATED CASE NO. 1:17-CV-02587-ELR<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..........................................................................1

II.     INTRODUCTION ........................................................................................2

III.    JURISDICTION AND VENUE .................................................................10

IV.     PARTIES ...................................................................................................11

    A.      Lead Plaintiffs .................................................................................11

    B.      Defendants ......................................................................................12

        1.      Defendant HD Supply Holdings, Inc. ....................................12

        2.      The Individual Defendants .....................................................13

        3.      Relevant Non-Parties .............................................................15

V.      OVERVIEW OF THE FRAUD ................................................................15

    A.      Background of HD Supply ...............................................................15

    B.      A Prelude to Disaster: FM Moves Its Headquarters Cross-
        Country to Cut Costs, Firing Nearly All of its Supply Chain
        Workforce in the Process .................................................................18

    C.      In 2016, FM's Supply Chain Experiences Massive
        Failures, and the Company Assures Investors that
        the Problems Will Be Fixed by Year End..........................................19

    D.      The Class Period Begins with Defendants Emphatically
        Assuring Investors That The Supply Chain Recovery
        Was "On Track," and That There Were No Surprises Forthcoming ..27

    E.      In Contrast to Defendants' Statements About the Supply
        Chain Recovery, 2016 Ended With the FM Supply Chain
        "Still Fundamentally Broken"..........................................................29

    F.      When Directly Confronted With the Truth About the
        Company's Supply Chain Failures, Management Fired
        the Messenger...................................................................................33

G.     Despite Repeated Assurances, The Company's Supply
Chain Recovery Continues to Struggle into 2017.............................36

H.     The Truth Begins to Emerge ................................................38

I.     Defendant DeAngelo Unloads Over $53 Million In HD
Supply Stock—80% of His Holdings—In Less Than a Week ..........39

J.     HD Supply Reveals the Truth: The FM Supply Chain
Remains Dysfunctional and Requires Substantial
Additional Investment ........................................................42

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS ........................................................................45

A.     The November 9, 2016 Robert W. Baird Global
Industrial Conference ........................................................45

B.     Third Quarter 2016 Results ................................................47

C.     The February 22, 2017 Barclays Industrial
Select Conference..............................................................50

D.     Fourth Quarter and Full Year 2016 Results .......................51

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER .......................55

A.     DeAngelo's Own Statements Made Clear that Defendants
Knew of the Supply Chain Problems and the Time and
Expense Required to Fix Them............................................55

B.     Former Employees Confirm Defendants' Knowledge
and More..........................................................................57

C.     The FM Supply Chain Was the Most Critical Aspect of
HD Supply's Business During the Class Period ..................58

D.     Insider Stock Sales by DeAngelo Were Highly Unusual
in Scope and Timing, and Raise a Strong Inference He
Had the Motive and Opportunity to Withhold and Delay
the Disclosure of HD Supply's Struggling FM Segment
Recovery..........................................................................61

VIII.  CLASS ACTION ALLEGATIONS.................................................63

IX.  UNDISCLOSED ADVERSE FACTS ..........................................65

X.  LOSS CAUSATION ...................................................................67

XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-
ON-THE-MARKET DOCTRINE.................................................70

XII.  NO SAFE HARBOR ..................................................................72

XIII.  COUNTS AGAINST DEFENDANTS .......................................73

XIV.  PRAYER FOR RELIEF..............................................................79

XV.  JURY TRIAL DEMANDED ......................................................80

# I.   NATURE OF THE ACTION

1.     Lead Plaintiffs City Pension Fund for Firefighters & Police Officers in the City of Miami Beach, Pembroke Pines Pension Fund for Firefighters and Police Officers, and Hollywood Police Officers' Retirement System (collectively, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Lead Counsel's investigation included, among other things: (i) review and analysis of filings of HD Supply Holdings, Inc. ("HD Supply" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of presentations, press releases, conference call transcripts, media and analyst reports made by or about the Company; (iii) review and analysis of other publicly-available information concerning HD Supply; (iv) interviews with former HD Supply employees and other persons with knowledge of the matters alleged herein; (v) consultation with relevant experts; and (vi) review and analysis of other materials and data concerning the Company, including analysis of HD Supply executives' trading in HD Supply common stock.

2.    Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant HD Supply, and Defendants Joseph J. DeAngelo ("DeAngelo") and Evan J. Levitt ("Levitt" and, together with DeAngelo, the "Individual Defendants," and together with HD Supply, "Defendants"), and under Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired HD Supply common stock between November 9, 2016 and June 5, 2017, inclusive (the "Class Period"). Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for its allegations after a reasonable opportunity for discovery.

## II.   <u>INTRODUCTION</u>

3.    HD Supply is one of the largest commercial distributors in North America, providing products and services to approximately 500,000 customers across a variety of industrial sectors. The Company's business is concentrated in three segments, with the most important being its Facilities Management ("FM") division. In the years leading up to the Class Period, HD Supply's FM segment grew rapidly, and the Company regularly emphasized to investors the segment's

ability to deliver "above-market growth," *i.e.*, its ability to grow faster than the overall market for its products. HD Supply's FM segment was thus a leading driver of the Company's profits, accounting for more than half of its adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA")—a financial metric that Defendants repeatedly touted to shareholders as an "important" and "primary measure used by management to evaluate operating performance."

4. As a commercial distributor, the FM segment's lifeblood was its supply chain, which provides it with the ability to obtain the products needed by its customers on a timely basis, and its ability to deliver those products to its customers when they need it. Indeed, because of competition from companies like Amazon, it is absolutely critical for HD Supply's business that the FM segment's supply chain operates efficiently and effectively. In fact, the FM segment's publicly stated strategic mission is to compete on "speed and product availability over price," with the Company's web page motto being: "GET WHAT YOU NEED, WHEN AND WHERE YOU NEED IT." Given this business strategy, the Company's operations and business success were entirely reliant on the efficient functioning of its all-important supply chain.

5.     In the months leading up to the Class Period, FM's supply chain experienced significant failures after relocating its headquarters cross-country and laying off nearly all of its supply chain employees.  FM under-ordered inventory for its busy selling season, then, upon realizing its problems, over-ordered to compensate, which, according to former employees directly involved in the supply chain process, "paralyzed" the Company's distribution centers as the FM business struggled to process the excess incoming inventory and fill customer orders at the same time.  As a result, the FM segment failed to fulfill orders, incurred massive additional expenses, and lost numerous customers and sales.  These failures also exposed systemic problems in the segment's supply chain, and left FM floundering to clear its inventory and struggling to return to normal operations.

6.     Significantly, following FM's operational breakdown, Defendants guaranteed the market that HD Supply was successfully implementing measures to rectify its supply chain deficiencies, and that any inventory delays and expenditures would be quickly resolved.  Indeed, Defendant DeAngelo emphasized that he and the rest of the Company's senior executives were "laser focused" and "intensely engaged" on the recovery.  On November 9, 2016—the start of the Class Period—Defendant DeAngelo appeared at the Robert W. Baird Global Industrial Conference, where he assured investors that the most serious deficiencies in FM's

supply chain had been fixed, that the Company's "supply-chain execution" had "tracked exactly where we thought it would be," and that the recovery process was "on track." When analysts pressed for further information, DeAngelo reiterated that "we have no surprises, we're right on track," and that the Company was "perfectly positioned" to deliver strong results in 2017.

7. Throughout the Class Period, Defendants repeated these assurances. On February 22, 2017, Defendant Levitt appeared at the Barclays Industrial Select Conference, where he further made clear that the problems that had affected the FM supply chain in 2016 had been rectified. Levitt acknowledged that the Company suffered "a bit of a supply chain disruption" in 2016, but emphasized that "[a]ll of that's behind us now. Supply chain is in [as] good condition as it's ever been[.]" Levitt further added that the Company had "pivoted from that supply chain recovery to a commercial recovery in November," and that the Company felt "real good about where we are and the prospects for 2017." Levitt's assurances had their intended effect on investors: on February 23, 2017, the day after he spoke at the Barclays conference, the price of HD Supply stock reached its Class Period high of $44.49 per share.

8. Just one month later, with the stock still trading close to its Class Period high, Defendant DeAngelo liquidated virtually his entire stake in the

Company at prices that were artificially inflated by Defendants' fraud. Beginning on March 29, 2017, and continuing over the course of a mere five days, DeAngelo unloaded 1.3 million shares, or <u>80% of his holdings in HD Supply</u>, for proceeds of almost $54 million. Not only were these sales massive in scale, they were also extraordinarily suspicious in scope and timing. Indeed, DeAngelo had not sold a single share of HD Supply stock in the previous twelve months, and he dumped his stake just one month after Defendants falsely assured investors that the problems that had impacted FM's supply chain in 2016 were "behind us now." Moreover, DeAngelo gave no explanation for the liquidation, and no market-related rationale—such as tax obligations or expiring options—was readily apparent. DeAngelo's stock sales were so large and suspicious that HD Supply took the extraordinary step of emailing its employees to assure them that, despite his liquidation of stock, DeAngelo had not lost confidence in the Company.

9. In reality, Defendants knew full well that the problems that had impacted the FM supply chain were not "behind us now," and that, in stark contrast to Defendants' public statements, the supply chain was not in "as good condition as it's ever been." Indeed, former high-ranking Company employees, each of whom were personally involved in the supply chain recovery effort, confirmed that by November 2016 at the latest, it was well known inside the

Company—including to the Individual Defendants—that "the supply chain needed a massive overhaul to meet demand," and that the Individual Defendants were well aware of the continued deficiencies in the FM segment's supply chain. These employees also confirmed that the Individual Defendants received daily reports and data that made clear the severity of the supply chain problems, and that this information stood in direct contrast to Defendants' public representations.

10. Significantly, these employees also independently confirmed that, in December 2016, the "Supply Chain Transformation Team," which was tasked with guiding the supply chain recovery efforts, prepared a detailed presentation for HD Supply's senior management. This presentation meticulously outlined the dire need for a multi-million-dollar, long-term overhaul of the Company's supply chain. Nazia Ali ("Ali"), HD Supply's then-Director of Supply Chain Transformation and the head of this team, repeatedly stressed to the Individual Defendants and the rest of the management team that the Company's recovery efforts were ineffective and deficient, and required a much more substantial plan. Defendant DeAngelo refused to implement the team's recommendations, and instead Ali was fired just days later.

11. The full extent of Defendants' fraud was not revealed until June 6, 2017, when the Company issued a press release admitting that, contrary to

Defendants' prior representations, FM's supply chain issues had still not been fixed. On that day, the Company disclosed that: (1) the problems affecting the FM supply chain were <u>still</u> materially impacting the Company's business, such that FM's Q1 2017 adjusted EBITDA had actually declined a staggering 13% compared to the same quarter of the prior year—representing the largest such drop in HD Supply's history as a public company; (2) the FM supply chain recovery efforts would extend through the rest of 2017, and even into 2018; and (3) as a result of the ongoing supply chain problems, the Company would be forced to spend substantial additional sums on the recovery efforts, which would materially impact Adjusted EBITDA in future periods.

12. Moreover, during a conference call to discuss these results, analysts pressed management for additional details regarding these disclosures. In response, DeAngelo adamantly refused to quantify the additional supply chain investments. During the call, Defendants also admitted that, in direct contrast to their statements in February 2017, that the supply chain problems were "behind us now," in reality the FM supply chain had only just begun to function properly "exiting the quarter," *i.e.*, in <u>May 2017 at the earliest</u>.

13. Analysts were shocked by these admissions, slashing the Company's ratings and excoriating management for their prior misrepresentations. For

example, Deutsche Bank issued a report headlined, "Downgrading to Hold; Credibility Crunch," which emphasized that management's credibility had become an "<u>impediment</u>" given that management had "repeatedly professed high confidence in the Company's profit trajectory," and was now calling for "a sizeable ramp in FM investment spending for which details and magnitude were not articulated." As such, it was "<u>unclear when the new elevated spending might subside, and could instead go on for years</u>." Similarly, RBC Capital Markets stated that the "<u>most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call</u>."

14.    As a result of Defendants' disclosures, HD Supply's share price crashed, falling $7.24 per share, or 17.5%, from a close of $41.27 per share on June 5, 2017, to a close of $34.03 per share on June 6, 2017. The stock fell another $1.22 per share, or 4%, to $32.81 per share on June 7, 2017, as the market continued to digest the news. In total, HD Supply stock fell more than 20% in just two trading days in response to these disclosures, wiping out a total of $1.7 billion in market capitalization. Moreover, the stock price never recovered, and today trades far below its Class Period high—and the prices at which DeAngelo sold his stake in the Company.

15.    Investors who purchased HD Supply common stock at artificially-

inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

## III.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District at 3100 Cumberland Boulevard, Suite 1480, Atlanta, Georgia, 30339.

19.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.   PARTIES

### A.   Lead Plaintiffs

20.   Lead Plaintiff City Pension Fund for Firefighters & Police Officers in the City of Miami Beach ("Miami Beach F&P") is a defined benefit plan that provides retirement benefits to police officers and firefighters in Miami Beach, Florida. As of March 31, 2017, Miami Beach F&P managed more than $830 million in assets on behalf of approximately 1,250 members and beneficiaries. As reflected in its certification previously submitted in this litigation (ECF No. 24-4), Miami Beach F&P purchased HD Supply common stock on the NASDAQ Stock Market ("NASDAQ") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On October 19, 2017, this Court appointed Miami Beach F&P as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 34.

21.   Lead Plaintiff Pembroke Pines Pension Fund for Firefighters and Police Officers ("Pembroke Pines F&P") provides retirement benefits to firefighters and police officers in Pembroke Pines, Florida.  As of June 2016, Pembroke Pines F&P managed more than $518 million in assets on behalf of

approximately 656 members and beneficiaries. As reflected in its certification previously submitted in this litigation (ECF No. 24-4), Pembroke Pines F&P purchased HD Supply common stock on the NASDAQ during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On October 19, 2017, this Court appointed Pembroke Pines F&P as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). ECF No. 34.

22. Lead Plaintiff City of Hollywood Police Officers' Retirement System ("Hollywood Police") provides retirement benefits to police officers in Hollywood, Florida. As of December 2016, Hollywood Police managed more than $272 million in assets on behalf of approximately 631 members and beneficiaries. As reflected in its certification previously submitted in this litigation (ECF No. 24-4), Hollywood Police purchased HD Supply common stock on the NASDAQ during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On October 19, 2017, this Court appointed Hollywood Police as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). ECF No. 34.

**B.    Defendants**

**1.    Defendant HD Supply Holdings, Inc.**

23.    Defendant HD Supply is a Delaware corporation with its principal

executive offices located at 3100 Cumberland Boulevard, Suite 1480, Atlanta, Georgia 30339. HD Supply's securities are traded on the NASDAQ Stock Market ("NASDAQ") under the symbol "HDS."

## 2.    The Individual Defendants

24.    Defendant Joseph J. DeAngelo ("DeAngelo") has served as the Company's President and Chief Executive Officer ("CEO") since January 2005, and as Chairman of the Board of Directors since March 12, 2015. DeAngelo also served as the interim CEO of the Company's FM segment from September 2015 until June 5, 2017—the day before the end of the Class Period—when William Stengel was appointed CEO of FM.

25.    During the Class Period, Defendant DeAngelo made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on November 9, 2016, December 6, 2016, and March 14, 2017.

26.    Defendant Evan J. Levitt ("Levitt") served as HD Supply's Senior Vice President, Chief Financial Officer ("CFO"), Chief Administrative Officer and Comptroller during the Class Period.

27.     During the Class Period, Defendant Levitt made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on February 22, 2017, and March 14, 2017.

28.     Defendants DeAngelo and Levitt are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, in part because of their positions with the Company, possessed the power and authority to control the contents of HD Supply's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant was involved in the conference calls and public statements alleged herein to be false or misleading and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

### 3. Relevant Non-Parties

29.    William P. Stengel ("Stengel") served as Chief Operating Officer ("COO") for HD Supply Facilities Maintenance from August 2016 through June 2017 when he was appointed, on June 5, 2017, as CEO of HD Supply Facilities Maintenance.    During the Class Period, Stengel, together with Defendant DeAngelo, oversaw the supply chain problems and the Company's recovery efforts.

## V.    OVERVIEW OF THE FRAUD

### A.    Background of HD Supply

30.    HD Supply is one of the largest industrial distributors in North America. During the Class Period, the Company operated in three segments: Facilities Maintenance ("FM"), Waterworks, and Construction.[1]

31.    The allegations in this Complaint focus on the FM segment, which offers maintenance, repair, and operations ("MRO") products to the managers and owners of multifamily, hospitality and commercial properties, as well as healthcare

---

[1] During the Class Period HD Supply's Waterworks segment was the nation's largest distributor of water, sewer, storm and fire protection products.  On June 6, 2017, HD Supply announced the sale of its Waterworks business to private equity firm Clayton, Dubilier & Rice for $2.5 billion in cash.  HD Supply's Construction & Industrial segment provides specialty hardware, tools and materials for medium-to-large contractors, including home improvement products and building materials.

and government facilities. FM's products include electrical and lighting items, plumbing, HVAC products, appliances, janitorial supplies, hardware, kitchen and bath cabinets, window coverings, textiles and guest amenities, healthcare maintenance and water and wastewater treatment products.

32.     During the Class Period, FM was by far the Company's most important segment.  FM was the largest segment by sales, accounting for 37% of the Company's net sales in 2016, and contributed more than 50% of HD Supply's 2016 Adjusted EBITDA─one of the Company's most important financial metrics and one that was frequently touted to investors.  Indeed, the Company emphasized in both its FY 2015 and FY 2016 Annual reports filed with the SEC on Form 10-K that Adjusted EBITDA "is a primary measure used by management to evaluate operating performance," and that "the presentation of Adjusted EBITDA enhances investors' overall understanding of the financial performance of our business."

33.     FM distributes and sells through a network of more than 40 distribution centers throughout the United States.  As a distributor, FM's supply chain is absolutely critical.  FM must be able to efficiently stock the inventory that its customers demanded and to quickly fill orders and ship product when and where the customer needs it.  Indeed, FM's professed strategy is to compete on "speed and product availability over price," according to its Form 10-K for the

fiscal year ended January 29, 2017 ("FY2016 10-K").[2] The Company's website proudly exclaims, "GET WHAT YOU NEED, WHEN AND WHERE YOU NEED IT." As such, having the right products in the right places at the right times is critical to FM's business success.

34. Former HD Supply employees[3] have confirmed the importance of the Company's supply chain integrity. Indeed, as CW1,[4] a former Senior Supply Chain Systems Analyst explained, HD Supply only enabled a customer to order an item if it was in-stock and therefore immediately available for shipment. Further, according to CW1, 75% of FM's products are imported from overseas, a large portion of which are manufactured in China and require lead times of three months or more. Thus, because FM does most of its sales during its busy spring to

---

[2] HD Supply's fiscal year is a 52- or 53-week period ending on the Sunday nearest to January 31. Fiscal Year 2016 ("FY 2016") ended January 29, 2017. The end dates of the fiscal quarters discussed in this Complaint are as follows: Q1 2016 ended May 1, 2016; Q2 2016 ended July 31, 2016; Q3 2016 ended October 30, 2016; Q4 2016 ended January 29, 2016; Q1 2017 ended April 30, 2017; and Q2 2017 ended July 30, 2017.

[3] Former HD Supply employees are referred to herein as "CW__" and are referenced in the feminine form to maintain their confidentiality.

[4] CW1 was a Senior Supply Chain Systems Analyst at HD Supply from June 2016 through February 2017. CW1's was responsible for assessing how the supply chain was functioning, and how it stacked up against the competition, and she was tasked with developing a plan to get the Company's supply chain up to industry standards. CW1 reported directly to Ali and Stengel.

summer season, it is critical that FM be able to order sufficient inventory to meet customer demand.

**B.     A Prelude to Disaster: FM Moves Its Headquarters Cross-Country to Cut Costs, Firing Nearly All of its Supply Chain Workforce in the Process**

35.     In early 2016, FM moved its headquarters from San Diego to Atlanta. In preparation for the move, "90 percent of the corporate supply-chain employees" were either terminated or otherwise left due to the move, according to CW2.[5]  As CW2 explained, the Company then replaced these employees with far-less experienced ones:

> Essentially, they rehired an entire team in Atlanta and then did a big transition to move all the job functions over….One of the things that happened was you have a bunch of new people, many who are right out of college and many who don't know the job.  And you have other people who are in the know who are being fired.

36.     As CW3[6] described it, the move, and the associated employee

---

[5] CW2 was a Senior Manager of Inventory Analytics at HD Supply from December 2015 through November 2016 in the Company's Atlanta, Georgia headquarters.  CW2 was responsible for collecting and organizing the data metrics on the FM recovery process that were sent out every morning to senior management and executives.

[6] CW3 served as a distribution center manager for six years with HD Supply until her resignation in January 2017.  During her tenure, CW3 worked at three distribution centers, including the Company's Columbus, Ohio distribution center. CW3 reported to Michael Badulini, the Regional Distribution Manager for the Northeast, who in turn reported to the Vice President of Operations for Facilities

departures were "about when the org [sic] started having big problems with the supply chain—when people who had tenure and understood the dynamics went away." FM's supply chain, CW3 said, "went down and down and down" from that point forward.

C. **In 2016, FM's Supply Chain Experiences Massive Failures, and the Company Assures Investors that the Problems Will Be Fixed by Year End**

37.     As a result of its newly-hired and inexperienced personnel, as well as other problems related to the headquarters move, FM failed to properly prepare for its spring and summer 2016 selling season. As explained above, many of FM's products were manufactured in China and had to be ordered three to four months in advance. This was corroborated by both CW3 and CW4,[7] both of whom confirmed that the new supply chain team simply did not plan for the lead time that was involved. They simply did not know how to properly anticipate demand or to manage the transition of data to the new headquarters. Further, these new employees were not adequately trained with the Company's legacy data

Management, who reported to Will Stengel, the Company's COO and FM segment leader.

[7] CW4 joined HD Supply and its Inventory Analytics team in February 2016, as a Senior Analyst of Business Process Improvements. CW4 worked at the Company until August 2017 and was based in the Company's Atlanta, Georgia headquarters. CW4 principally reported to CW2, who was later replaced in November 2016, by Jay Thorne, the Senior Manager of the Inventory Team.

management system, which the Company had modified over time.  As a result, the

Company ordered far too little inventory for the busy season.  As CW2 put it,

"[t]here was a month or two for a lot of import products where very little-to-no

product was ordered . . . the new hires didn't know to recognize it was a problem,

and the old team"—who were on their way out—"didn't care."  Corrective action

was subsequently taken to order compensate for the shortfall, but because of the

long lead times, an excessive amount of inventory arrived late that could not be

properly handled or processed, just as the distribution centers were also processing

customer orders for the selling season.

38.    By early summer 2016, FM's distribution centers were "paralyzed."

As CW2 explained:

> [E]ssentially the distribution centers then got swamped with all this
> inventory and then couldn't process it.  That also got in the way of
> receiving domestic orders . . . so the distribution centers had more
> inventory to process than they can, which slows down receiving for all
> products and slows down any transfers to other distribution centers,
> and which again harms your fill rate.  You're not moving stuff in your
> supply chain very well.  In the summer of 2016, that's kind of what
> the problem had turned to.  It was like, 'Oh, oh, we don't have enough
> inventory.'  Now in the summer, the inventory is here, but now the
> distribution centers are paralyzed and not operating very well.

39.    CW5[8] corroborated this account, stating that the inventory buildup

_____

[8] CW5 worked at HD Supply from June 2010 until March 2017.  From June 2015
until November 2016, CW5 was an Operations Manager for the Greater Chicago

was so bad that "if you walked into any of our warehouses, we couldn't even move. It was unsafe. There was zero room."

40. The supply chain failure caused significant problems for FM's business. According to CW5, a former HD Supply Senior Supply Chain Transformation Analyst, the Company "hadn't been paying on purchase orders, hadn't paid vendors," and "started losing customers like crazy." CW5 further stated that the customers were "going elsewhere" to competitors because of FM's difficulties filling orders.

41. According to CW1, HD Supply's four biggest distribution centers, located in Atlanta, Dallas, Los Angeles and Philadelphia, were particularly hard hit, and all were reporting significant issues back to headquarters. CW1—whose job included personally traveling to these centers to assess their performance and assist in the recovery efforts—said that these distribution centers were in "complete collapse," and a "complete disaster," and that they were utterly unable to process

_____

Area. Her responsibilities were to oversee operations and inventory of two distribution centers. In November 2016, CW5 was promoted to Senior Supply Chain Transformation Analyst, a position she held until she left the Company in March 2017. Although CW5 worked in Chicago, she reported directly to executives in Atlanta, including Nazia Ali, the Director of Supply Chain Transformation, and after Nazia Ali was fired in January 2017, CW5 reported to Tripper Briggs, Vice President of Strategic Business Development.

the volume of orders generated. The result was a mass of back-orders and mis-shipments (customers ordered one thing and got another), which caused FM to "lose customers and frustrate long-term customers."

42.     CW1 said that as a result of the supply chain breakdown, the Company experienced dramatic drops in its "fill-rate" – a crucial metric of how quickly and how well the Company fills orders. Industry leaders, she said, were expected to achieve a 99% fill-rate, but by the summer of 2016, the Company's fill-rate was only in the high 80's. CW3 also said that during this time fill-rates were "significantly, very low" and that the drop in fill-rate had a "huge, visible impact" on customers, who fled for competitors.

43.     In addition to "fill-rate" benchmarks, the Company also tracked "in-stock" targets, *i.e.*, the percentage of offered products that would be in stock at a given distribution center. In-stock rate was critical because, according to CW1, a customer could only order a product from HD Supply if it was in stock and ready to ship immediately. The in-stock rate was supposed to be at 98.4% across the Company, but CW3 recalled that by late fall 2016, only one or two centers, out of over 40, had achieved even a 90% in-stock rate.

44.     FM's attempts to fix its supply chain "disruption" in 2016 were referred to internally as "Project Firefight," which was meant to convey the

urgency of the supply-chain problem.  CW2 referred to it as a situation of "all hands on deck, everyone focus on this, this is the number one priority. Things are not okay…."  CW3 said that the goal was to "fight the fires of customer deficits," to "fight the fire of no product, and get the product organized, stowed, staged, received and shipped as required."

45.     Project Firefight effectively consisted of triage measures rather than long-term fixes to the underlying supply chain problems, according to former employees.  For example, FM management lifted restrictions on a practice called "cross-shipping" or "flex-transport," which was the practice of shipping a product from a far-away distribution center when it was not available at the closest one. Under normal conditions, the Company strictly limited this practice, since, for example, it was extraordinarily costly to drive a single item from Seattle to Florida, rather than just making sure the item was in-stock in Florida.  But the supply chain was in such poor condition that the Company was forced to lift cross-shipping restrictions in the hopes of improving fill rates, even though that meant less profitable or even unprofitable sales.  CW4 called it "a crazy practice" and said "it was like taking a water-hose to a much bigger problem."  Further, the practice dramatically increased shipping costs, which would wind up significantly impacting into the FM segment's Adjusted EBITDA throughout the Class Period.

46. Throughout Project Firefight, Company and regional management participated in daily "Firefight Meetings," according to CW1, CW2, and CW3, that tracked the progress of Project Firefight. CW1 recalled participating in daily Project Firefight conference calls starting in late August 2016. CW1 said that the daily conference calls usually included DeAngelo, Stengel, and Dan McInerney─ the Company's Vice President of Distribution─and that "anybody who was involved in the supply chain leadership was on those calls." These calls were the initiative of what CW1 called the Strategic Business Development Unit─or "Stengel's baby." DeAngelo participated in these calls "pretty much every day," and asked specific questions about how the individual distribution centers were performing. There was an attendance sheet for each conference call, which typically began between 4 and 5pm and lasted for 45 minutes. The attendance sheets regularly listed DeAngelo and Ali, as well as other senior personnel, according to CW1.

47. In connection with these daily meetings, CW2's team also prepared daily data updates for management, which included in-stock levels of critical products and fill-rates. According to CW1, the data was compiled daily from an internal "data warehouse" system and sent out every morning via emails "for everyone to see." These emails would form the basis of discussions in the

conference calls later the same day. According to CW1, after CW2 left the Company in November 2016, another employee—Jay Thorne—took over for CW2 and continued to send the daily data updates to management.

48.     While HD Supply disclosed in 2016, that FM was experiencing some supply chain problems, Defendants dramatically underplayed them, and assured investors that they were temporary problems that would be remedied quickly. For example, on June 7, 2016, Defendant DeAngelo disclosed that "suboptimal inventory forecasting impacted our ability to deliver" products to customers, but specifically assured investors that the Company had "adjusted the approach," and was "starting to see improvement," and—significantly—that the Company expected "to work through it over the next approximate 3 months," or by September 2016.

49.     Then, on September 7, 2016, HD Supply reported results for the second quarter of 2016, ended July 31, that missed estimates as a result of the ongoing FM supply chain issues. The Company also announced its supply chain would require additional investment going forward. Nonetheless, on the accompanying investor call, DeAngelo reassured investors that, while costs had been larger than expected in the second quarter, the FM supply chain's problems were minor and the situation had improved dramatically. Indeed, to further assure

investors that the Company's most senior officers were personally involved in the supply chain recovery effort, and were closely monitoring its progress, DeAngelo emphasized that he and other senior management were "laser-focused" and "intensely engaged" on this "critical" issue, including "daily" meetings to track the improvements. As a result, DeAngelo stated that the "work" on the supply chain would be completed by year-end:

> …the critical element of our transformation execution is centered on Facilities Maintenance supply chain investment. As we previously disclosed last quarter, as we gain supply chain visibility, we adjusted suboptimal inventory forecast practices, certain operational and distribution strategies. This had implications for [distribution center] capacity, inventory positions and logistics execution. As a result, we took action and disclosed on our last call an estimated 3-month recovery period that was to last into the third quarter. The improvement is ramping up, but is taking longer than original estimate and the recorded costs are larger than expected. We are laser-focused as we work through this and I am intensely engaged.

> We have a daily cadence to accelerate execution by tracking import and domestic delivery consumption, detailed operational metrics, staffing requirements, category level sales performance and other operational elements to compress the cycle time to achieve expected performance standards.

> *      *      *

> We estimate that our work will last through the balance of the year throughout which we will continue to be transparent regarding our progress.

50. In reality, as the Company was ultimately forced to disclose—and as numerous former employees confirmed—by the start of the Class Period, the

supply chain was not only still functioning poorly, but it was in need of a complete overhaul.

**D. The Class Period Begins with Defendants Emphatically Assuring Investors That The Supply Chain Recovery Was "On Track," and That There Were No Surprises Forthcoming**

51. By the start of the Class Period, Defendants were well aware that HD Supply's FM supply chain recovery was failing. Indeed, according to CW1, by that time it was apparent that "the supply chain needed a massive overhaul to meet demand."

52. Nonetheless, Defendants continued to falsely assure investors that the FM supply chain problems were close to being fixed. On November 9, 2016, Defendants DeAngelo and Levitt, on behalf of the Company, participated in the Robert W. Baird Global Industrial Conference. At that conference, Defendant DeAngelo repeatedly represented that the supply chain recovery was "on track" and there had been no surprises whatsoever in their efforts:

> Give you a quick update on our execution. Our work in Facilities Maintenance on our supply chain is on track. We're perfectly position[ed] to enter 2017 and deliver on our commitments of 300 basis points more than market.

53. When analysts at the conference sought further follow up and clarifications regarding the Facilities Maintenance recovery, DeAngelo reiterated that the "supply chain execution to-date has tracked exactly where we thought it

would be" and that "we have no surprises, we're right on track." Defendants claimed the Company would "consistently be able to deliver and every year forward that 300 basis points market outgrowth and at a 1.5 operating leverage." [9]

54. According to former HD employees, however, these assurances were knowingly false. For instance, CW2 stated that the supply chain data that CW2's team prepared specifically indicated that the supply chain recovery was experiencing significant failures and was not where management wanted it to be. CW4, who reported to CW2 and was also part of the team responsible for preparing the underlying data, corroborated CW2's account.

55. In addition to the daily calls with Defendant DeAngelo and Stengel, there were also weekly calls held among directors of all of the distribution centers and the supply chain team in Atlanta. Included on these calls were Ali—who headed the Supply Chain Transformation Team—CW6[10] and CW1. The data and

---

[9] The Company defines operating leverage as a ratio of its Adjusted EBITDA growth to its net sales growth; when operating leverage is higher than 1, profitability grows more quickly than sales revenue, because all costs other than the per-unit cost of each sale have already been met. However, in quarters where Adjusted EBITDA growth was negative, the Company effectively had negative operating leverage, or less than zero.

[10] CW6 was a Manager of Supply Chain Systems, based in Atlanta from August 2016 through January 2017, and worked on the same team as CW1. CW6 also reported to Nazia Ali, the Director of Supply Chain Transformation who reported

progress, or lack thereof, discussed on these calls were regularly communicated up the reporting chain to Stengel and DeAngelo by Ali, according to CW1 and CW6.

56.     In early December 2016, Defendants again assured the market during the Company's 2016 third quarter earnings conference call that the Company's "operational recovery" of its FM supply chain was making "exciting daily progress" and was "at or ahead of expectations."  In reality, however, as numerous former HD Supply employees confirmed, the supply chain was failing to meet internal targets and industry standards for performance, and it was clear that the supply chain needed a complete overhaul in order to meet customer demands.

**E.     In Contrast to Defendants' Statements About the Supply Chain Recovery, 2016 Ended With the FM Supply Chain "Still Fundamentally Broken"**

57.     At the end of 2016, and beginning of 2017, CW1 recalled that, "the supply chain was still fundamentally broken."  CW1 characterized the recovery effort as putting "band-aids over a broken bone," and said that the efforts in Project Firefight had not fixed the underlying weaknesses.

58.     One critical problem Defendants needed to address was the inefficiency of its distribution centers, which had contributed to both fill-rates and

directly to COO Stengel, who was in charge of the supply chain recovery along with Defendant DeAngelo.

in-stock rates falling far below industry standards. Accordingly, Defendants undertook a "re-slotting" program, with the purpose, according to CW5 (and corroborated by CW6) of reorganizing products within each of FM's more than 40 distribution centers. Re-slotting meant rearranging products in the warehouse in the most efficient way; putting fast-moving, high-volume materials on the floor level closest to the shipping dock and relegating the less important product to the back of the building, so that the segment's most important products could be loaded in and out more quickly and easily.

59. Originally, according to CW6, the idea with the re-slotting program was to embark on this process methodically and over time, distribution center by distribution center, starting in Atlanta. But instead of following this plan, Defendants sought to complete the re-slotting of the more than 40 distribution centers all at the same time. According to CW5 the targets, and particularly the timeframe, for re-slotting was simply "not feasible." Further, just as the re-slotting program was getting underway, it quickly became clear to CW6 and her colleagues that re-slotting was never going to be more than a "band-aid" to see the distribution centers out of trouble in the short term.

60. CW5 said that the plan was not realistic due to the lack of key senior supply chain team leaders to supervise its implementation and the fact that "HD

Supply had never looked at something like this. They basically put it on a bunch of inventory analysts to run a multi-million-dollar re-slot project. <u>Everyone knew that this whole re-slot effort after the Firefight was never going to be achieved system-wide because of the lack of experienced personnel to carry it out</u>."

61.     Notably, CW5 shared her reservations about the re-slotting program with her superiors, emphasizing that, "it was a project that never could have been met.  It was too large a scale project to do within the time period."   CW5 and her colleagues also voiced concerns about the poor performance of the re-slotting effort to CW5's superiors at weekly meetings with the whole team in Atlanta and directors of all the main distribution centers, as well as Ali.  Ali, CW1, CW6 and CW5 were all part of these weekly meetings and it was known by the whole team that the information, including the fact that this costly program was going to take significantly more time and resources, was being communicated to management. Indeed, these former employees directly informed Stengel, who in turn worked directly with Defendant DeAngelo in overseeing FM and its supply chain recovery.

62.     Also in December 2016, the Company hired a consulting company called REGIS to audit the inventory of FM's nine largest distribution centers, according to CW1.  The concept of the audit was to make sure that FM's inventory management system was accurately tracking the inventory it had in stock.

According to CW1, the audit revealed that, in fact, FM's inventory management system was in total disrepair, and had accuracy rates as low as 80% for some major distribution centers—far below industry standards of upper 90%s—suggesting a "lack of inventory integrity."  This meant that, in many cases, a full 20% of a distribution center's inventory had not been logged into FM's system.  Thus, not only did FM struggle to fill orders and to keep in-demand product in-stock, it also could not even accurately determine what products it did have stocked.

63.    Thus, by December 2016, DeAngelo, Stengel and other senior executives were well aware of these problems because for months they had (i) received daily metrics updates from the distribution centers, including the in-stock and fill rates; (ii) participated in daily calls regarding Project Firefight and the supply chain recovery's progress; and (iii) discussed the data and progress of the recovery at the "ground level" with numerous employees, including Ali and CW1. The supply chain transformation team, particularly Ali and CW6, had also briefed Stengel on the systemic weaknesses in the supply chain in November 2016, which CW6 characterized as "pull[ing the curtain back a little and r[unning] them through what was happening with distribution center operations."  All of this information directly informed Defendants that the recovery was in chaos, was taking longer than was publicly disclosed, would require additional substantial expenditures to

fix, and was most definitely not "on track." Because of this, said CW1, DeAngelo "would have to have known" how bad things were by December.

64. In addition, according to former employees, HD Supply executive management were in receipt of hard data every day regarding distribution center performance, which made clear the extent of the problems.

**F.    When Directly Confronted With the Truth About the Company's Supply Chain Failures, Management Fired the Messenger**

65. In November 2016, according to CW6, CW6's team, led by Ali, had told Stengel during their supply chain evaluation meetings that FM's distribution centers were not able to function in their current state. Accordingly, in December 2016, Ali—the Company's Director of Supply Chain Transformation—along with CW1 and CW6, prepared an in-depth assessment of FM's ongoing problems and a detailed proposal for correcting them. CW6 stated that he, together with CW1, and Ali, "we had come to the conclusion that it would take as much to fix the existing system as it would to put a whole new system in place to do what we needed to do." They developed a comprehensive proposal for a multi-million-dollar overhaul of the supply chain, which included a proposal for a complete reevaluation of the distribution operations before further steps could even be taken. They also proposed standardizing distribution center operations across the network, and

identifying potential additional locations for distribution centers, beginning with an entire new facility in San Antonio, Texas, to relieve the overstretched Dallas and Houston centers. This effort would clearly require substantial costs and time—far more than anything the Company had publicly announced thus far.

66. The Supply Chain Transformation team met with Stengel, and following that, Ali and Stengel met with Defendant DeAngelo shortly before Christmas 2016, to present the proposal. In the proposal, the Supply Chain Transformation Team recommended the following:

- An undertaking of a broad analysis of how to transform the supply chain, which would entail evaluating the locations of the existing distribution centers, their capacity, the existing systems for inventory control, and "system capabilities," all of which would need to be completed before FM could go any further with the supply chain transformation effort;

- A resulting "Model Distribution Center Project," which would include standardizing operations across the network and identifying where FM would need to build additional distribution centers, beginning with a whole new facility in San Antonio to relieve the Dallas and Houston markets;

- In connection with the San Antonio building project, a review of real estate options in that city, as well as the employment of a consulting firm called Fortna to help with "inside-the-four-walls" design for the distribution centers, starting with onsite visits to both the Houston and San Antonio distribution centers. Fortna would be used to help optimize operations for all new distribution centers as they came on-stream; and

- After the above steps were completed, an evaluation of potential sites for other new distribution centers in each region.

67.     As CW6 remembered, DeAngelo initially approved the plan shortly thereafter, during the week before Christmas.

68.     But just two weeks later, when CW6 returned to work after the start of the New Year, CW6 discovered that, instead of proceeding with the approved plan, Defendant DeAngelo had fired Ali and shelved the entire proposal.  As CW6 said, "something drastic happened between us getting the thumbs-up and our coming back after New Year's."  CW6 further said that "[w]e were completely blindsided. [W]e had a good plan and I think we had the data to back it up."  But DeAngelo had suddenly opted to go in a totally different direction.

69.     CW1 agreed with CW6, saying Ali was terminated because she persisted in giving Stengel and DeAngelo news they did not want to hear, including the persistence of the low in-stock and fill rates.  CW5 further confirmed this, explaining that Ali told senior management that "real changes" had to be made if the Company wanted to deliver on the promises that they were making. But executives "didn't like that, so she was let go."

70.     CW1 also confirmed that senior management at HD Supply did not want to hear bad news about the supply chain recovery efforts―stating that the

culture at HD Supply was "resistant to change" and akin to "we don't like to hear the truth."  This was also confirmed by CW1.

71.    After Ali was terminated, CW6 said it was clear to her that the Company's new approach to fixing the supply chain was far narrower than the plan DeAngelo initially approved, and that basically HD Supply had just decided to continue to muddle through with its existing systems rather than undertaking the more extensive and appropriate restructuring measures that were needed.

72.    Just weeks after Ali was fired for presenting DeAngelo and Stengel with the truth of the disastrous condition FM's supply chain, and the substantial additional cost and time needed to fix it, Defendants publicly stated that the supply chain's problems were "behind us" and that the supply chain was in as "good condition as it's ever been."

**G.    Despite Repeated Assurances, The Company's Supply Chain Recovery Continued to Struggle into 2017**

73.    By the start of 2017, FM's supply chain was still in disastrous shape, and the Company had barely begun to address the underlying problems. As confirmed by CW1, CW5, and CW6, the re-slotting program was barely off the ground by January 2017, in-stock and fill-rates were still abysmal, and the Company still did not have a sufficient, comprehensive plan to fix the FM supply chain.  Yet weeks after Ali was terminated for presenting her team's findings that

the supply chain needed a complete overhaul, Defendants assured the market that the problems were already fixed.

74. Specifically, on February 22, 2017, Defendant Levitt participated in the Barclays Industrial Select Conference. At the conference, Levitt repeatedly told investors that the problems that the FM supply chain had experienced in 2016 had all been fixed, and the supply chain was functioning as well as ever:

> So in 2016, we did have a lot of activities, we moved functional support teams for our target business, our Facilities Maintenance business from San Diego to Atlanta, a lot of activity associated with that and we had a bit of supply chain disruption. <u>All of that's behind us now. Supply Chain [is in as] good condition as it's ever been, all the metrics that we watch on a 24-hour cadence[,] in-stock positions[,] fill-rates are as good or better than they've ever been. And so 2017 is a year of execution.</u>

75. In response, an analyst asked Levitt to help investors "understand what happened to your supply chain . . . How does that happen? How does that happen that you've closed down a headquarters and you wake up all of a sudden [and] say, oh crap, or we messed up…" Levitt responded by confirming what the confidential witnesses cited in this Complaint have said: that, in early 2016, the Company had "under-forecasted demand and then under-ordered inventory"; that it had taken a long time to get sufficient product to correct for the under-ordering; and that when the additional product finally arrived, it put an "enormous strain" on the distribution centers at their busiest time, which materially impacted the

Company's business.  Significantly, however, Levitt again made clear that the problems were entirely in the past, and that FM had pivoted from fixing its supply chain issues to winning back lost business in November 2016:

> ….So that put an enormous amount of strain on our distribution centers, took time to receive that inventory, redistributed across our network of 40 plus distribution centers and have the right in-stock position in the local markets.  <u>That is behind us now, we pivoted from that supply chain recovery to a commercial recovery in November. So [we] feel real good about where we are and the prospects for 2017</u>.

76.    The day after Levitt made these positive statements, HD Supply's stock reached its Class Period high of $44.49 per share.

77.    Yet, by March 2017, according to CW5, FM and Company management "still weren't fixing the issues long-term and they still weren't really getting over the hump."  In fact, the Company was still failing to fulfill orders properly and to manage its supply chain logistics correctly—the same problems that had plagued FM during 2016.

### H.    The Truth Begins to Emerge

78.    On March 14, 2017, the Company issued a press release announcing its results for the fourth quarter and full year ended January 29, 2017.  On the same day, the Company filed its annual report on Form 10-K with the SEC.  Although the Company met analyst estimates for Q4 2016 earnings, Defendants surprised the market by announcing a projected $10 million in additional spending related to the

FM supply chain recovery for Q1 2017. As a result of the additional expenses, HD Supply's stock price fell from a close of $42.68 on March 13, 2017, to a close of $41.02 on March 14, 2017—a drop of nearly 4%—on unusually high volume.

79.     Yet, Defendants continued to insist that these inflated costs were temporary, associated primarily with one-time freight and labor expenses, and that they would not continue into the rest of 2017. FM, DeAngelo insisted, was already "in the second phase of the commercial recovery" (*i.e.*, winning back lost business), and thus he was "confident in our execution and outlook."

80.     Analysts were reassured by DeAngelo's statements. For example, a William Blair research report on HD Supply projected "double-digit EBITDA growth in second half 2017, as one-time costs fall off and FM growth improves." And a Deutsche Bank Markets Research report carried the headline "Favorable growth inflection; long term upside," and emphasized that "[w]ithin FM, the Property Improvement business represents a key area to drive elevated growth and margin upside."

## I.     Defendant DeAngelo Unloads Over $53 Million In HD Supply Stock—80% of His Holdings—In Less Than a Week

81.     Only one month after DeAngelo and Levitt told investors that the supply chain problems were "all behind us," Defendant DeAngelo effectively cashed out of the Company.

82.    Specifically, between March 29, 2017, and April 4, 2017, DeAngelo sold more than 1.3 million shares of HD Supply stock, at prices ranging from $40.26 to $41.28, <u>for total proceeds of more than $53 million</u>.  In a few short days, DeAngelo sold an astonishing 80% of his holdings in HD Supply stock. Significantly, the sales were extraordinarily suspicious in size and in timing— indeed, DeAngelo did not sell a single share of stock during the prior twelve months,[11] and his current liquidation occurred shortly after the Company insisted that their supply chain problems were "behind us," at which point the Company's stock was trading at a Class-Period high.  Moreover, neither DeAngelo nor the Company provided any explanation for why the CEO had cashed out—for example, DeAngelo did not need to sell for tax purposes, and he was not being forced to exercise expiring options.

83.    Defendant DeAngelo's massive stock sales surprised and unnerved even the Company's own employees.  As CW6 recalls, "when [DeAngelo] turn[ed] around shortly after" shelving the supply chain transformation that Ali, CW6 and their team had proposed in December, and began to sell HD Supply stock, "it was

---

[11] The only sale Defendant DeAngelo made during 2016 took place in March, when DeAngelo sold a mere 31,670 shares solely to satisfy mandatory tax withholding requirements, according to SEC Form 4's filed in connection with those transactions.

highly questionable."   Indeed, the sales were so suspicious that, as CW4 recalls, management took the extraordinary step of sending an email to all employees assuring them not to worry that Defendant DeAngelo had nearly cashed out of the Company.

84.   The following charts illustrate the timing, volumes and prices of DeAngelo's stock sales, as well as provide a comparison between DeAngelo's 2017 and 2016 sales:



| DEANGELO'S CLASS PERIOD STOCK SALES | | | | |
|---|---|---|---|---|
| Transaction Date | Shares | Price | Buy/Sell | Proceeds |
| 3/29/2017 | 300,000 | $40.39 | Sell | $12,115,530 |
| 3/30/2017 | 300,000 | $41.09 | Sell | $12,326,070 |
| 3/31/2017 | 300,000 | $41.28 | Sell | $12,384,390 |
| 4/03/2017 | 300,000 | $40.52 | Sell | $12,156,960 |
| 4/04/2017 | 112,145 | $40.27 | Sell | $4,515,956 |
| Total | 1,312,145 | | | 53,498,906 |



**J.  HD Supply Reveals the Truth: The FM Supply Chain Remains Dysfunctional and Requires Substantial Additional Investment**

85.    On June 6, 2017, the last day of the Class Period, HD Supply finally

disclosed the full truth: namely, that the FM supply chain was in much worse shape

than Defendants had previously acknowledged, materially impacting the

Company's operating results, including its most important financial metric. On that day, the Company announced that, for Q1 2017, FM's Adjusted EDITDA had deteriorated dramatically from the same period of the prior year—a drop from $134 million to $117 million, or 13%—the largest decline in HD Supply's history as a public company, precisely because of the supply chain issues. In addition, the Company disclosed that, rather than the problems being "all behind us," the Company would need to spend substantial additional sums in 2017 and 2018 to fix the lingering problems.

86.     Moreover, when analysts pressed Defendants to give more specifics about the newly announced additional FM spending during an earnings conference call that same day, Defendants persistently dodged these questions.

87.     Strikingly, during an exchange with an unidentified analyst, Stengel admitted that the Company's prior representations about its supply chain recovery process had been false, and that, contrary to prior representations, the supply chain's performance had only improved, at earliest, by May 2017, as the Company "exited" the first quarter of 2017:

> *Unidentified Analyst*
> Just switching back to facilities maintenance; I know you've had some operational issues which you've highlighted in multiple calls. Could you just give us kind of an update on where you stand on that; specifically delivery rates, on-time deliveries, any other sort of metrics to provide some clarity?

*William Stengel*

Yes, those are all legacy issues for us so we're very focused on moving forward. All of our operating metrics are as good or better than they were in the past, so think about that as a past chapter in the history and we're focused on moving forward. So I get daily dashboards, we've got a daily cadence with the team, we've got new talent into the operations of the business, every single part of the operations is performing at elevated levels; so totally comfortable with where we are there.

*Unidentified Analyst*

Okay. And was that the case in the first quarter, did you perform at those levels or did you get there kind of exiting the quarter?

*William Stengel*

I would say we got there exiting the quarter.

88.    In response to these stunning disclosures, analysts excoriated the

Company's credibility.  For example, Deutsche Bank issued a report on June 9,

2017, titled "Downgrading to Hold; Credibility Crunch," which stated:

We believe that HD Supply management credibility has now become an impediment to a sustained higher share price. The company missed 1Q17 consensus targets and lowered the year after last year's misses and repeatedly professed high confidence in the company's profit trajectory and associated contribution leverage. Instead, HD Supply took down its profit leverage targets while simultaneously called out a sizeable ramp in Facilities Maintenance investment spending for which details and magnitude were not articulated.

Overall, it is unclear when the new elevated spending might subside, and could instead go on for years.

89.    Similarly, an RBC Capital Markets report issued on June 7, 2017,

stated that "[t]he most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call," and that "the key new development that appears to have spooked investors was Outperform-rated HD Supply's admission that it needed to invest more than previously expected in FM…."

90.     As a result of the June 6, 2017 disclosures, HD Supply's share price plummeted $7.24 per share, or 17.5%, from a close of $41.27 per share on June 5, 2017 to a close of $34.03 per share on June 6, 2017.  The stock continued trading lower the next day, dropping an additional $1.22 per share, or 4%, to $32.81 per share on June 7, 2017—representing a two-day drop of over 20%, and wiping out more than $1.7 billion in market capitalization.

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     The November 9, 2016 Robert W. Baird Global Industrial Conference

91.     On November 9, 2016, the first day of the Class Period, Defendants DeAngelo and Levitt took part in the Robert W. Baird Global Industrial Conference.  During the conference, Defendant DeAngelo assured investors that the FM segment's recovery was going smoothly: "<u>[o]ur work in Facilities Maintenance on our supply chain is on track</u>."

92.     Asked whether any unexpected problems had come up in the prior sixty days, Defendant DeAngelo responded" [w]e've had nothing new and interesting negative…no surprises whatsoever." Defendant DeAngelo further elaborated that the "supply-chain execution to-date tracked exactly where we thought it would be, so we're essentially through the balance of the supply chain." Similarly, regarding HD Supply's "commercial recovery," DeAngelo stated that "[w]e have no surprises, we're right on track."

93.     During the conference, one analyst asked whether DeAngelo foresaw any additional, as yet undisclosed costs as part of the FM segment's recovery: "Is there anything from this point forward that is going to flex up in the P&L or are all the costs in at this point?" In response, DeAngelo stated: "All the costs are in at this point."

94.     Analysts took DeAngelo's statements as a sign that the FM segment's problems were behind it. For example, a November 9, 2016 Credit Suisse report titled "Back on the Right Track; Reiterate Outperform," stated that:

> additional costs related to getting the FM segment back on track appears on target and on time. After Q2, we thought issues sounded temporary (vs. structural) and today's update gives us confidence in our initial belief.

95.     The statements in paragraphs 91 through 93 were false and misleading because by November 2016, Defendants knew that the FM supply chain recovery

was not "on track"; indeed, as CW1 confirmed, the supply chain was "still fundamentally broken" and the Company had only applied "band-aid" solutions. Further, the Supply Chain Transformation team headed by Ali was able to determine from available data that "it would take as much to fix the existing system as it would to put a whole new system in place to do what we needed to do," according to CW6. Moreover, as multiple confidential witnesses confirmed, DeAngelo and other management were in receipt of daily data updates and participating in daily calls about the supply chain recovery, from which they were learning that FM was not meeting the Company's internal targets for progress in the recovery, including for key metrics such as fill-rates and in-stock rates. And further, by November 2016 it was already apparent that additional time, planning and expenditures would be necessary to fully resolve FM's supply chain issues, and thus all costs were not "in" by that point.

## B. Third Quarter 2016 Results

96. On December 6, 2016, HD Supply issued a press release announcing its third quarter 2016 financial results. Immediately following the earnings announcement, HD Supply held an investor conference call to discuss its Q3 2016 financial results. During the call, Defendant DeAngelo highlighted that "the operational recovery of our Facilities Maintenance supply chain continues to make

exciting daily progress and the teams are executing at or ahead of expectations," and that "[t]he key daily metrics have seen strong recovery since last earnings call and are now operating at or better from the first quarter 2016 levels."

97.    Defendant DeAngelo further reiterated that "[w]e are on track" regarding the supply chain recovery process, and that the FM supply chain recovery was "tracking exactly where it should be."

98.    An analyst asked what Defendant DeAngelo and Stengel were doing "to make sure that you don't run into these cost overruns that you experienced this year [in FM] . . ."  DeAngelo responded that the Company had been buying inventory and "ensuring it is perfectly deployed," that "every 24 hours…we're looking at is stuff in the right place for tomorrow's sales and for that selling season," and that "we have an integrated end-to-end approach, plus our demand planning is now systematic versus manual."  These things, DeAngelo said, "allow us to be successful coming into the selling season."

99.    Analysts responded favorably to these reassurances.  On December 6, 2016, Wells Fargo issued a report entitled "HDS: Facilities Maint Back on Track— Raising Ests & Valuation."  The report stated that "we believe there were some lingering concerns regarding Facilities Maintenance" but that "[m]anagement did a credible job dispelling those concerns, in our view, adding to our level of

confidence heading into FY17."

100. The statements in paragraphs 96 through 98 were false and misleading because by December 2016, Defendants knew that the FM supply chain recovery was not "on track" or "tracking exactly where it should be." Indeed, as multiple confidential witnesses confirmed, DeAngelo and other management were in receipt of daily data updates and participating in daily calls about the supply chain recovery, from which they learned that the FM supply chain was not meeting the Company's internal targets for progress in the recovery, including for key metrics such as fill-rates and in-stock rates. Further, an external inventory audit had shown that the Company's inventory management system didn't even have an accurate count of the inventory in its largest distribution centers.

101. Moreover, by December 2016, the Company had still not addressed the underlying problems in the supply chain, which was "still fundamentally broken"; rather they had only "throw[n] bodies at the problem" and put "band-aids over a broken bone." Indeed, in December 2016, the Supply Chain Transformation team headed by Ali informed senior management, including Defendant DeAngelo, that the supply chain problems had not been fixed, and in fact the supply chain required a complete overhaul, and told management that "it would take as much to fix the existing system as it would to put a whole new system in place to do what

we needed to do."

## C. The February 22, 2017 Barclays Industrial Select Conference

102.   On February 22, 2017, HD Supply management spoke at the Barclays Industrial Select Conference. Defendant Levitt unequivocally assured investors that the "supply chain disruption [is] behind us now. Supply chain is in as good condition as it's ever been, all the metrics that we watch on a 24-hour cadence in-stock positions, fill rates, as good or better than they've ever been."

103.   In response, an analyst asked Levitt to "help people understand what happened to your supply chain . . . How does that happen? How does that happen that you've closed down a headquarters and you wake up all of a sudden [and] say, oh crap, or we messed up . . ." Levitt responded by citing the Company's seasonal demand variances, forecasting and ordering deficiencies, and late arrival of overseas inventory orders, all of which resulted in "strain on our distribution centers." Significantly, however, Levitt again emphasized: "[t]hat is behind us now, we pivoted from that supply chain recovery to a commercial recovery [*i.e.*, a recovery of lost business] in November."

104.   The statements in paragraphs 102 through 103 were false and misleading because Defendants knew that, in fact, FM's supply chain operational problems were ongoing and not "behind" the Company, or even close to being

fixed.  Indeed, as described further at § V.I, *infra*, only two months prior to these statements, the Supply Chain Transformation Team had presented Defendant DeAngelo with a detailed report and recommendation demonstrating that the FM supply chain still required a complete overhaul in order to meet customer demands. Further, Stengel would later directly contradict Defendants' representations that the supply chain problems were "behind us" by February 2017, instead stating that FM's supply chain only returned to proper performance exiting the first quarter of 2017, or around May 2017, at the earliest.

### D.    Fourth Quarter and Full Year 2016 Results

105.  On March 14, 2017, before market open, HD Supply issued a press release announcing its results for the fourth quarter and full fiscal year ended January 29, 2017.  The Company had met analyst estimates for earnings per share; however, it announced lowered Adjusted EBITDA guidance due to FM supply chain problems.

106.  The same day, before market open, the Company held its Q4 2016 earnings call with analysts and investors.  During the call, Levitt announced an increase in the projected spending needed in the first quarter of 2017 associated with the supply chain recovery, stating:

> Our first quarter [Adjusted] EBITDA guidance includes approximately $10 million of costs associated with 2016 Facilities

Maintenance supply chain recovery including $2 million associated with labor we opted to retain through a lower sales volume quarter to be prepared for the upcoming selling season[,] $5 million associated with freight expense and $3 million associated with rent expense contributed to real estate secured to expand distribution center capacity.

107. On the news, HD Supply's stock price fell from a close of $42.68 on March 13, 2017, to a close of $41.02 on March 14, 2017—a drop of nearly 4%—on unusually high volume.

108. Nonetheless, in spite of these disclosures, Defendant DeAngelo assured investors that the increased spending was temporary, that residual supply chain defects were "<u>behind us</u>," that FM had "significant momentum," and that FM had "<u>pivoted into a commercial recovery</u>," *i.e.*, a push to win back previously lost business:

> First, I want to give an update on <u>our Facilities Maintenance commercial recovery, which continues to make solid progress</u>. As a reminder, our Facilities Maintenance supply chain interruption began with the under-ordering of inventory in advance of the 2016 spring and summer selling seasons. Corrective action was taken to adjust ordering in 2016, which resulted in an atypical amount of inventory, primarily long lead import inventory arriving at our distribution centers during the busy summer selling season. As a result, our distribution center resources were stretched beyond the ordinary course capacity and <u>it took until November of 2016 to process the inventory into our network and rebalance it throughout the country to perfectly meet our local customer promise</u>.
>
> On our third quarter call, <u>we confirmed that the rebalancing phase was behind us and that we have pivoted into a commercial recovery</u>. The

three phases of our commercial recovery are progressing as we expected.

*    *    *

Our February performance of Facilities Maintenance was also in line with our expectations. Facilities Maintenance has significant momentum.

109. Asked if he was "confident in the progress that you are making," with FM DeAngelo responded "Yes, 100%." And finally, an analyst asked DeAngelo whether it was "still your expectation that Facilities Maintenance growth can get to mid-single digits by May as we start to hit the easier comparisons and the rental cycle picks up?" DeAngelo responded "Yes, that's great."

110. Analysts expressed some surprise at FM's sudden announcement of higher than previously stated supply chain recover costs, but ultimately continued to give credence to Defendants' reassurances. For example, as a March 14, 2017, William Blair report stated:

> **What you need to know:** Fourth-quarter results met Street expectations, but first-quarter guidance was 6% below consensus due to higher Facilities Maintenance (FM) costs. Shares traded down 4% given another negative surprise and pushout of improved FM results. Some clients are beginning to question if there is more going on than HDS is letting on, but we do not think so. Management was clear that operating leverage would recover starting in the second quarter.

*    *    *

**Recovery of FM sales and EBITDA margins the main focus.**
Management said FM is progressing as expected and guided to better
FM operating leverage starting in the second quarter.

111.    The statements referenced in paragraphs 105 through 106 and paragraphs 108 through 109 were materially false and misleading because Defendants knew that the FM supply chain still required substantial investments, and thus the operational recovery of the supply chain was in no way "behind us." Further, FM clearly had not "rebalanced" all of its inventory "throughout the country to perfectly meet our local customer promise."  Moreover, the Company had not "pivoted" to a purely "commercial recovery," as its supply chain was still not equipped to deal properly with existing demand, and thus it could not yet "fill those orders as they come."  Defendants had in fact refused to implement the recommendations of the Supply Chain Transformation team that were needed to get the supply chain into the condition needed to meet industry standards.  Further, as CW5 confirmed, by March 2017, FM "still [wasn't] fixing the [supply chain] issues long-term and they still weren't really getting over the hump," and was continuing to struggle to fill customer orders and meet customer expectations. Defendants also could not have reasonably expected that FM growth could get to "mid-single-digits by May." Indeed, just three months later HD Supply would

report that FM Adjusted EBITDA had actually declined an unprecedented 13% in the first quarter of FY 2017, compared to the same quarter prior year.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

112. The facts set forth herein, viewed collectively, give rise to a strong inference that the Individual Defendants acted knowingly, or at least recklessly, when they concealed from the market the material negative news that HD Supply's FM segment supply chain recovery was not "on track," that its problems were not "behind" them, and that the supply chain was not in as "good condition as it's ever been." Instead, Defendants knew throughout the Class Period that the Company's supply chain required an overhaul that could take years to complete, and that in the meantime, increased spending and decreased sales would seriously diminish the segment's bottom line.

### A. DeAngelo's Own Statements Made Clear that Defendants Knew of the Supply Chain Problems and the Time and Expense Required to Fix Them

113. Throughout the Class Period, Defendant DeAngelo served as the interim CEO of the FM segment. By his own admissions, DeAngelo knew of the lingering supply chain issues during the Class Period, as he was involved in every step of the FM segment and its purported recovery, including daily discussions and meetings about the progress of that recovery. For example, on September 7, 2016,

DeAngelo told investors that "we are laser-focused" and "intensely engaged" in the supply chain recovery. And on November 9, 2016, the start of the Class Period, DeAngelo explained:

> Our cadence for executing our supply chain improvements and executing our commercial recovery is a 24-hour cadence. <u>So every 24 hours we get together, we look at every element of the business</u>.

114. DeAngelo further confirmed that he led the FM recovery leadership team in conjunction with Will Stengel, and Chief Sales Officer, Steve Margolius. In doing so, DeAngelo stated:

> Will is the Chief Operating Officer for Facilities Maintenance. So has a very big job. He runs all the support functions and all the support execution required for a sales team to be effective. And Steve Margolius is the Chief Sales Officer and he is solely focused on how am I going to grow. <u>So between Will, myself, and Steve, I mean we're the operating entity for Facilities Maintenance</u>.

115. And again in December, during the Company's Third Quarter 2016 Earnings Conference Call, Defendant DeAngelo reaffirmed his involvement and daily knowledge of the FM recovery process and its progress.

> <u>The executive leadership continues to drive daily execution calls with our extended supply chain teams to track key operational metrics, gauge daily progress and prioritize actions to drive coordinated performance across the country</u>. The key daily metrics have seen strong recovery since last earnings call and are now operating at or better from the first quarter 2016 levels.

**B.  Former Employees Confirm Defendants' Knowledge and More**

116.  As further described above, Defendants' direct knowledge of the truth regarding the poor progress of FM's supply chain recovery and its seemingly ever-growing costs was confirmed by several former employees who were personally involved in the FM supply chain recovery process.

117.  For example, CW2 and CW4 were personally responsible for compiling the data on Distribution Center in-stock and fill rates that were sent daily to Stengel and DeAngelo in advance of their daily meetings.  As CW2 said, and CW4 confirmed, the supply chain recovery progress "was not where management wanted [it] to be."

118.  The reports prepared by CW2 and CW4 were reviewed by CW1, who participated in the daily recovery meetings with Ali, Stengel, DeAngelo and "anybody who was involved in the supply chain leadership."  The daily calls were scheduled on HD Supply's internal electronic Microsoft Outlook calendar.  There was an attendance sheet associated with each conference call meeting and, as recounted by CW1, DeAngelo was definitely listed on the attendance sheets.

119.  The subject matter of the daily calls, says CW1, concentrated on keeping tabs on different kinds of inventory at the nine biggest distribution centers and were backed up by emails with spreadsheets and data documenting the

Company's supply chain progress, or lack thereof. DeAngelo actively participated "pretty much every day," according to CW1.

120. The daily data Defendants received also informed them that the Company's "re-slotting" program was failing. As CW5 stated, "<u>anyone with access to the data knew exactly what was going on</u>."

121. As described above, DeAngelo and Stengel were told in December 2016 about the poor status of the FM supply chain recovery and the costs that were required to fix it when Ali and CW6 presented their detailed proposal for a multi-million-dollar overhaul of the supply chain, which they believed necessary for FM to get back to where it had been performing before the supply chain troubles started. But management deliberately disregarded these findings and, shortly after the presentation, fired Ali.

### C. The FM Supply Chain Was the Most Critical Aspect of HD Supply's Business During the Class Period

122. As described above, the FM segment comprised more than 50% of the Company's Adjusted EBITDA—one of the Company's most important financial metrics—during FY 2016, and has contributed approximately 75% of the Company's Adjusted EBITDA since HD Supply's 2017 sale of its Waterworks unit. As such, the FM segment is essential to HD Supply.

123. FM's supply chain is, in turn, the make-or-break factor in its business as a distributor. FM's strategy is to compete on speed and product availability rather than price. In other words, its ability to keep products in stock, to fill orders quickly, and to accurately monitor its supply chain, are the main factors in its ability to gain advantage over competitors. When the Company's supply chain fell apart in 2016, drops in the Company's fill-rates and in-stock rates led to dramatic declines in the Company's Adjusted EBITDA—a metric that had until then been rapidly growing.

124. Given the FM supply chain's importance, it is inconceivable that Company management, including the Individual Defendants, were unaware of the deficiencies in the supply chain recovery process. Indeed, as stated above, prior to and throughout the Class Period, Defendants emphatically proclaimed HD Supply's FM Supply Chain to be the most critical aspect of its business, and said that the supply chain recovery was crucial to the Company's success. For example, in HD Supply's Q2 2016 Earnings Call on September 7, 2016, DeAngelo stated that "the critical element of our transformation execution is centered on Facilities Maintenance Supply Chain Investment." Aware of the significance of the supply chain recovery to investors, DeAngelo assured them that he was "laser-focused" on the supply chain improvements and "intensely engaged," stating:

I am confident that <u>these are essential structural changes and precise execution cadence positioned Facilities Maintenance for long-term profitable growth</u>. <u>Supply chain execution is our priority</u>, including network design and DC productivity. Our supply chain transformation through digitally enabled performance will remove friction points concurrently improving our customers' overall experience, accelerating profitable growth and reducing cost. We know what we need to do and are energized to transform our capabilities.

125.  Further, throughout the FM recovery and the Class Period, substantial portions of each of the Company's investor conference calls were focused on FM and its supply chain recovery, often with multiple analysts asking questions about its progress.  For example, of the nine analysts that participated in the Company's 2Q 2016 earnings conference call on September 7, 2016, eight sought clarification from Defendants on the status of FM's supply chain or its impact on the Company's adjusted EBITDA.  The same strong focus on FM's supply chain recovery by analysts continued in earnings calls throughout the Class Period.

126.  Analyst reports also featured the FM supply chain as essential to the Company's profitability and competitiveness, and many of them highlighted FM's supply chain issues *in their headlines* during the Class Period.  For example, a November 2016 RBC Capital Markets report was titled "HDS—Guidance Tweaked Higher for F3Q16; FM Supply Chain 'On Track'."  A March 2017 RBC Capital Markets report on HDS cited FM and its supply chain issues within its top

two "key points." A March 2017 Deutsche Bank report opened with a statement that the Company was "upbeat regarding its prospects to return to FM outgrowth of ~300 bps" and focused first on FM's anticipated operating leverage.

127. Given the importance of FM and its supply chain to the Company's *financial* performance, it is clear that not only DeAngelo, but also Levitt—the Company's CFO—was intensely focused on the supply chain's problems and the costs to fix them, and therefore knew that the statements pleaded herein were false. Levitt himself made statements about the progress of the supply chain recovery, including that FM's supply chain problems were "behind us" and that FM had "pivoted from that supply chain recovery to a commercial recovery [*i.e.*, a recovery of lost business] in November"; and also made frequent statements about the costs associated with the supply chain recovery and its impact on the Company's financials.

**D.  Insider Stock Sales by DeAngelo Were Highly Unusual in Scope and Timing, and Raise a Strong Inference He Had the Motive and Opportunity to Withhold and Delay the Disclosure of HD Supply's Struggling FM Segment Recovery**

128. As set forth in § V.I *infra,* just weeks after assuring investors that FM's supply chain issues were effectively resolved, DeAngelo unloaded 80% of his HD Supply holdings in a five-day selling spree beginning March 29, 2017, selling 1.3 million shares in total and netting himself more than $53.4 million in

proceeds.  In the prior year, Defendant DeAngelo had made no sales of HD Supply stock other than two small, mandatory tax sales totaling less than 32,000 shares.



129.   The massive volume and suspicious timing of DeAngelo's stock sales were so disconcerting that they forced the Company to take the unprecedented step of emailing all of its employees to tell them not to worry about the transactions, in an attempt to quash internal suspicion, according to CW4.

130.   DeAngelo's sales contribute further to a strong inference of scienter, taking place shortly after he made false statements about FM's supply chain recovery, at a time when myriad other facts confirm that he knew the supply chain's true condition.   In fact, as explained above, Stengel himself explicitly confirmed at the end of the Class Period that the FM supply chain did not begin to

function properly until May 2017 at the earliest (the end of the fiscal quarter), after DeAngelo had unloaded his 1.3 million shares.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

131. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired HD Supply common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of HD Supply and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

132. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, HD Supply's common stock were actively traded on the NASDAQ, an open and efficient market, under the symbol "HDS." Millions of HD Supply shares were traded publicly during the

Class Period on the NASDAQ.  As of June 2, 2017, HD Supply had 202,659,525 shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by HD Supply and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

133.  Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134.  Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and have retained counsel competent and experienced in class and securities litigation.

135.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)  whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)  whether Defendants participated in and pursued the common course of conduct complained of herein;

c)  whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, and performance of HD Supply's FM segment;

d) whether the market price of HD Supply common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

e) the extent to which the members of the Class have sustained damages and the proper measure of damages.

136. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. UNDISCLOSED ADVERSE FACTS

137. The market for HD Supply's common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, HD Supply's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and the other members of the Class purchased or otherwise acquired HD Supply's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to HD Supply,

and have been damaged thereby.

138.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HD Supply's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business practices, financial condition, and the condition of its supply chain, as alleged herein.

139.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about HD Supply's business practices, financial condition, and the condition of its supply chain.

140.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common

stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## X.     LOSS CAUSATION

141.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of HD Supply's common stock and operated as a fraud or deceit on Class Period purchasers of HD Supply's common stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of HD Supply's common stock fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of HD Supply's common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

142.   By failing to disclose the true state of the Company's supply chain issues and the investments, both temporal and financial that would be necessary to

fix them, Defendants presented a false and misleading picture of HD Supply's business and financial success. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused HD Supply to conceal the truth.

143. Defendants' false and misleading statements had the intended effect and caused HD Supply's common stock to trade at artificially inflated levels throughout the Class Period, with HD Supply common stock reaching as high as $44.49 on February 10, 2017, or $41.13 on March 30, 2017, the time Defendant DeAngelo sold off 80% of his HD Supply holdings. On the trading day before the truth of Defendants' fraud was first revealed, March 13, 2017, HD Supply common stock closed at $42.68. On the last trading day before Defendants' fraud was ultimately revealed, June 5, 2017, HD Supply common stock closed at $41.27.

144. Defendants' disclosures on March 14, 2017 and June 6, 2017 revealed to the market the false and misleading nature of Defendants' statements and omissions. On March 14, 2017, Defendants revealed that the FM supply chain recovery was not completed as previously stated, but instead $10 million of additional expenses was needed to get the supply chain recovery to completion. In response to Defendants' March 14, 2017 partial disclosure, the price of HD Supply common stock materially declined from a close of $42.68 on March 13, 2017, to a

close of $41.02 on March 14, 2017—a drop of nearly 4% on unusually high volume of 5.75 million shares, as compared with less than half that volume on March 9 and 10, 2017.

145. Then on June 6, 2017, Defendants revealed the full truth of their fraudulent conduct when they disclosed (a) that the supply chain problems and prolonged recovery process had caused a $17 million decline in FM's Q1 Adjusted EBITDA as compared to the same quarter the previous year—the largest such drop in HD Supply's history as a public company; and (b) FM's supply chain would require substantial additional investment during the remainder of the year and into the following year in order to fully recover. In response to Defendants' June 6, 2017 disclosures, the price of HD Supply common stock plummeted by more than 20% over the next two days, from a close of $41.27 on June 5, 2017, to a close of $34.03 on June 6, 2017, and then to a close of $32.81 on June 7, 2017.

146. The drastic decline in the price of HD Supply's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of HD Supply's common stock price declines negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-

specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of HD Supply's common stock and the subsequent decline in the value of HD Supply's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

147. At all relevant times, the market for HD Supply's common stock was an efficient market for the following reasons, among others:

    a)    HD Supply common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

    b)    As a regulated issuer, HD Supply filed periodic public reports with the SEC and the NASDAQ;

    c)    HD Supply common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d) HD Supply regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

148. As a result of the foregoing, the market for HD Supply's common stock promptly digested current information regarding HD Supply from all publicly available sources and reflected such information in HD Supply's stock price. Under these circumstances, all purchasers of HD Supply's common stock during the Class Period suffered similar injury through their purchase of HD Supply's shares at artificially inflated prices and a presumption of reliance applies.

149. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding HD Supply's business practices, financial condition, and the condition of its supply chain—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered such information important in the making of investment decisions.

## XII.  NO SAFE HARBOR

150.  The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, including the condition of the Company's FM supply chain at the times the statements were made, the progress of the supply chain recovery as of the times the statements were made, and the success of FM and its supply chain in meeting objective and quantifiable internal targets and industry standards at the times the statements were made.

151.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

152.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants

are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of HD Supply who knew that the statement was false when made.

## XIII. COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

153. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

154. This Count is asserted on behalf of all members of the Class against all Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

155. During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156.    These Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, the Company's statements concerning the supply chain recovery progress, its inventory management and the costs associated therewith.

157.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class;  made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the above statements intentionally or with a severely reckless disregard for the truth which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the costs associated with HD Supply's supply chain and FM segment recovery, the progress of that recovery and the

recovery's effects on HD Supply's earnings; (b) artificially inflate and maintain the market price of HD Supply common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase HD Supply common stock at artificially inflated prices and suffer losses when the true facts became known.

158. Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements and omissions from:

  a) the November 9, 2016, Robert W. Baird Global Industrial Conference

  b) the December 4, 2016, Third Quarter 2016 Earnings Conference Call

  c) the February 22, 2016, Barclays Industrial Select Conference

  d) the March 9, 2017, Q4 and FY 2016 Earnings Conference Call

159. HD Supply is liable for the false and misleading statements and omissions made in press releases and during conference calls with investors and analysts, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

160. Defendant DeAngelo and Levitt benefited from making these false and misleading statements. DeAngelo benefited from insider stock sales of

personally held or controlled HD Supply stock at artificially inflated stock prices—
DeAngelo's proceeds during the Class Period were $53,498,906.

161. As described above, the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

162. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at HD Supply, which resulted in continuous and material misrepresentations about the Company's recovery progress, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

163. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for HD Supply common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiffs and the Class would not have purchased HD Supply common stock at the prices they paid, or at all, if they had been aware that the market price was being artificially and falsely inflated by these Defendants' misleading and incomplete statements.

164.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of HD Supply common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) of the Exchange Act
### (Against Defendants DeAngelo and Levitt)

165.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

166.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

167.    During their tenures as officers and/or directors of HD Supply during the Class Period, each of these Defendants was a controlling person of the Company within the meaning of § 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of HD Supply, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made during

the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

168.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants DeAngelo and Levitt had direct involvement in the day-to-day operations of the Company, and in overseeing, reviewing and managing supply chain recovery efforts, as explicitly admitted by DeAngelo himself.  Defendants DeAngelo and Levitt were directly and personally involved in providing false information to or omitting material information from the market during the Class Period.  As a result of the foregoing, Defendants DeAngelo and Levitt, as a group and individually, were controlling persons of HD Supply within the meaning of § 20(a) of the Exchange Act.

169.    As set forth above, HD Supply violated § 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of HD Supply and as a result of their own aforementioned conduct, Defendants DeAngelo and Levitt are liable pursuant to § 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired HD Supply common stock.  Moreover, as detailed above, during the Class

Period while these Defendants served as officers and/or directors of HD Supply, each of these Defendants was culpable for the material misstatements and omissions made by HD Supply, including such misstatements and omissions concerning the Company's supply chain recovery progress and costs, as set forth above.

170. As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of HD Supply common stock.

## XIV. **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XV.   **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

DATED: November 16, 2017          Respectfully Submitted,

**SAXENA WHITE P.A.**
*/s/ Steven B. Singer*
Steven B. Singer (admitted *pro hac vice*)
Joshua H. Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

-and-

Maya Saxena
Joseph E. White, III (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Kenneth M. Rehns
150 East Palmetto Park Road
Suite 600
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
krehns@saxenawhite.com

*Lead Counsel for Lead Plaintiffs and the Class*

**LINDSEY & LACY, PC**
W. Thomas Lacy
2002 Commerce Dr. N. Suite 300

Peachtree City, GA 30269
Telephone: (770) 486-8445
Facsimile: (770) 486-8889
tlacy@llptc.com

***Local Counsel for Lead Plaintiffs***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 16, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 16, 2017       */s/ Steven B. Singer*
Steven B. Singer (admitted *pro hac vice*)
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

## CERTIFICATE OF TYPE SIZE COMPLIANCE

I hereby certify that on this date, I electronically filed the foregoing pleading (prepared in Times New Roman 14-point font) with the Clerk of the Court using the CM/ECF system.

*/s/ Steven B. Singer*
Steven B. Singer (admitted *pro hac vice*)
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com