**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE HD SUPPLY HOLDINGS, INC. SECURITIES LITIGATION | * * * * * | CONSOLIDATED CASE NO. 1:17-CV-02587-ELR |

**ORDER**

Presently before the Court is Defendants' Motion to Dismiss. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion.

## I. Background

Lead Plaintiffs[1] are City Pension Fund for Firefighters & Police Officers in the City of Miami Beach, Pembroke Pines Pension Fund for Firefighters and Police Officers, and Hollywood Police Officers' Retirement System. Defendants are HD Supply Holdings, Inc. ("Company" or "HD Supply"), and Joseph J. DeAngelo and Evan J. Levitt ("Individual Defendants"). Plaintiffs bring suit on behalf of all investors who purchased or otherwise acquired HD Supply common stock between

[1] In an Order entered on October 19, 2017, the Court consolidated City of Hollywood Police Officers' Retirement Systems v. HD Supply Holdings, Inc., Case No. 1:17-cv-02587-ELR and Ebisike v. HD Supply Holdings, Inc., Case No. 1:17-cv-02984-ELR, closing the latter case and making all future filings in Case No. 1:17-cv-02587-ELR. [Doc. 33].

November 9, 2016 and June 5, 2017, inclusive ("Class Period"). Plaintiffs bring this suit on behalf of themselves and all others similarly situated to recover losses suffered from Defendants' alleged violations of federal securities laws.

HD Supply is one of the largest commercial distributors in North America, providing products and services to approximately 500,000 customers across a variety of industrial sectors. The Company's business is concentrated in three segments, with the most important being its Facilities Management ("FM") division. As a commercial distributor, the FM segment's lifeblood is its supply chain, which provides it with the ability to obtain the products needed by its customers on a timely basis, and its ability to deliver those products to its customers.

Defendant DeAngelo has served as HD Supply's President and Chief Executive Officer ("CEO") since January 2005, and as Chairman of the Board of Directors since March 12, 2015. DeAngelo also served as the interim CEO of the Company's FM segment from September 2015 until June 5, 2017, when William Stengel was appointed CEO of FM. Defendant Levitt served as HD Supply's Senior Vice President, Chief Financial Officer ("CFO"), Chief Administrative Officer, and Comptroller during the Class Period.

The Court will discuss Plaintiffs' detailed allegations below, but provides here a general summary of the facts Plaintiffs assert in their complaint as part of their allegations:

> 5. In the months leading up to the Class Period, FM's supply chain experienced significant failures after relocating its headquarters cross-country and laying off nearly all of its supply chain employees. FM under-ordered inventory for its busy selling season, then, upon realizing its problems, over-ordered to compensate, which, according to former employees directly involved in the supply chain process, "paralyzed" the Company's distribution centers as the FM business struggled to process the excess incoming inventory and fill customer orders at the same time. As a result, the FM segment failed to fulfill orders, incurred massive additional expenses, and lost numerous customers and sales. These failures also exposed systemic problems in the segment's supply chain, and left FM floundering to clear its inventory and struggling to return to normal operations.
>
> 6. Significantly, following FM's operational breakdown, Defendants guaranteed the market that HD Supply was successfully implementing measures to rectify its supply chain deficiencies, and that any inventory delays and expenditures would be quickly resolved. Indeed, Defendant DeAngelo emphasized that he and the rest of the Company's senior executives were "laser focused" and "intensely engaged" on the recovery. On November 9, 2016—the start of the Class Period—Defendant DeAngelo appeared at the Robert W. Baird Global Industrial Conference, where he assured investors that the most serious deficiencies in FM's supply chain had been fixed, that the Company's "supply-chain execution" had "tracked exactly where we thought it would be," and that the recovery process was "on track." When analysts pressed for further information, DeAngelo reiterated that "we have no surprises, we're right on track," and that the Company was "perfectly positioned" to deliver strong results in 2017.
>
> 7. Throughout the Class Period, Defendants repeated these assurances. On February 22, 2017, Defendant Levitt appeared at the Barclays Industrial Select Conference, where he further made clear that the problems that had affected the FM supply chain in 2016 had been

rectified. Levitt acknowledged that the Company suffered "a bit of a supply chain disruption" in 2016, but emphasized that "[a]ll of that's behind us now. Supply chain is in [as] good condition as it's ever been[.]" Levitt further added that the Company had "pivoted from that supply chain recovery to a commercial recovery in November," and that the Company felt "real good about where we are and the prospects for 2017." Levitt's assurances had their intended effect on investors: on February 23, 2017, the day after he spoke at the Barclays conference, the price of HD Supply stock reached its Class Period high of $44.49 per share.

8. Just one month later, with the stock still trading close to its Class Period high, Defendant DeAngelo liquidated virtually his entire stake in the Company at prices that were artificially inflated by Defendants' fraud. Beginning on March 29, 2017, and continuing over the course of a mere five days, DeAngelo unloaded 1.3 million shares, or 80% of his holdings in HD Supply, for proceeds of almost $54 million. Not only were these sales massive in scale, they were also extraordinarily suspicious in scope and timing. Indeed, DeAngelo had not sold a single share of HD Supply stock in the previous twelve months, and he dumped his stake just one month after Defendants falsely assured investors that the problems that had impacted FM's supply chain in 2016 were "behind us now." Moreover, DeAngelo gave no explanation for the liquidation, and no market-related rationale—such as tax obligations or expiring options—was readily apparent. DeAngelo's stock sales were so large and suspicious that HD Supply took the extraordinary step of emailing its employees to assure them that, despite his liquidation of stock, DeAngelo had not lost confidence in the Company.

9. In reality, Defendants knew full well that the problems that had impacted the FM supply chain were not "behind us now," and that, in stark contrast to Defendants' public statements, the supply chain was not in "as good condition as it's ever been." Indeed, former high-ranking Company employees, each of whom were personally involved in the supply chain recovery effort, confirmed that by November 2016 at the latest, it was well known inside the Company—including to the Individual Defendants—that "the supply chain needed a massive overhaul to meet demand," and that the Individual Defendants were well aware of the continued deficiencies in the FM segment's supply

chain. These employees also confirmed that the Individual Defendants received daily reports and data that made clear the severity of the supply chain problems, and that this information stood in direct contrast to Defendants' public representations.

10. Significantly, these employees also independently confirmed that, in December 2016, the "Supply Chain Transformation Team," which was tasked with guiding the supply chain recovery efforts, prepared a detailed presentation for HD Supply's senior management. This presentation meticulously outlined the dire need for a multi-million-dollar, long-term overhaul of the Company's supply chain. Nazia Ali ("Ali"), HD Supply's then-Director of Supply Chain Transformation and the head of this team, repeatedly stressed to the Individual Defendants and the rest of the management team that the Company's recovery efforts were ineffective and deficient, and required a much more substantial plan. Defendant DeAngelo refused to implement the team's recommendations, and instead Ali was fired just days later.

11. The full extent of Defendants' fraud was not revealed until June 6, 2017, when the Company issued a press release admitting that, contrary to Defendants' prior representations, FM's supply chain issues had still not been fixed. On that day, the Company disclosed that: (1) the problems affecting the FM supply chain were still materially impacting the Company's business, such that FM's Q1 2017 adjusted EBITDA[[2]] had actually declined a staggering 13% compared to the same quarter of the prior year—representing the largest such drop in HD Supply's history as a public company; (2) the FM supply chain recovery efforts would extend through the rest of 2017, and even into 2018; and (3) as a result of the ongoing supply chain problems, the Company would be forced to spend substantial additional sums on the recovery efforts, which would materially impact Adjusted EBITDA in future periods.

12. Moreover, during a conference call to discuss these results, analysts pressed management for additional details regarding these disclosures. In response, DeAngelo adamantly refused to quantify the additional supply chain investments. During the call, Defendants also admitted that, in direct contrast to their statements in February 2017,

[2] "EBITDA" commonly stands for earnings before interest, taxes, depreciation, and amortization.

that the supply chain problems were "behind us now," in reality the FM supply chain had only just begun to function properly "exiting the quarter," i.e., in May 2017 at the earliest.

13. Analysts were shocked by these admissions, slashing the Company's ratings and excoriating management for their prior misrepresentations. For example, Deutsche Bank issued a report headlined, "Downgrading to Hold; Credibility Crunch," which emphasized that management's credibility had become an "impediment" given that management had "repeatedly professed high confidence in the Company's profit trajectory," and was now calling for "a sizeable ramp in FM investment spending for which details and magnitude were not articulated." As such, it was "unclear when the new elevated spending might subside, and could instead go on for years." Similarly, RBC Capital Markets stated that the "most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call."

14. As a result of Defendants' disclosures, HD Supply's share price crashed, falling $7.24 per share, or 17.5%, from a close of $41.27 per share on June 5, 2017, to a close of $34.03 per share on June 6, 2017. The stock fell another $1.22 per share, or 4%, to $32.81 per share on June 7, 2017, as the market continued to digest the news. In total, HD Supply stock fell more than 20% in just two trading days in response to these disclosures, wiping out a total of $1.7 billion in market capitalization. Moreover, the stock price never recovered, and today trades far below its Class Period high—and the prices at which DeAngelo sold his stake in the Company.

15. Investors who purchased HD Supply common stock at artificially-inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

Consolidated Am. Class Action Compl. at ¶¶ 5-15 [Doc. 37].

Plaintiffs bring claims pursuant to Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the

United States Securities and Exchange Commission against all Defendants. Plaintiffs bring claims pursuant to Section 20(a) of the Exchange Act against the Individual Defendants. Defendants' motion to dismiss is now before the Court.

## II. Discussion

### A. Section 10(b) & Rule 10b-5

"Section 10(b) of the Securities and Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014).

As explained by the United States Court of Appeals for the Eleventh Circuit:

Section 10(b) makes it unlawful to

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, in turn, forbids

> any person, directly or indirectly, . . .
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236 (11th Cir. 2008).

The United States Court of Appeals for the Eleventh Circuit has succinctly set out the standards governing Defendants' Motion as follows:

> To survive a motion to dismiss, a claim brought under Rule 10b–5(b) must satisfy: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"); (2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), and; (3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See Phillips v. Scientific–Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) (reviewing a Rule10b-5(b) claim for a company's alleged exaggeration of product demand); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1197, 1202 (11th Cir. 2001) (reviewing a Rule 10b-5(b) claim for a company's alleged misrepresentation of its profits).
>
> Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 1965, 1974, 167 L.Ed.2d 929 (2007).
>
> In addition to the Rule 8(a)(2) requirements, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: (1) precisely what statements or

> omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud. Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006); Ziemba, 256 F.3d at 1202. The "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).
>
> The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions. For Rule 10b–5(b) claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). And for all private Rule 10b–5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id., § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. Phillips, 374 F.3d at 1016–18. If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d 1257, 1269-70 (11th Cir. 2016).

> To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (quotation omitted).

### 1. Statements Were False or Misleading

Defendants argue that Plaintiffs failed to plead particularized facts establishing that any of the challenged statements were false or misleading when made, as required by Rule 9(b) and 15 U.S.C. § 78u-4(b)(1). "A statement is misleading if in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it. Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." FindWhat Inv'r Grp., 658 F.3d at 1305 (quotation omitted). "A duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises." Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir. 1986).

> Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968); accord Rudolph, 800 F.2d at 1043 ("Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises."); Lormand v. U.S. Unwired, Inc.,

> 565 F.3d 228, 248 (5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." In re K-tel Intern., Inc. Sec. Litig., 300 F.3d 881, 898 (8th Cir. 2002) (internal quotation marks and alteration omitted). In sum, "a defendant may not deal in half-truths." First Va. Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977).

FindWhat Inv'r Grp., 658 F.3d at 1305.

As stated in the complaint, there are four instances where Plaintiffs allege that Defendants made false and misleading statements. Plaintiffs rely heavily on confidential witnesses throughout the complaint to show that Defendants' statements were false or misleading. Thus, the Court will pause here to discuss whether information from confidential witnesses can be considered.

A securities fraud complaint need not name a confidential source. Mizzaro, 544 F.3d at 1239. But the complaint must "unambiguously provide[] in a cognizable and detailed way the basis of the whistleblower's knowledge." Id. at 1239-40. The complaint should describe "the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." Id. at 1240. Upon a review of the complaint here, the Court finds that Plaintiffs have met these standards with regard to the six confidential witnesses provided in the complaint. Compl. at ¶¶

34, n.4; 35, n.5; 36, n.6; 37, n.7; 39, n. 8; 55, n.10. The Court will refer to these witnesses as Plaintiffs have done in their complaint, i.e., CW1.

The Court will now examine Defendants' challenges to the alleged false or misleading statements, as asserted by Plaintiffs in the complaint.

*a). The November 9, 2016 Robert W. Baird Global Industrial Conference*

Plaintiffs allege that the following statements were false or misleading, as follows:

> 91. On November 9, 2016, the first day of the Class Period, Defendants DeAngelo and Levitt took part in the Robert W. Baird Global Industrial Conference. During the conference, Defendant DeAngelo assured investors that the FM segment's recovery was going smoothly: "[o]ur work in Facilities Maintenance on our supply chain is on track."
>
> 92. Asked whether any unexpected problems had come up in the prior sixty days, Defendant DeAngelo responded[ "w]e've had nothing new and interesting negative . . . no surprises whatsoever." Defendant DeAngelo further elaborated that the "supply-chain execution to-date tracked exactly where we thought it would be, so we're essentially through the balance of the supply chain." Similarly, regarding HD Supply's "commercial recovery," DeAngelo stated that "[w]e have no surprises, we're right on track."
>
> 93. During the conference, one analyst asked whether DeAngelo foresaw any additional, as yet undisclosed costs as part of the FM segment's recovery: "Is there anything from this point forward that is going to flex up in the P&L or are all the costs in at this point?" In response, DeAngelo stated: "All the costs are in at this point."

Compl. at ¶¶ 91-93 (emphasis in original).

Viewing the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have pleaded the claims in Pargraphs 91 and 92 as false or misleading with enough particularity to withstand dismissal at this time. See Compl. at ¶ 95 (explaining the reasons that these statements were false or misleading); see also id. at ¶¶ 46-47, 51, 54-55, 63-65, 113-114.

First, Defendants argue that statements about the FM supply chain being "on track" are based on generalized allegations of persisting problems and a few examples of such alleged problems that collectively fail to show that Defendants' statements were false or misleading when made. The Court disagrees. Plaintiffs have alleged that at least by August 2016, the Company started "Project Firefight" to attempt to fix the supply chain disruption through triage measures. Id. at ¶ 44-46. According to CW1, CW2, and CW3, part of this Project included daily conference calls or "Firefight Meetings," which tracked the progress of the Project. Id. at ¶ 46. In attendance at these daily meetings were regional management and usually DeAngelo, Stengel, and the Company's Vice President of Distribution. Id. DeAngelo participated in these calls "pretty much every day," and asked specific questions about how the individual distribution centers were performing. Id. In addition, CW2's team provided daily data updates for management, which included in-stock levels of critical products and fill-rates. Id. at ¶ 47. According to CW1, this data was compiled daily from an internal "data warehouse" system

and sent out every morning via emails "for everyone to see," which later served as the basis for the daily meetings. Id. These daily updates were still happening by November 2016. Id.

Plaintiffs have also specifically alleged that according to CW1, by November 2016, it was apparent that "the supply chain needed a massive overhaul to meet demand." Id. at ¶ 51. Plaintiffs further provide that

> CW2 stated that the supply chain data that CW2's team prepared specifically indicated that the supply chain recovery was experiencing significant failures and was not where management wanted it to be. CW4, who reported to CW2 and was also part of the team responsible for preparing the underlying data, corroborated CW2's account.

Id. at ¶ 54. In addition to the daily meetings described above, Plaintiffs assert that Defendant DeAngelo participated in weekly calls with directors of the distribution centers and the supply chain team in Atlanta, which included Ali, who was heading the Supply Chain Transformation Team, CW6, and CW1. Id. at ¶ 55. According to CW6 and CW1, the supply chain data and progress of supply chain recovery were communicated up the reporting chain to Defendant DeAngelo. Id. Furthermore, in November 2016, according to CW6, the team lead – Ali – "had told Stengel during their supply chain evaluation meetings that FM's distribution centers were not able to function in their current state." Id. at ¶ 65. Additionally, "the supply chain transformation team, particularly Ali and CW6, had also briefed Stengel on the systemic weaknesses in the supply chain in November 2016, which

CW6 characterized as 'pull[ing] the curtain back a little and r[unning] them through what was happening with distribution center operations.'" Id. at ¶ 63. Finally, "according to former employees, HD Supply executive management were in receipt of hard data every day regarding distribution center performance, which made clear the extent of the problems." Id. at ¶ 64. Thus, the Court rejects Defendants' arguments that these are generalized allegations and instead concludes that Plaintiffs have made particularized allegations about the FM supply chain showing how it was not "on track." See Anastasio v. Internap Network Servs. Corp., No. 1:08-CV-03462-JOF, 2011 WL 13124500, at *14 (N.D. Ga. Sept. 30, 2011) (statement that network migration was going "very smoothly" was false and misleading where witness and whistleblower corroborated contemporaneous and "continued operational problems").

As for Pargraph 93 of the complaint, Defendants argue that Plaintiffs mischaracterize DeAngelo's comments that "all costs are in." The Court agrees. The full statements were as follows:

> Analyst: Okay. And so this system that's in place right now, or the capacity that's in place right now -- are there any changes as it relates to whether it's a cost to running this new space or depreciation of a building that you had to buy? Is there anything from this point forward that is going to flex up in the P&L, or are all the costs in at this point?
>
> DeAngelo: All the costs are in at this point.

> Levit: Yes, and the cost of those overflow facilities, or additional facilities, will -- we've been experiencing those this year, and those will continue into 2017 and 2018. They're generally three-year operating leases, so they are SG&A costs.

Defs.' Mot. to Dismiss, Ex. A at 5 [Doc. 43-3]. As this full colloquy indicates, Defendants did explain that there would be additional costs into 2017 and 2018 in the form of additional facilities. Therefore, the specific statement from DeAngelo in ¶ 93 that all costs were in is dismissed.

*b). December 6, 2016 Press Release Announcing Third Quarter Results*

Plaintiffs allege that the following statements were false or misleading, as follows:

> 96. On December 6, 2016, HD Supply issued a press release announcing its third quarter 2016 financial results. Immediately following the earnings announcement, HD Supply held an investor conference call to discuss its Q3 2016 financial results. During the call, Defendant DeAngelo highlighted that "the operational recovery of our Facilities Maintenance supply chain continues to make exciting daily progress and the teams are executing at or ahead of expectations," and that "[t]he key daily metrics have seen strong recovery since last earnings call and are now operating at or better from the first quarter 2016 levels."
>
> 97. Defendant DeAngelo further reiterated that "[w]e are on track" regarding the supply chain recovery process, and that the FM supply chain recovery was "tracking exactly where it should be."
>
> 98. An analyst asked what Defendant DeAngelo and Stengel were doing "to make sure that you don't run into these cost overruns that you experienced this year [in FM] . . ." DeAngelo responded that the Company had been buying inventory and "ensuring it is perfectly deployed," that "every 24 hours . . . we're looking at [th]is stuff in the

> right place for tomorrow's sales and for that selling season," and that "we have an integrated end-to-end approach, plus our demand planning is now systematic versus manual." These things, DeAngelo said, "allow us to be successful coming into the selling season."

Compl. at ¶¶ 96-98 (emphasis in original).

Viewing the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have pleaded these claims as false or misleading with enough particularity to withstand dismissal at this time. See id. at ¶¶ 100-101 (explaining the reasons that these statements were false or misleading); see also id. at ¶¶ 56-61, 63-65; 113-115, 117-120; see Anastasio, 2011 WL 13124500, at *14.

Defendants argue that Plaintiffs' allegations that Defendants had access to "daily data updates . . . from which they learned that the FM supply chain was not meeting the Company's internal targets for progress in the recovery, including for key metrics such as fill-rates and in-stock rates" are conclusory, non-specific, and unsupported. Defs.' Mot. to Dismiss at 10. The Court disagrees. See Compl. at ¶ 42 (fill-rates were significantly lower, reporting near the "high 80's" rather than the 99% fill-rate expected); ¶ 43 (in-stock rate was supposed to be at 98.4% but by fall of 2016 only one or two centers out of 40 had achieved a 90% in-stock rate); ¶¶ 45-47, 54-55, 63-64 (discussing the details of Project Firefight and daily Firefight Meetings with DeAngelo and Stengel, daily updates including in-stock levels of critical products and fill-rates sent to management, and weekly calls with DeAngelo and Stengel and the supply chain team discussing the underlying data

and progress).[3] This is sufficient to withstand dismissal, and any further specificity can be satisfied during discovery. In re Faro Techs. Sec. Litig., 534 F. Supp. 2d 1248, 1260 (M.D. Fla. 2007) (rejecting the defendants' argument that the plaintiff never alleged the amount by which selling expenses were understated and not requiring that the plaintiff "quantify the falsity to the penny"); In re Theragenics Corp. Secs. Litig., 137 F. Supp. 2d 1339, 1346-47 (N.D. Ga. 2001) (finding the plaintiffs need not state the exact number of medical professionals who provided information to them or the sales volume that could be attributed to them and instead it was sufficient that the plaintiffs provided the sources for their information and belief and additional information could be obtained through discovery).[4]

---

[3] Defendants specifically attack how CW3 could know this metric information. First, the complaint lists CW1 as saying that the fill-rate was in the low 80's rather than the expected 99% rate. Compl. at ¶ 42. This is sufficient without any corroboration from CW3. Second, CW3 was a distribution center manager and participated in weekly calls where Company-wide distribution center performance data was discussed. Id. at ¶ 36, n.6, ¶ 55. This occurred in November and December 2016, even if CW3 left the Company in January 2017 as Defendants argue. Thus, CW3 had the knowledge during the relevant time frame based on CW3's proximity to information.

[4] Defendants attack the level of specificity Plaintiffs provide about an audit of the Company's inventory. The complaint alleges that in December 2016, the Company hired a consulting firm called REGIS to audit the inventory of FM's nine largest distribution centers and that the audit revealed that FM's inventory management system was in total disrepair, with an accuracy rate of 80%, below the 90% for industry standards. Compl. at ¶ 62. The Court finds that this is sufficiently plead with particularity. See In re Faro Techs. Sec. Litig., 534 F. Supp. 2d at 1260. However, the Court notes that the complaint does not state when the audit was completed and only that the Company hired REGIS in December 2016. Therefore, the Court does not rely on the audit information to find that the complaint has properly alleged the false and misleading statements from December 2016. Nevertheless, the complaint has pleaded enough information about December 2016 to withstand dismissal even if the audit information is disregarded for now.

Similarly, Defendants contend that Plaintiffs have failed to plead the falsity of statements reporting that certain supply chain metrics had returned to pre-2016 disruption levels because Plaintiffs do not specify what levels of these metrics were observed pre-disruption or plead any facts showing that the metrics were below the stated levels at the time. See Compl. at ¶¶ 96, 102. As explained above, Plaintiffs have pleaded sufficient details regarding the falsity of the metrics information based on the CWs' beliefs and information at the time, without having to specifically quantify how false the statements were when made. This will be made clear through discovery. Moreover, even if DeAngelo's statements about the metrics information from December 6, 2016, turns out to be true, he further reiterated that the supply chain progress was "on track" and "tracking exactly where it should be," which according to the CWs was not correct because through November and December 2016, "the supply chain was still fundamentally broken" (id. at ¶ 57), the distribution centers could not function in their current state (id. at ¶ 65), and a multi-million dollar overhaul of the supply chain was proposed by Ali, the Company's Director of Supply Chain Transformation. Id. at ¶ 65.

Defendants further assert that the complaint's metrics information regarding in-stock rates and fill rates is from the summer of 2016, prior to the Class Period. However, this pre-Class Period information shows why Project Firefight began and provides context for the CWs' accounts that by November 2016 the Company and

DeAngelo were still participating in daily and weekly calls about the metrics and distribution center performance that made clear the extent of the problems. Further, as noted above, Plaintiffs have sufficiently alleged the problems that were existing by November and December 2016, and any further quantifiable details can be obtained through discovery.

*c). February 22, 2017 Barclays Industrial Select Conference & March 14, 2017 Press Release Announcing Fourth Quarter and Full Year 2016 Results*

Plaintiffs allege additional false or misleading statements by Defendants from February 22, 2017, as follows:

> 102. On February 22, 2017, HD Supply management spoke at the Barclays Industrial Select Conference. Defendant Levitt unequivocally assured investors that the "supply chain disruption [is] behind us now. Supply chain is in as good condition as it's ever been, all the metrics that we watch on a 24-hour cadence in-stock positions, fill rates, as good or better than they've ever been."
>
> 103. In response, an analyst asked Levitt to "help people understand what happened to your supply chain . . . How does that happen? How does that happen that you've closed down a headquarters and you wake up all of a sudden [and] say, oh crap, or we messed up . . ." Levitt responded by citing the Company's seasonal demand variances, forecasting and ordering deficiencies, and late arrival of overseas inventory orders, all of which resulted in "strain on our distribution centers." Significantly, however, Levitt again emphasized: "[t]hat is behind us now, we pivoted from that supply chain recovery to a commercial recovery [i.e., a recovery of lost business] in November."

Compl. at ¶¶ 102-103 (emphasis in original).

Furthermore, Plaintiffs allege that the following statements were false or misleading from March 14, 2017, as follows:

> 105. On March 14, 2017, before market open, HD Supply issued a press release announcing its results for the fourth quarter and full fiscal year ended January 29, 2017. The Company had met analyst estimates for earnings per share; however, it announced lowered Adjusted EBITDA guidance due to FM supply chain problems.
>
> 106. The same day, before market open, the Company held its Q4 2016 earnings call with analysts and investors. During the call, Levitt announced an increase in the projected spending needed in the first quarter of 2017 associated with the supply chain recovery, stating:
>
>> Our first quarter [Adjusted] EBITDA guidance includes approximately $10 million of costs associated with 2016 Facilities Maintenance supply chain recovery including $2 million associated with labor we opted to retain through a lower sales volume quarter to be prepared for the upcoming selling season[,] $5 million associated with freight expense and $3 million associated with rent expense contributed to real estate secured to expand distribution center capacity.
>
> . . .
>
> 108. Nonetheless, in spite of these disclosures, Defendant DeAngelo assured investors that the increased spending was temporary, that residual supply chain defects were "<u>behind us</u>," that FM had "significant momentum," and that FM had "<u>pivoted into a commercial recovery</u>," i.e., a push to win back previously lost business:
>
>> First, I want to give an update on <u>our Facilities Maintenance commercial recovery, which continues to make solid progress</u>. As a reminder, our Facilities Maintenance supply chain interruption began with the under-ordering of inventory in advance of the 2016 spring and summer selling seasons. Corrective action was taken to adjust ordering in 2016, which resulted in an

> atypical amount of inventory, primarily long lead import inventory arriving at our distribution centers during the busy summer selling season. As a result, our distribution center resources were stretched beyond the ordinary course capacity and it took until November of 2016 to process the inventory into our network and rebalance it throughout the country to perfectly meet our local customer promise.
>
> On our third quarter call, we confirmed that the rebalancing phase was behind us and that we have pivoted into a commercial recovery. The three phases of our commercial recovery are progressing as we expected.
>
> * * *
>
> Our February performance of Facilities Maintenance was also in line with our expectations. Facilities Maintenance has significant momentum.

> 109. Asked if he was "confident in the progress that you are making," with FM DeAngelo responded "Yes, 100%." And finally, an analyst asked DeAngelo whether it was "still your expectation that Facilities Maintenance growth can get to mid-single digits by May as we start to hit the easier comparisons and the rental cycle picks up?" DeAngelo responded "Yes, that's great."

Id. at ¶¶ 105-106, 108-109 (emphasis in original).

Defendants argue that Plaintiffs have not pleaded facts to show that Defendants' specific statement about one aspect of the recovery effort – rebalancing of inventory throughout the Company's distribution network – was not false or misleading. Additionally, Defendants contend that Levitt's "behind us" statement from February 2017 referred to several specific events which were behind the Company. However, the complaint alleges that, by the beginning of

2017, after Defendants rejected a large-scale proposal to address supply chain problems from the Supply Chain Transformation Team, it was clear to CW6 "that basically HD Supply had just decided to continue to muddle through with its existing systems rather than undertaking the more extensive and appropriate restructuring measures that were needed." Id. at ¶ 71. In addition, the complaint alleges that "by March 2017, according to CW5, FM and Company management 'still weren't fixing the issues long-term and they still weren't really getting over the hump.' In fact, the Company was still failing to fulfill orders properly and to manage its supply chain logistics correctly—the same problems that had plagued FM during 2016." Id. at ¶ 77. The Company's act of muddling through with existing systems, rather than restructuring, and continuing to fail to fulfill orders properly and manage supply chain logistics correctly, which had also plagued FM in 2016, support Plaintiffs' allegations that Levitt made false statements about supply chain disruption being behind the Company. While Defendants offer other explanations, when viewed in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have made particularized allegations to survive dismissal. The same is true on the issue of inventory rebalancing. Viewing the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged that these particular statements about the inventory were false or misleading, and that discovery will determine whether the rebalancing effort had actually fixed the

supply chain's underlying problems. See Carlton v. Cannon, 184 F. Supp. 3d 428, 472 (S.D. Tex. 2016) ("downplay[ing] the extent and duration of the [] problems" gave a false impression of "a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul").

*d). Forward-Looking Statements*

Defendants argue that two of the statements above were forward-looking and protected by the PSLRA's safe harbor provision. The PSLRA provides that there is no liability with respect to any "forward-looking statement," thereby creating a safe harbor for such statements. See 15 U.S.C. § 78u-5(c). Under this safe harbor provision, a defendant "shall not be liable with respect to any forward-looking statement" if:

> (A) the forward-looking statement is—
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; . . .

Id. at § 78u-5(c)(1)(A).

The two statements challenged by Defendants are as follows:

- These things [- buying inventory, ensuring "it is perfectly deployed," "looking at . . . stuff in the right place for tomorrow's sales and for that selling season," and having an "integrated end-to-end approach, plus our demand planning is now systematic versus manual - ] DeAngelo said, "allow us to

be successful coming into the selling season." Compl. at ¶ 98; and

- And finally, an analyst asked DeAngelo whether it was "still your expectation that Facilities Maintenance growth can get to mid-single digits by May as we start to hit the easier comparisons and the rental cycle picks up?" DeAngelo responded "Yes, that's great." Id. at ¶ 109.

Defendants argue that these statements were accompanied by meaningful cautionary language, and therefore, as a matter of law, cannot support a viable 10(b) claim. The cautionary language referred to by Defendants can be found at the beginning of the earnings calls in which the statements were made. Defs.' Mot. to Dismiss, Ex. D at 2-3; Ex. E at 2. [Docs. 43-6, 43-7]. The call statements also referred the listener to risk factors discussed in the Company's annual report on Form 10-K and those factors "described from time to time in HD Supply, Inc.'s other filings with the US Securities and Exchange Commission." Id. at Ex. D at 2-3; Ex. E at 2; see Filings at Ex. F at 3-4, 13-36 [Doc. 43-8] & Ex. G at 3-5, 14-38 [Doc. 43-9].

The cautionary language must "warn[] of risks of a significance similar to that actually realized." In re S1 Corp. Sec. Litig., 173 F. Supp. 2d 1334, 1357 (N.D. Ga. 2001). Many of the cautionary language statements referred to by Defendants are boilerplate and point out generalized risks but do not caution against the more specific risks that Plaintiffs allege were known to Defendants at the time. See In re Sci.-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1362 (N.D.

Ga. 2002) ("Boilerplate warnings will not suffice as meaningful cautionary statements . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement.") (quoting In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (quoting legislative history)). While some of the other cautionary language in the SEC filings is not as generalized, Defendants have referred the Court to over 50 pages of filings in which they vaguely contend the cautionary language warned against specifics risks similar to those actually realized. See Filings at Ex. F at 3-4, 13-36 & Ex. G at 3-5, 14-38. The Court will not use its scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended. Moreover, the Court finds that this is a fact-intensive inquiry that is better suited for disposition after discovery and that, accordingly, these statements survive dismissal at this early stage.

*e). Puffery*

Defendants argue that some statements are corporate optimism, or "puffery," that is deemed immaterial as a matter of law and thus not actionable under Section 10(b). The challenged statements are as follows:

- DeAngelo telling investors that "FM had significant momentum." Compl. at ¶ 108;

- Asked if DeAngelo was "confident in the progress that you are making," with FM DeAngelo responded "Yes, 100%." Id. at ¶ 109; and

- DeAngelo stated that that the Company had been buying inventory and "ensuring it is perfectly deployed." Id. at ¶ 98.

A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the "total mix" of facts available. In re Sci.-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d at 1360. The Court finds that the first two statements from Paragraphs 108 and 109 are puffery because they are vague and not subject to any sort of objective verification or clear definition. See IBEW Loc. 595 Pension and Money Purchase Pension Plans v. ADT Corp., 660 F. App'x 850, 857 (11th Cir. 2016) (describing a stock repurchase plan as "thoughtful," "effective," and "optimal" was nonactionable corporate puffery); Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1029 (11th Cir. 2003) (characterizing a comment regarding "strong performance" as nonactionable mere puffery). However, the Court will not dismiss the last statement from Paragraph 98 regarding the perfect deployment of inventory because the comment is not vague and subject to an objective verification.

*f). CWs' Disagreements with Managerial Decisions*

Finally, Defendants argue that, with regard to all of the alleged false or misleading statements, the CWs' statements were merely disagreements with

management about the steps that the Company could take to improve and that the Company was always improving. The Court disagrees. As Plaintiffs argue in response, the CWs listed in the complaint were tasked with assessing the supply chain and determining how to repair it as well as reviewing, compiling, and reporting supply chain performance metrics daily and weekly to the Individual Defendants. Thus, they had the knowledge during the relevant time frame based on a proximity to the supply chain issues. Viewing the complaint in the light most favorable to Plaintiffs, the Court accepts the particularized statements from the CWs at this time. Discovery may prove that Defendants are correct – that these six CWs merely disagreed with how the Company was addressing problems with the supply chain and that the Company was continuously improving. But at this early stage, Plaintiffs have met the standard to survive dismissal.

In summary, the Court finds that Plaintiffs have pleaded sufficient particularized facts to support their allegations that Defendants made false or misleading statements to support Plaintiffs' 10(b) claims, except for the statements from ¶¶ 93, 108, and 109 in the complaint as discussed herein.

**2. Scienter**

Defendants argue that Plaintiffs failed to plead particularized facts giving rise to a "strong inference" that Defendants acted with the "required state of mind,"

or scienter, as required by 15 U.S.C. § 78u-4(b)(2). The Eleventh Circuit has explained the standard governing scienter as follows:

> Rule 10b–5 requires a plaintiff to show that the defendant made the material misstatement or omission with the requisite culpable state of mind, or scienter. In this Circuit, "scienter consists of intent to defraud or severe recklessness on the part of the defendant." Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 790 (11th Cir. 2010) (internal quotation marks omitted). As we have explained,
>
>> [s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.
>
> Mizzaro, 544 F.3d at 1238 (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)).
>
> As we've noted, the PSLRA explicitly requires that the complaint's allegations create "a strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2) (emphasis added). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). "The inquiry is inherently comparative," as "the court must take into account plausible opposing inferences." Id. at 323, 127 S.Ct. 2499. The PSLRA also mandates that the court assess scienter "with respect to each act or omission alleged to violate this chapter." 15 U.S.C. § 78u–4(b)(2); accord Phillips v. Sci.-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) ("[Scienter] must be inferred for each defendant *with respect to each violation*." (emphasis added)). "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter

> at least as strong as any opposing inference?" Mizzaro, 544 F.3d at 1239 (quoting Tellabs, 551 U.S. at 326, 127 S.Ct. 2499).

FindWhat Inv'r Grp., 658 F.3d at 1299-1300.

First, Defendants argue that because Plaintiffs have failed to plead that Defendants made false or misleading statements, there can be no scienter. Because the Court has found that Plaintiffs have pleaded Defendants' alleged false or misleading statements sufficiently, Defendants' argument fails. Plaintiffs' allegations, as supported by six CWs, support an inference that Defendants were aware of the true condition of the FM supply chain throughout the Class Period. For example, the Individual Defendants were involved in daily and weekly updates of the FM supply chain, including metrics data, gauged daily progress, and at least DeAngelo, served as part of the "operating entity for Facilities Maintenance." See, e.g., Compl. at ¶¶ 74, 102, 113-115, 118, 120-121. Further, Plaintiffs allege that DeAngelo initially approved a plan for a comprehensive multi-million dollar overhaul of the supply chain, but two weeks later, shelved the plan and fired Ali, the Company's then-Director of Supply Chain Transformation. Id. at ¶¶ 66-68. See Hubbard v. BankAtlantic Bancorp, Inc., No. 07-61542-CIV-UNGARO, 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (finding allegations that the individual defendants were presented with information that would have shown the falsity of the company's financials or they were confronted with concerns regarding the company's lending practices, as supported by confidential witnesses,

were sufficient to show scienter); Primavera Inv'rs v. Liquidmetal Techs., Inc., 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (finding scienter where, by virtue of their positions, the individual defendants had unfettered access to internal information and ample opportunity to prevent the release of any misleading statement).

Defendants argue that they cautioned throughout the Class Period that the supply chain progress involved many steps and remained a work in progress, and that the Company would continue to invest in, and incur expenses for, improvements to the supply chain. However, Plaintiffs have also alleged that the Individual Defendants stated, with regard to the supply chain, that there were no surprises and they were right on track, FM supply chain teams were executing at or ahead of expectations, inventory was perfectly deployed, supply chain disruption was behind the Company and in as good condition as it had ever been by February 2017, and problems with the supply chain were "behind" them. See, e.g., Compl. at ¶¶ 92, 96-98, 102-103. While Defendants' arguments may turn out to be correct after discovery, at this stage viewing the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs' have sufficiently pleaded scienter.

Second, Defendants contend that DeAngelo's stock sales do not raise a strong inference of scienter because each sale was made pursuant to a pre-arranged 10b5-1 plan, and thus, DeAngelo had no influence over how, when, or whether to effect the sales of stock. Defendants point to two of DeAngelo's SEC filings,

which state that DeAngelo's stock sales were made pursuant to a 10b5-1 plan. Defs.' Mot. to Dismiss, Exs. J-K. There is no further information provided about this plan, such as when DeAngelo adopted this plan or any details about it.[5] In light of these missing details, the Court cannot conclude that DeAngelo made the sales according to a stock plan so as to wholly negate any scienter. See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp., 111 F. Supp. 3d 1336, 1378 (S.D. Fla. 2015) (explaining that trading through 10b5-1 plan is not automatically immunized because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time and disguise their conduct with a stock plan, and such plans are not a defense if they were adopted during the class period).

Instead, Plaintiffs' allegations that DeAngelo sold almost his entire holdings of Company stock over a five-day period for $53 million after having reassured investors about the Company's supply chain recovery and that DeAngelo had not sold any stock in the prior twelve months, supports a strong inference of scienter.[6] In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187, 1202 (N.D. Ga. 2007) ("To demonstrate the relevance of stock trades to the issue of scienter, a plaintiff bear[s] the burden of showing that sales by insiders were in fact unusual

---

[5] Defendants also rely on Plaintiffs' allegations from the original complaint that the sales were made pursuant to a stock plan; this is not the governing complaint in this case. See Order, Dec. 18, 2017 [Doc. 40] (dismissing original complaint).

[6] See Compl. at ¶ 82, n.11, noting that the only sale that DeAngelo made during 2016 was to satisfy mandatory tax withholding requirements.

or suspicious in amount and in timing."); see also Thorpe, 111 F. Supp. 3d at 1371 (scienter found where insider sold $2.3 million of stock in two days, two months prior to corrective disclosure, after selling no shares the prior year). Such allegations of a personal financial motive may "weigh heavily in favor of a scienter inference." Tellabs, Inc., 551 U.S. at 325.

As for Levitt, Defendants argue that he did not make any stock sales, which weighs against any inference that he acted with scienter. However, even without the sales, Defendants' false or misleading statements as alleged by Plaintiffs are sufficiently pleaded to support a strong inference of scienter.

**3. Loss Causation**

Defendants argue that Plaintiffs failed to adequately plead that their claimed losses were caused by the alleged fraud. "The loss causation element of a Rule 10b–5 claim requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." FindWhat Inv'r Grp., 658 F.3d at 1309. "The plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses." Id. "To show loss causation in a § 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." Meyer v. Greene, 710 F.3d 1189, 1195 (11th Cir. 2013) (quotation omitted). "However, the plaintiff need not show that the defendant's misconduct was the sole and exclusive

cause of his injury; he need only show that the defendant's act was a substantial or significant contributing cause." FindWhat Inv'r Grp., 658 F.3d at 1309 (quotation omitted).

In a case such as this involving fraud-on-the-market, Plaintiffs can demonstrate loss causation circumstantially as follows:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

FindWhat Inv'r Grp., 658 F.3d at 1311-12 (footnote omitted). "To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." Meyer, 710 F.3d at 1197 (quotation omitted). "Further, a plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures." Id. (quotation omitted).

Plaintiffs allege two corrective disclosures in the complaint, as follows:

> 144. Defendants' disclosures on March 14, 2017 and June 6, 2017 revealed to the market the false and misleading nature of Defendants' statements and omissions. On March 14, 2017, Defendants revealed that the FM supply chain recovery was not completed as previously stated, but instead $10 million of additional expenses was needed to

> get the supply chain recovery to completion. In response to Defendants' March 14, 2017 partial disclosure, the price of HD Supply common stock materially declined from a close of $42.68 on March 13, 2017, to a close of $41.02 on March 14, 2017—a drop of nearly 4% on unusually high volume of 5.75 million shares, as compared with less than half that volume on March 9 and 10, 2017.
>
> 145. Then on June 6, 2017, Defendants revealed the full truth of their fraudulent conduct when they disclosed (a) that the supply chain problems and prolonged recovery process had caused a $17 million decline in FM's Q1 Adjusted EBITDA as compared to the same quarter the previous year—the largest such drop in HD Supply's history as a public company; and (b) FM's supply chain would require substantial additional investment during the remainder of the year and into the following year in order to fully recover. In response to Defendants' June 6, 2017 disclosures, the price of HD Supply common stock plummeted by more than 20% over the next two days, from a close of $41.27 on June 5, 2017, to a close of $34.03 on June 6, 2017, and then to a close of $32.81 on June 7, 2017.

Compl. at ¶¶ 144-145.

First, Defendants argue that the announcement on March 14, 2017, of $10 million of additional expenses necessary to get the supply chain recovery to completion did not correct or reveal any prior challenged statement to have been false because Defendants had repeatedly warned that the Company would continue to incur such expenses. In support, Defendants cite to their following statements: Defs.' Mtn. to Dismiss at 28 ("Ex. C at 11 ('[W]e're always making investments in the supply chain. So it wouldn't be appropriate to assume that [supply chain recovery costs] go to zero.'); Ex. A at 5 (lease expense and other costs associated with overflow facilities 'will continue into 2017 and 2018'); Ex. D at 14 (HD

Supply would retain labor hired for recovery efforts to be prepared for upcoming 2017 selling season.”)). While these statements may show that additional expenses might be necessary, none of these statements indicates that $10 million worth of expenses was to be expected. On the same day as the announcement of the $10 million in expenses, Levitt announced the spending as $2 million associated with labor, $5 million associated with freight expenses, and $3 million associated with rent expenses. Compl. at ¶ 106. Even if the Court accepted Defendants' statements that Defendants had warned of the labor and rent expenses (see *supra* at Ex. A and Ex. D), there is no explanation for the additional $5 million for freight expenses. Moreover, while the announcement of the $10 million does not precisely mirror the earlier alleged misrepresentations about the supply chain recovery – that there were no surprises and they were right on track, FM supply chain teams were executing at or ahead of expectations, inventory was perfectly deployed, supply chain disruption was behind the Company and in as good condition as it had ever been by February 2017, and problems with the supply chain were “behind” them, Compl. at ¶¶ 92, 96-98, 102-103 – the $10 million announcement for supply chain recovery completion does relate back to the misrepresentations.

Second, the Court need not view the March 14, 2017 corrective disclosure in isolation and can consider the additional alleged corrective disclosure made on

June 6, 2017. Meyer, 710 F.3d at 1197 (court can consider series of partial disclosures). Defendants argue that Plaintiffs have failed to plead facts establishing that the decline in Q1 EBITDA was caused by the supply chain problems or that the additional investment spending was intended to address any undisclosed problems with the supply chain. However, Plaintiffs did plead facts showing that in response to the June 6 announcement, analysts lost faith in management credibility, contending that management credibility was now an impediment to a sustained higher share price, and analysts stated that the "most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call," and that "the key new development that appears to have spooked investors was Outperform-rated HD Supply's admission that it needed to invest more than previously expected in FM." Compl. at ¶¶ 88-89. These analysts' reports support Plaintiffs' inference that the June 6 announcement revealed a truth to the market about FM. See Thorpe, 111 F. Supp. 3d at 1382–83 (relying on analysts' reports to strengthen the inference that the disclosure revealed a truth to the market in support of loss causation).[7]

[7] Defendants argue in their reply that certain portions of the analysts' reports indicate other explanations for the June 6, 2017 announcement rather than problems with the supply chain. While these portions do seem to indicate other explanations, the information relied upon by Plaintiffs is also in the analysts' reports and supports Plaintiffs' position. Viewing the complaint in the light most favorable to Plaintiffs, as the Court must, the Court accepts the allegations from Plaintiffs in the analysts' reports to support loss causation. See Rosky ex rel. Wellcare Health Plans, Inc. v. Farha, No. 8:07-CV-1952-T-26MAP, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30,

Furthermore, Stengel stated that supply chain performance had only improved by May 2017, at the end of the first quarter of 2017, thereby contradicting Levitt's statements from at least February 2017 that the supply chain was in as good condition as it had ever been and all metrics were good or better than they had ever been. See Compl. at ¶ 74. Once again the June 6 announcement may not precisely mirror Defendants' prior alleged misrepresentations, but it does relate back.[8] Thus, when viewed in totality, the Court finds that Plaintiffs have pleaded sufficient facts to support that the March 14 and June 6 announcements were corrective disclosures, there was a price drop after the announcements, and a factfinder could infer at this stage that it was more probable than not that the corrective disclosure caused at least a substantial amount of the price drop.

In sum, the Court finds that Plaintiffs' 10(b) claims are sufficiently pleaded so as to proceed except for the specific statements discussed herein found in the complaint at Paragraphs 93, 108, 109.

---

2009) ("loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss").

[8] Defendants argue that the investments were instead for "e-commerce, mobile, sales force effectiveness, and data analytics" and "developing a next generation customer-centric omnichannel environment for our customers." Defs.' Reply at 7 [Doc. 50]. While these statements do show that the Company was investing in these areas, they do not negate Plaintiffs' allegations about the $10 million investment in FM as specifically described by the Company for freight, labor, and rent expenses and analysts' reactions to troubled FM spending.

**B. Section 20(a) of the Exchange Act**

Defendants argue that because Plaintiffs have failed to plead a primary violation of Section 10(b) and Rule 10b-5, their control person claims under Section 20(a) must also be dismissed. Having found that all but three specific statements of the 10(b) claims survive, the Court denies Defendants' Motion to Dismiss the Section 20(a) claims.

**III. Conclusion**

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss [Doc. 43], dismissing only the specific statements discussed herein found in Paragraphs 93, 108, and 109 from the complaint.

**SO ORDERED**, this 18th day of September, 2018.

Eleanor L. Ross
United States District Judge
Northern District of Georgia