# EXHIBIT K

Page 1

1              M. HARTZMARK, PH.D.
2          UNITED STATES DISTRICT COURT
3                   FOR THE
4          NORTHERN DISTRICT OF GEORGIA
5    In Re HD Supply Holdings, Inc.,  )
                                      ) Civil Action No.
6    Securities Litigation,           ) 1:17-CV-02587-ELR
     ---------------------------------)
7
8    VIDEOTAPED DEPOSITION OF MICHAEL HARTZMARK, PH.D.
9                New York, New York
10                  May 2, 2019
11
12
13
14
15
16
17
18
19
20
21    Reported by:
22    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
23    JOB NO. 159526
24
25

1                M. HARTZMARK, PH.D.
2     disclosed on March 14, 2017 and June 6, 2017."
3            Did I read that correctly?
4        A.   Yes.
5        Q.   Can you explain what you mean when you
6     say "there is no evidence of a lack of price
7     impact"?
8        A.   I think it speaks for itself.  There's
9     no evidence of a lack of price impact.
10       Q.   What would evidence of a lack of price
11    impact look like?
12           MR. SALTZMAN:  Objection.
13       A.   What would evidence of a lack -- I'm
14    sorry, evidence of lack of price --
15       Q.   Uh-huh.
16       A.   You have no price movements.  You'd
17    have no statistically significant price
18    movements.
19       Q.   Do you agree, with respect to that
20    passage I just read, that in order for you to
21    reach that opinion, you would have to know what
22    the allegations in the case are so as to
23    determine whether any price impact on the
24    alleged corrective disclosure dates and
25    misrepresentation dates can be attributed to the

1                M. HARTZMARK, PH.D.

2    allegations in the complaint?

3          MR. SALTZMAN:  Objection.

4      A.    For the purposes of this report, I'm

5    assuming that the plaintiffs' allegations are

6    proven true at trial, which includes the dates

7    where there are misrepresentations and

8    corrective disclosures.

9      Q.    Okay.  So you assume the truth of the

10   allegations in the complaint with respect to

11   misrepresentations?

12     A.    My understanding is, as an economic

13   expert, that's what I'm supposed to do.

14     Q.    I'm just asking.  Yes, you did?

15     A.    As I believe I state --

16     Q.    That's not --

17     A.    Paragraph 2 --

18     Q.    Okay.

19     A.    Okay.  I'm just saying in paragraph 2,

20   "I have reviewed the Complaint and the Court's

21   Order relating to the Defendants' Motion to

22   Dismiss, and assume the allegations are true for

23   purposes of this report."

24     Q.    Apart from the complaint, what source

25   of information do you have with respect to the

1                 M. HARTZMARK, PH.D.
2    significant movements on the misrepresentations
3    and corrective disclosures as alleged in the
4    complaint, I suggest that there's no evidence of
5    a lack of price impact, and that's as far as
6    I've looked at this.
7         Q.   In order for you to render the
8    opinions set forth in your report, was it
9    important for you to have an understanding of
10   the allegations of what was misrepresented?
11             MR. SALTZMAN:   Objection.
12        A.   With respect to market efficiency,
13   again, I assume that the allegations, corrective
14   disclosures, and misrepresentations as indicated
15   in the complaint are going to be proven true at
16   trial.
17             With respect to the common damages
18   methodology, those are issues that, you know,
19   it's a common damages methodology, and the
20   inputs of that methodology will be determined,
21   you know, sometime subsequent, I guess, with
22   discovery and trial.
23        Q.   On the dates of the alleged corrective
24   disclosures, did you make any effort to
25   determine what information corrected prior

1                    M. HARTZMARK, PH.D.

2       A.    Yes.

3       Q.    What is the unexpected news to which
4  you were referring?

5       A.    Assuming the complaint is proven at
6  trial, it'll be associated with the information
7  that is revealed on June 6, 2017, but I say from
8  a statistical perspective, the information is
9  unexpected and material, and that's a general
10 analysis from an efficient market; that if you
11 see a statistically significant decline,
12 especially of that magnitude, that the news is
13 unexpected and material.

14      Q.    And the news that was unexpected would
15 be the news that's as alleged in the complaint?
16 That's your source?

17            So if we look at the complaint to see
18 what it says was unexpected on June 6, that
19 would be your basis?

20            MR. SALTZMAN:  Objection.

21      A.    Well, I understand that's a corrective
22 disclosure as alleged by the complaint, and I am
23 assuming that the plaintiffs will prove at trial
24 that that's corrective disclosure, and to the
25 extent that that's the case, you know, this I'm

1            M. HARTZMARK, PH.D.

2 looking at as it relates to market efficiency.

3 But I'm assuming that the corrective disclosures

4 are corrective.

5    Q.   And if the corrective disclosures are

6 proven not to be corrective, if the alleged

7 corrective disclosures are proven not to be

8 corrective, would that have an impact on your

9 opinions?

10        MR. SALTZMAN:  Objection.

11    A.   Well, my opinion as it relates to the

12 market efficiency?

13    Q.   Yes.

14    A.   No, because there was material

15 information that was disclosed on that day, and

16 from a statistical perspective, it was

17 unexpected and material.

18    Q.   Have you attempted to analyze the June

19 6 disclosure to see whether there was any

20 unexpected information disclosed that was

21 unrelated to the alleged fraud?

22        MR. SALTZMAN:  Objection.

23    A.   That's an issue associated with loss

24 causation, and I haven't been asked to opine on

25 loss causation.

1                M. HARTZMARK, PH.D.
2     Q.    It would be real easy if you just said
3  yes, you did or no, you didn't.
4           MR. THORNTON:  So could you read him
5     the question and see if I can get an answer.
6           (Record read.)
7     A.    The answer stays the same.  I wasn't
8  asked to do that because I wasn't asked to do a
9  loss causation analysis.
10    Q.    I'm not asking you what you were asked
11 to do.  I'm asking you what you did.
12          So did you make any effort to do that
13 or did you not?  It's a very simple question.
14          Yes, you did or no, you didn't?
15    A.    I believe the scope of what I was
16 asked to do is clearly delineated in my report.
17    Q.    That's not my question, Dr. Hartzmark.
18 I'm not asking what your engagement was.  I'm
19 asking what you did.  All you have to do is tell
20 me if you made some effort to break out any
21 information in the June 6 announcement that was
22 unexpected and unrelated to the alleged fraud,
23 just tell me, yes, I did, and then I'll ask you
24 what you did.  If the answer is no, I didn't,
25 then we can move on to the next question.

1             M. HARTZMARK, PH.D.
2      A.   Well, your question is quite broad.
3  Okay?  I have looked at a variety of analyst
4  reports, for example, okay?  I don't recall
5  whether I looked at -- it's likely, but I don't
6  recall whether I looked at June 6.  I know that
7  I cite to certain analyst reports, so I would
8  have looked at it.
9           And that's why your question is broad,
10 but I was -- did not look at them for the
11 purposes of a loss causation analysis.  I looked
12 at them for the purposes of asking the question
13 of whether HD common stock traded in an open,
14 well-developed and efficient market.
15     Q.   Is there some reason you just won't
16 answer my question?
17     A.   I think I've answered your question.
18          Answer -- read the question again.
19          (Record read as follows:
20      "Q   Have you attempted to analyze the
21   June 6 disclosure to see whether there was any
22   unexpected information disclosed that was
23   unrelated to the alleged fraud?")
24          THE WITNESS:  And I will say that I
25   examined analyst reports.  I don't remember

Page 89

1           M. HARTZMARK, PH.D.
2     specifically.  However, I did not look at
3     them for the purposes of a loss causation
4     analysis.  I looked at them for the purposes
5     of a market efficiency analysis.
6  BY MR. THORNTON:
7     Q.    For whatever purpose you looked at
8  them, did you identify any information disclosed
9  on June 6 that was both unexpected and unrelated
10 to the alleged fraud?
11    A.    I don't --
12          MR. SALTZMAN:  Objection.
13    A.    I can't recall.
14    Q.    Turn to page -- actually, paragraph 90
15 of your report, which is on page -- it begins at
16 the bottom of page 40.
17          If you would look at that.  I won't
18 read it out loud.
19          (Document review.)
20    Q.    Okay.
21    A.    Yes.
22    Q.    You see there's reference there to
23 analyst reports?
24    A.    Yes, I cite to RBC Capital's report,
25 Drexel Hamilton, Morgan Stanley, Raymond James,

1                M. HARTZMARK, PH.D.
2    analysis.  I was just looking to try to get a
3    sense of why the statistical measures -- why I
4    had a statistically significant price decline
5    over a two-day period as opposed to a one-day
6    period.
7        Q.   Does that mean the answer to my
8    question is no, you can't describe anything that
9    you recall from the analyst reports that you
10   attribute to the -- that they attributed to the
11   newly announced additional FM spending?
12              MR. SALTZMAN:  Objection.
13       A.   I'm confused.  I mean, at least in
14   this one sentence it says the most troubling
15   development was the new incremental FM spending.
16       Q.   Okay.  You're talking about with
17   respect to the RBC.  My question was whether you
18   recall anything else in the analyst reports that
19   address that; and if you do, tell me, and if you
20   don't, just say you don't.
21       A.   Not that I recall right now.
22       Q.   Okay.  Do you recall anything about
23   what these analyst reports to which you refer in
24   paragraph 90 said about other HD businesses
25   besides the FM segment?

1                M. HARTZMARK, PH.D.
2        A.    When you say "referring"?
3        Q.    Yes.  The paragraph where there were,
4   I think, six reports identified?
5        A.    Yes.
6        Q.    Okay.  So you believe you personally
7   read this before; is that correct?
8        A.    This, I believe, I -- I have, you
9   know, reviewed again for the purposes to
10  determine whether there was material and
11  unexpected information that would have been
12  disclosed.
13       Q.    And then if you look at the first page
14  under "Key points," about three or four lines
15  down, I think this is one you quoted.  It says,
16  "The most troubling development was the new
17  incremental FM spending that was unexpected and
18  frankly poorly explained on the call."
19             You see that?
20       A.    Yes.
21       Q.    Then the next sentence says,
22  "Investors thought the worst and linked this
23  spending to the ecommerce pressures that have
24  torpedoed Grainger."
25             Do you see that?

1                    M. HARTZMARK, PH.D.
2        A.    Yes.
3        Q.    Do you have any understanding about
4    what that sentence is referring to?
5              MR. SALTZMAN:  Objection.
6        A.    Again, I -- I have read this for the
7    purposes to determine whether there's material
8    information that was disclosed.  It appears it
9    was material enough for them to reduce their
10   price target from $53 to $39.
11             I didn't look at the individual
12   issues.
13       Q.    So is the answer to my question, no,
14   you don't have any understanding about what that
15   sentence means?
16       A.    Well, let me then --
17             MR. SALTZMAN:  I'm going to object to
18        this whole line of questioning.  This is
19        getting further and further outside the
20        scope of Dr. Hartzmark's report, which he
21        has repeatedly made clear what it is about
22        and what the issues you are asking about,
23        which is loss causation, which has nothing
24        to do with why we're here today.
25             MR. THORNTON:  I'm asking him

1                M. HARTZMARK, PH.D.
2       questions about an analyst report that he
3       relied on in issuing the report at issue in
4       this case.
5             MR. SALTZMAN:  And he relied on it to
6       the extent he made clear.
7             MR. THORNTON:  I think I'm entitled
8       to -- your objection is noted, but I think
9       I'm entitled to ask these questions.
10  BY MR. THORNTON:
11      Q.   So let me just repeat my question.
12  It's very simple.
13           The sentence I read about ecommerce
14  pressures, do you have any understanding what
15  that relates to?
16      A.   Well, you know, I'm going to note that
17  this is a 14-page report, and I will, to the
18  extent that issue is in here, I'm going to -- if
19  you will let me, I'm going to take a look at it.
20  I have told you why I relied on this report and
21  how this is consistent with -- with my opinion
22  that there was material, unexpected news, and
23  that the statistically significant responses
24  associated with material, unexpected news.
25           You're asking me about one sentence

1            M. HARTZMARK, PH.D.
2  out of 14 pages, so I need to understand what
3  context you're asking in.
4       Q.   As you sit here today, without reading
5  the entire 14 pages, sir, do you have any
6  understanding what this sentence is referring to
7  about the ecommerce pressures that have
8  torpedoed Grainger?
9            MR. SALTZMAN:  I'm going to object to
10      that again.  He's not -- he's not an expert
11      on this industry, and I don't understand why
12      you're asking him for his opinion on
13      ecommerce pressures torpedoing the company.
14           MR. THORNTON:  All he has to do -- all
15      he has to do is say is, "No, I don't," and
16      we move on to something else.  If the answer
17      is, "Yes, I do," then I'm going to ask him
18      to tell me what his understanding is.  It
19      doesn't have to be this difficult.
20 BY MR. THORNTON:
21      Q.   And I'm not asking you, sir, to read
22 the report.
23      A.   You're asking me to read one sentence
24 out of 14 that I have told you exactly why I
25 relied on this report.  I am -- if you're going

1                  M. HARTZMARK, PH.D.
2    to ask me about one sentence out of 14 pages, I
3    deserve the opportunity to -- to re-read the
4    report for these other purposes that you're
5    asking me for.
6         Q.   Here's my question:  As you sit here
7    today, without reading the entire 14-page
8    report, do you have any understanding about what
9    that sentence refers to as it relates to
10   ecommerce pressures that have torpedoed
11   Grainger?
12             MR. SALTZMAN:  If this line of
13        questioning continues, I'm going to call the
14        chambers about it.  I think it's clearly way
15        outside the scope of the deposition.
16             MR. THORNTON:  Fine.
17   BY MR. THORNTON:
18        Q.   I'm not -- Dr. Hartzmark, look, it's
19   really simple.  If you have something in mind,
20   just tell me.  If you don't, I don't want you to
21   read the entire report.
22        A.   Well.
23        Q.   So just --
24        A.   Again, I read this report.
25        Q.   Okay.

1                M. HARTZMARK, PH.D.
2        A.   And I examined it for the purposes of
3   market efficiency.  Okay?  As to the specific
4   issues, I don't recall as I sit here.  You've
5   given me a 14-page report, and you have asked me
6   about one sentence, and I'm going to look at the
7   report to see what I can recall.
8        Q.   I'm not asking you to do that.  I
9   think, if you're unable to answer anything
10  other, that's fine.  It's a very simple question
11  susceptible of a very straightforward and simple
12  answer.
13           MR. SALTZMAN:  I don't think that it
14      is.  I don't think it is a simple question.
15           (Document review.)
16           (Hartzmark Exhibit 6, William Blair
17      analyst report, marked for identification,
18      as of this date.)
19  BY MR. THORNTON:
20       Q.   You've been handed what's been marked
21  as Exhibit 6.
22           Is this the -- or does it appear to be
23  the William Blair analyst report to which you
24  refer in paragraph 90 of your report?
25       A.   Yes.