# EXHIBIT O

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| IN RE HD SUPPLY HOLDINGS, INC. SECURITIES LITIGATION | CONSOLIDATED CASE NO. 1:17-CV-02587-ELR |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I.    SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.    This report concerns a securities action in which Lead Plaintiffs "seek to certify a class pursuant to Rules 23(a) and 23(b)(3), consisting of all persons who purchased or otherwise acquired publicly-traded HD Supply common stock during the Class Period, and who were damaged thereby (the 'Class')."[1]  Per the Consolidated Amended Class Action Complaint ("Complaint"), the Class Period is defined as "November 9, 2016 [through] June 5, 2017, inclusive[.]"[2]  In support of Plaintiffs' Memorandum, Lead Plaintiffs have submitted an expert report by Michael L. Hartzmark (the "Hartzmark Report").  On May 2, 2019, Dr. Hartzmark gave a deposition (the "Hartzmark Depo.") in this matter.

2.    Counsel for Defendants in this matter has asked me to examine whether the alleged misrepresentations caused "price impact" over the entire Class Period, or, assuming that Plaintiffs prevail on liability, whether there is only price impact over some

---

[1] Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, p. 2.  ("Plaintiffs' Memorandum")

[2] Complaint, ¶2.

portion of the Class Period.  As discussed below, to the extent that there is price impact, I find that such price impact would have ended with the March 14, 2017 alleged corrective disclosure and that, therefore, there is no price impact from the alleged misrepresentations from March 14, 2017 through the end of the proposed class period. Thus, the class period should be limited to November 9, 2016 through March 13, 2017, inclusive.

## II.    QUALIFICATIONS AND REMUNERATION

3.  I received Bachelor's degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Master's degree and a Ph.D. in Economics from Harvard University.  I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association.  I have published in my fields of expertise on subjects such as market efficiency, loss causation, statistics, and the analysis of stock price movements.

4.  National Economic Research Associates ("NERA") was established in 1961 and now employs approximately 500 people in over twenty offices worldwide.  NERA provides consulting for economic matters to parties for their internal use, to parties in litigation, and to governmental and regulatory authorities.  I have worked at NERA for over twenty years and am a managing director in NERA's securities and finance practice. My work entails providing analyses for parties in litigation and consulting for parties in non-litigation settings.  I have served as a speaker at events providing CLE credits for attorneys and at academic conferences on areas related to securities litigation.  I have provided reports and/or testimony for plaintiffs and defendants in numerous securities class actions.

5.  My curriculum vitae, which sets forth in further detail my publications and prior testimony experience, is attached to this report as Exhibit 1.

6.   NERA is being compensated on a non-contingent basis for out-of-pocket costs and at our usual rates for time.  My billing rate is $950 per hour.  I have been assisted by a number of individuals at NERA working at my direction who are billing at their standard rates, which are all less than $950 per hour.


### III.   MATERIALS CONSIDERED

7.   Materials considered for the purposes of this report are listed in Exhibit 2.


### IV.   THE HARTZMARK REPORT PROVIDES AN UNRELIABLE AND MISLEADING OPINION REGARDING PRICE IMPACT

8.   In *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2405 (2014) ("*Halliburton II*"), the Supreme Court held that "a defendant could rebut [the] presumption [of reliance] in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'"  In other words, if there was no impact on the stock price from the alleged misrepresentations when an investor purchased shares, he or she could not have relied on and been misled by the alleged misrepresentations.

9.   In ¶22, the Hartzmark Report cites *Halliburton II* on price impact and in the next paragraph states that "there is no evidence of a lack of price impact when one examines the reaction of HD Supply's common stock price to the alleged corrective disclosures."[3] The Hartzmark Report later reaffirms this assertion, stating that the "empirical results from the event study for the alleged corrective disclosure and misrepresentation dates demonstrate there is no evidence of a lack of price impact when one examines … the alleged corrective information disclosed on March 14, 2017 and June 6, 2017."[4]

---

[3] Hartzmark Report, ¶23.  (Emphasis removed.)

[4] Hartzmark Report, ¶103.

10. Despite making a claim of "no evidence of a lack of price impact" from "the alleged corrective disclosures" and from "the alleged corrective information[,]" the Hartzmark Report never actually examines the corrective portion of the disclosures on the dates it references.  Instead, the Hartzmark Report merely finds that there is purportedly no evidence of a lack of price impact from ***all of the information disclosed, whether corrective or not***, on the dates of the alleged corrective disclosures.[5]

11. There are at least two reasons why this is a crucial distinction.  First, whether the allegedly corrective information or other information unrelated to the allegations caused any price impact matters when considering whether investors could have relied on the alleged misrepresentations.  While the Hartzmark Report states that there is no evidence of a lack of price impact from "the alleged corrective information[,]" because that report has failed to distinguish between the corrective information and other information, at best, Dr. Hartzmark could say that he has found no evidence as to which information (i.e., corrective information or non-corrective information) caused the price impact that he measures in his report.  This is equivalent to a prosecutor finding that someone has been murdered, not looking into any of the evidence as to who committed the murder, and then proclaiming that "there is no evidence" that a particular suspect was not the murderer.  While there has been some event (a price effect or a murder), the statement that "there is no evidence" that supports a claim that the accused (an alleged corrective disclosure or a murder suspect) was not guilty of causing that event is arbitrary, speculative, and misleading if one has not done anything more than noted that an event has occurred.  A failure to examine evidence is not the same as a lack of evidence.  As discussed below, the actual evidence demonstrates that there was no price impact related to the alleged

---

[5] For example, in ¶87, the Hartzmark Report notes that it is analyzing "the price impact on March 14, 2017 from the disclosure on March 14, 2017" and does the same for June 6, 2017 in ¶92, but then, with no analysis of whether any of the news disclosed on those dates was corrective or not, jumps to a conclusion that it has "examine[d] the price reaction of HD Supply common stock to … the alleged corrective information disclosed on March 14, 2017 and June 6, 2017" in ¶103.  The Hartzmark Report's conflation of all news and corrective information is further discussed in this report.

corrective information in the June 6, 2017 disclosure, and thus any price impact ended on March 13, 2017.

12. Second, Dr. Hartzmark is currently involved in another case (*In re Finisar Corporation Securities Litigation*) in which he has testified that the analysis that he has performed in that matter is not sufficient to reach a conclusion regarding the price impact of the alleged corrective disclosures because he did not distinguish between information related to the allegations and other non-allegation-related information.  In the instant matter (i.e., *HD Supply*), Dr. Hartzmark has performed event studies examining the price response of HD Supply's stock to all the information disclosed on each of the alleged misrepresentation and disclosure dates.  This is similar to the *Finisar* matter, in which Dr. Hartzmark opined that a similar analysis by another expert (i.e., one that looked at the total price impact of all news on a day without distinguishing between allegation-related and non-allegation-related news) could not support an opinion regarding the absence of price impact.  In particular, Dr. Hartzmark is opining in *Finisar* that another expert's "empirical results *alone* cannot be used as evidence of a lack of price impact. The empirical results, if correct, only offer the first step in a series of analyses that would be used by an economic expert to support an *affirmative* opinion as to whether or not there is an absence of price impact."[6]  Despite correctly noting in *Finisar* that the event-study analysis "cannot be used as evidence of a lack of price impact[,]" in this matter, as noted above, Dr. Hartzmark relies on the event study's empirical results alone, without distinguishing between allegation-related and non-allegation-related news, as "evidence of a lack of price impact[,]" or, in this case, as claim that there is no such evidence.[7]

---

[6] Rebuttal Report of Michael L. Hartzmark in *In re Finisar Corporation Securities Litigation* ("Hartzmark *Finisar* Rebuttal"), ¶3d.  (Emphases in original.)

[7] See Hartzmark Depo., 86:18-88:6 (discussed in ¶14 of this report) on how Dr. Hartzmark did not attempt to distinguish between allegation-related and non-allegation related news on June 6, 2017.

See also ¶¶6-9 of the Hartzmark *Finisar* Rebuttal, in which Dr. Hartzmark opines that the opposing expert "mischaracterizes [Dr. Hartzmark's] opinion suggesting [that Dr.
(continued)

13. Dr. Hartzmark continues in his report in *Finisar* to note that there are "commonly-used and generally-accepted economic analyses to examine price impact. These analyses would incorporate the evaluation of news, analyst reports and [company] corporate filings, among other materials to *affirmatively* demonstrate whether … [there] is or is not evidence of a lack of price impact."[8]  In Section V of this report, I will employ these commonly used and generally accepted economic analyses to demonstrate that not only is there evidence of a lack of price impact from the June 6, 2017 alleged corrective

_____

Hartzmark] concluded there is evidence of price impact" because the opposing expert allegedly failed to properly consider that Dr. Hartzmark "clearly stated that [he] was addressing the price movements associated with multiple disclosures" and did not engage in the "exercise of disaggregating the daily close-to-close price movements[.]"  In the Hartzmark Report in the *HD Supply* case, Dr. Hartzmark fails to disaggregate the price movements but, contrary to what he claims is proper in *Finisar*, does provide an opinion regarding whether there is evidence of price impact.  See also ¶11 of the Hartzmark *Finisar* Report.  ("Even more critical, an *affirmative* economic price impact analysis requires more than just a statistical analysis of price movements. To conduct a proper *affirmative* price impact analysis, an economic expert first assumes that the allegations are true – namely that the misstatements represent new information – and then using statistical analysis, in combination with the analysis of news reports, analyst evaluations and firm-specific financial information, among other sources, attempts to decipher and isolate the impact of the misstatements from the other disclosures that are contemporaneously revealed.  For example, even when a price movement is found to be statistically *insignificant*, the economist must evaluate whether or not there was offsetting news disclosed (unrelated to the misstatements) that might have suppressed the price movement."  (Emphases in original.))

See also Plaintiffs' Opposition to Defendants' Administrative Motion for Leave to File Sur-Reply in *Finisar*, p. 4. ("Defendants mistake Dr. Hartzmark's opinion that 'there is no evidence of a lack of price impact' based on the empirical results for the March 8, 2011 disclosure as an affirmative opinion based on a complete 'price impact' analysis.")  Here, I seek to avoid making the "mistake" of treating Dr. Hartzmark's opinion in this (the *HD Supply*) matter that "there is no evidence of a lack of price impact" as an affirmative opinion based on a complete price-impact analysis.  I recognize that Dr. Hartzmark's statement about "no evidence of a lack of price impact" is, instead, some statement by Dr. Hartzmark based on an incomplete analysis of price impact as opposed to one "based on a complete 'price impact' analysis."

[8] Hartzmark *Finisar* Rebuttal, ¶3d.  (Emphases in original; internal footnote omitted.)

disclosure, but there is proof of a lack of price impact from that alleged corrective disclosure.

14. Finally, it is worth noting that the Hartzmark Report is particularly misleading when it comes to its discussion of price impact.  In the *Finisar* case, the expert opposing Dr. Hartzmark apparently believed that Dr. Hartzmark's reference to price impact referred to the price impact of the allegedly misrepresented information.  However, as the Hartzmark *Finisar* Rebuttal points out, in that case, he was referring to "disclosures on December 1 and 2, 2010" in the relevant section and did not disaggregate the alleged misrepresentations from other news disclosed in that time period.[9]  In the instant matter, however, Dr. Hartzmark refers not to the price impact on certain dates, but refers specifically to the price impact of "the alleged corrective disclosures"[10] and of "the alleged corrective information disclosed on March 14, 2017 and June 6, 2017."[11] This is an incorrect and misleading description of what Dr. Hartzmark has in fact analyzed.  In fact, in his deposition, Dr. Hartzmark admitted that he could not recall his analysis, if any, or his conclusions, if any, regarding whether there was unexpected information related to the alleged fraud disclosed on June 6, 2017.  See, for example, Hartzmark Depo., 86:18-88:6:[12]

> Q. Have you attempted to analyze the June 6 disclosure to see whether there was any unexpected information disclosed that was unrelated to the alleged fraud?
> MR. SALTZMAN: Objection.
> A. That's an issue associated with loss causation, and I haven't been asked to opine on loss causation.

---

[9] Hartzmark *Finisar* Rebuttal, ¶¶7-8.

[10] Hartzmark Report, ¶23.  (Emphasis removed.)

[11] Hartzmark Report, ¶103.

[12] See also Hartzmark Depo., 89:7-13, where Dr. Hartzmark admits that he "can't recall" whether he "identif[ied] any information disclosed on June 6 that was both unexpected and unrelated to the alleged fraud[.]"

Q. It would be real easy if you just said
yes, you did or no, you didn't.
MR. THORNTON: So could you read him
the question and see if I can get an answer.
(Record read.)
A. The answer stays the same. I wasn't
asked to do that because I wasn't asked to do a
loss causation analysis.
Q. I'm not asking you what you were asked
to do. I'm asking you what you did.
So did you make any effort to do that
or did you not? It's a very simple question.
Yes, you did or no, you didn't?
A. I believe the scope of what I was
asked to do is clearly delineated in my report.
Q. That's not my question, Dr. Hartzmark.
I'm not asking what your engagement was. I'm
asking what you did. All you have to do is tell
me if you made some effort to break out any
information in the June 6 announcement that was
unexpected and unrelated to the alleged fraud,
just tell me, yes, I did, and then I'll ask you
what you did. If the answer is no, I didn't,
then we can move on to the next question.
A. Well, your question is quite broad.
Okay? I have looked at a variety of analyst
reports, for example, okay? I don't recall
whether I looked at – it's likely, but I don't
recall whether I looked at June 6. …

15. In fact, if one wishes to opine, as Dr. Hartzmark has done, that "there is no evidence of a lack of price impact when one examines the reaction of HD Supply's common stock price to the alleged corrective disclosures[,]"[13] as well as to "the alleged corrective information disclosed on March 14, 2017 and June 6, 2017,"[14] then disaggregation is not (just) a loss-causation question, but a price-impact question. Instead, Dr. Hartzmark opines that there is no evidence of a lack of price impact **with**

---

[13] Hartzmark Report, ¶23.

[14] Hartzmark Report, ¶103.

***respect to the alleged corrective information*** even though he has not examined the price impact, if any, of the alleged corrective information.   Consequently, Dr. Hartzmark provides an incorrect and misleading opinion.

## V.   THERE WAS NO PRICE IMPACT FROM THE ALLEGED CORRECTIVE DISCLOSURE ON JUNE 6, 2017

16. As the Hartzmark Report has not provided a proper affirmative opinion on price impact, I begin that analysis here, specifically with regard to the June 6, 2017 disclosure. On June 6, 2017, HD Supply announced its earnings for the first quarter of 2017 and provided a discussion of its future, including a discussion of future spending at its Facilities Maintenance ("FM") division.   While Plaintiffs attempt to tie that discussion of future spending at Facilities Maintenance to the Complaint's allegations of prior supply-chain issues at the Facilities Maintenance division, as discussed below, there was no change in the expected costs of dealing with the supply-chain recovery.   Instead, the new expected future costs announced for Facilities Maintenance on June 6, 2017 corresponded to other issues unrelated to the allegations.   In addition, the disappointing financial results at FM in 1Q17 were due to issues other than new disclosures regarding the supply-chain recovery.

### A.   There Was No Change in the Expected Cost of Dealing with the FM Supply-Chain Issues Disclosed on June 6, 2017

17. In ¶90, the Hartzmark Report quotes the Complaint as stating that "when analysts pressed Defendants to give more specifics about the newly announced additional FM spending during an earnings conference call [on June 6, 2017], Defendants persistently dodged these questions."[15]

---

[15] Hartzmark Report, ¶90.  (Closing footnote citing Complaint ¶86 omitted.)

18. However, the newly announced additional FM spending was not related to the supply-chain recovery that is the basis for the allegations in this matter.  In HD Supply's March 14, 2017 earnings call, Evan Levitt, HD Supply's CFO, stated the following:

> Our first-quarter EBITDA guidance includes approximately **$10 million of costs** associated with the 2016 Facilities Maintenance supply chain recovery including **$2 million** associated with labor we opted to retain through a lower sales volume quarter to be prepared for the upcoming selling season, **$5 million** associated with freight expense and **$3 million** associated with rent expense attributed to real estate secured to expand distribution center capacity.[16]

19. In HD Supply's June 6, 2017 earnings call, Mr. Levitt stated:

> Facilities Maintenance's adjusted EBITDA for the first quarter of 2017 was $117 million, down $17 million from the first quarter of 2016. This performance includes approximately **$3 million** of incremental facility costs, approximately **$5 million** in incremental previously incurred freight costs to expedite product movement that was capitalized in the 2016 ending inventory costs and approximately **$2 million** of incremental surge labor to accelerate distribution center execution.[17]

20. Notably, *all* of the spending categories, and the associated amounts, related to the supply-chain recovery announced on June 6, 2017 ($2 million for labor, $3 million for rent/facilities, and $5 million for freight) were the same as those forecast on March 14, 2017.  Thus, the "newly announced additional FM spending" referred to in ¶90 of the Hartzmark Report, the only information to which the Hartzmark Report attributes the June 6, 2017 price response of HD Supply's stock, could not be related to the supply-chain recovery issues.[18]  Instead, the FM spending related to the supply-chain recovery

---

[16] HD Supply 4Q 2016 earnings call transcript.  (Emphasis added.)

[17] HD Supply 1Q 2017 earnings call transcript.  (Emphasis added.)

[18] When asked whether he could "describe anything that you recall from the analyst reports that you attribute to the -- that they attributed to the newly announced additional FM spending[,]" and with the question rephrased as "whether you recall anything else
(continued)

issues was a confirmation of the previously announced forecast of those costs.[19,20]   If there was no change in the expected spending on the FM supply-chain recovery on June 6, 2017, that spending could not be the cause of any price change on that date.  (This position has been noted by the Eleventh Circuit in *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011). ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information -- or information already known by the market -- will not cause a change in the stock price.")  Moreover, as the amount of that spending was correctly forecast on March 14, 2017, there would be no artificial inflation in HD Supply's stock price on or after March 14, 2017, when the truth regarding that spending was disclosed to the market.[21]   In other words, the artificial

---

[other than 'one sentence [saying] the most troubling development was the new incremental FM spending'] in the analyst reports that address that," Dr. Hartzmark responded, "Not that I recall right now."  (Hartzmark Depo., 93:8-21.)

[19] The Complaint itself recognizes that the $10 million in spending was disclosed on March 14, 2017 rather than June 6, 2017.  See Complaint, ¶78.  ("On March 14, 2017, the Company issued a press release announcing its results for the fourth quarter …. Although the Company met analyst estimates for Q4 2016 earnings, Defendants surprised the market by announcing a projected $10 million in additional spending related to the FM supply chain recovery for Q1 2017.")

[20] RBC also noted, "HD Supply had guided to roughly $10 million in elevated costs and came in right at this level: $3 million incremental facility costs, $5 million incremental freight costs, and $2 million incremental surge labor costs. HD Supply noted that incremental surge labor costs are done, though there may be $1-$2 million in freight costs that linger into F2Q17. Although it was previously noted these costs could linger into F2Q17, we believe the execution on these costs has been disappointing." ("Skittish Distributor Investors Spooked by F1Q Miss," *RBC Capital Markets*, June 7, 2017.)  In fact, in HD Supply's March 14, 2017 earnings call, Mr. Levitt noted that it would be the freight category specifically with costs that could linger, stating that "we will continue to see some elevated cost roll through margin in the first quarter as a result of what we spent on freight, expediting freight to get inventory in stock.  That will flow itself through.  It's primarily in the first quarter, a little bit in the second quarter."

[21] This does not imply that there was necessarily artificial inflation in HD Supply's stock price prior to March 14, 2017.  Whether that was the case or not will depend on further analyses and any determination regarding liability in this matter.  However, there cannot
(continued)

inflation (if any existed) in HD Supply's stock price was removed when the market responded to the March 14, 2017 news announcement.

### B. The Newly Announced Additional FM Spending Did Not Relate to the Supply-Chain Recovery

21. While ¶90 of the Hartzmark Report correctly notes that there was "newly announced additional FM spending[,]" that spending was not tied to the supply-chain recovery, nor did the market tie the additional spending to the supply-chain recovery.

22. For example, ¶90 of the Hartzmark Report states that a "RBC Capital Markets report issued on June 7, 2017, stat[ed]: 'The most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call.'"[22]  The Hartzmark Report fails to include the bolded first sentence in the paragraph of the RBC Capital Markets Report containing this quote: "New incremental FM spending stirs worries that HDS could be susceptible to Amazon pressures."  The Hartzmark Report also limits its quote to one sentence, ignoring the following explanatory sentence in the RBC Capital Markets Report: "Investors thought the worst and linked this spending to the ecommerce pressures that have torpedoed Granger."  Had the Hartzmark Report put its quote from the RBC Capital Markets analyst report in context, it would have been clear that the newly announced additional FM spending related to competitive pressures, not to supply-chain recovery issues.[23]  When asked about the sentence following the one he quoted (i.e., when asked about the sentence "Investors thought the worst and linked this spending to the ecommerce pressures that

---

be any price inflation related to spending on the FM supply-chain recovery following March 13, 2017.

[22] Closing footnote in Hartzmark Report: "RBC Capital Markets, *Skittish Distributor Investors Spooked by F1Q Miss*, June 7, 2017, p.1."

[23] The same RBC Capital Markets Report states, "**Biggest Surprise: New ongoing investments in FM are needed to keep pace with the market.** HD Supply did not disclose the exact investments and this is still 'evolving internally'. It is hard not to link this spending to the more cutthroat ecommerce competition."  (Emphasis in original.)

have torpedoed Granger") and asked, "Do you have any understanding about what that sentence is referring to[,]" Dr. Hartzmark either would not or could not provide a meaningful response.[24]   Keeping in mind that Dr. Hartzmark was able to choose which analyst report to quote and what material to quote from that report, the fact that the sentence following the one quoted by the Hartzmark Report ties the new incremental FM spending to competitive pressures and not to supply-chain recovery issues is indicative of the lack of evidence tying the new incremental spending to the supply-chain recovery issues.

23. The Hartzmark Report also references a Raymond James report in its ¶90.[25]   In the third diamond bullet point on the first page of that report, Raymond James states, "In our view, the stock's visceral reaction was prompted by a conference call that failed to effectively placate industry-wide concerns that HDS too could be susceptible to either Grainger's recent price cuts and/or Amazon's ultimate encroachment."   This is very similar to the statements by RBC Capital Markets that the threat to HD Supply (and, per RBC Capital Markets, the newly announced additional FM spending) related to increased competitive activity, such as price cuts by Grainger or encroachment by Amazon.

24. Paragraph 90 of the Hartzmark Report also references an analyst report by William Blair.[26]   This analyst report states on its first page, "**Sudden need to invest in FM web experience viewed negatively by Street.** The biggest surprise on the fiscal first-quarter call was management's announcement that accelerated growth investments

---

[24] See Hartzmark Depo., 100:21-105:14, with Dr. Hartzmark testifying, "I didn't look at the individual issues[,]" and objections by counsel for Plaintiffs to questions related to the sentence in the RBC analyst report not quoted in the Hartzmark Report that immediately follows the sentence in the RBC analyst report that the Hartzmark Report quoted.

[25] "Visceral Post-1Q Stock Reaction Leaves HDS Shares Below Peer Values," *Raymond James*, June 7, 2017.

[26] "Waterworks Sale Overshadowed by Continued Growth Investment," *William Blair*, June 7, 2017.

are needed to meet changing customer expectations."[27]   As with the other analysts, William Blair recognized that the newly announced additional FM spending related to the threat of HD Supply losing customers to competitors, such as ecommerce sites like Amazon, specifically due to "changing customer expectations[,]" as opposed to concerns about the supply-chain recovery.

25. One can also see how HD Supply characterized the newly announced additional FM spending using a document from Dr. Hartzmark's own backup: HARTZMARK0006286, a page from HD Supply's July 19, 2017 Form 8-K.  A boxed description at the bottom of this page refers to "$10M – 20M Incremental SG&A Investment on Customer Experience and Extension of Existing Capabilities[.]"  Notably, this incremental investment relates to an "[e]xtension" of existing capabilities, not to fixing existing capabilities.  The "Supply Chain" category of this incremental investment is one of four sub-bullets under the larger bullet point "Build Out Dynamic Capabilities to Enable Selling Channels."  That is, the sole reference to supply chain in this list of investments involves, depending on the characterization, either building out new capabilities or extending existing capabilities, not fixing the company's existing capabilities.

26. Following this 8-K, RBC released an analyst report on July 19, 2017 titled "HDS – Reaffirmed Guidance and More Clarity on Strategic Investments Should be a Modest Positive[.]"  RBC tied this spending to the June 6, 2017 announcement, stating, "The key takeaways are that F2Q17 and F2017 guidance was reaffirmed, and the company provided significantly more clarity on the strategic investments it announced last quarter, sizing the spending at $10-$20 million in F2H17 through F2018.  The company also provided a grocery list of 14 different 'select growth' buckets where this strategic spending could be targeted."[28]   "[S]elect growth" buckets are, of course, different from

---

[27] Emphasis in original.

[28] Italicization removed.

fixing existing supply-chain capabilities.  Moreover, not only did the title of this RBC analyst report (referencing "More Clarity on Strategic Investments") implicitly tie the issues of a perceived lack of management credibility following the June 6, 2017 announcement to the new FM spending unrelated to the supply-chain issues, but so did the text of that RBC analyst report, which stated, "Recall that the company did not have crisp answers about these strategic investments in last quarter's conference call (vague on the dollar amount, areas where it would be spent, and the duration)." On August 29, 2017, in advance of the next quarterly earnings announcement, RBC stated, "We are not expecting anything close to last quarter's fireworks when an unexpected increase in growth spending triggered an unsettling sell-first-and-ask-questions later 17.5% pullback. On July-19, guidance was reaffirmed and FM growth spending was further clarified[.]"[29] Here, RBC explicitly ties the June 6, 2017 FM spending to new growth strategic initiatives, and blames those initiatives and the lack of "crisp answers" by the company regarding those initiatives for the stock pullback in June.

27. In advance of the second-quarter earnings announcement, Morgan Stanley was even more explicit in distinguishing the supply-chain recovery costs from the new investments announced on June 6, 2017, stating that the "ramp-down of inventory fulfillment costs is likely to be offset by incremental growth investments ($3m in 2Q as per guidance)."[30]  Thus, the analysts confirm that the new growth initiatives at Facilities

---

[29] "F2Q17 Preview: In-line Results Would Feel Like a Beat," *RBC Capital Markets*, August 29, 2017.

[30] "2Q17 Preview," *Morgan Stanley*, September 1, 2017.  This analyst report also states that in 3Q17, "tailwinds from the absence of surge labor and freight costs ($10m) more than offsetting a step-up in growth investment ($5m MSe [Morgan Stanley estimate] vs. $10-20m guidance for 2H17 and 2018)."   That is, the $10 million in supply-chain recovery costs in 3Q16 were not expected to be repeated in 3Q17 (a benefit of $10 million), which would more than offset the $5 million in growth investments that Morgan Stanley assumed would be incurred in 3Q17 out of the $10-$20 million total expected investments over 2H17 and 2018.

Maintenance were both distinct from the supply-chain recovery issues and were the cause of the stock-price decline following the June 6, 2017 announcement.[31]

### C. *Summary of the Analysis of the Newly Announced FM Expenditures on June 6, 2017*

28. In the *Finisar* case, Dr. Hartzmark opined that one should employ "commonly-used and generally-accepted economic analyses to examine price impact. These analyses would incorporate the evaluation of news, analyst reports and [company] corporate filings, among other materials to *affirmatively* demonstrate whether … [there] is or is not evidence of a lack of price impact."[32]

29. I have done so here, evaluating the news on that date compared to the earlier news on March 14, 2017; analyst reports following the June 6, 2017 news; and a relevant company corporate filing.   These analyses demonstrate that the newly announced additional FM spending disclosed on June 6, 2017 was unrelated to the FM supply-chain recovery.  On June 6, 2017, HD Supply reaffirmed the exact same FM supply-chain costs (including the exact same figures for each of the three categories of those costs) that it had previously disclosed on March 14, 2017.  Analyst reports following the June 6, 2017 disclosure demonstrate that the then-newly disclosed additional FM expenditures were believed to relate to new competitive issues and not to the previous supply-chain issues. Finally, when HD Supply provided more clarity on the make-up of that spending, the

---

[31] Paragraph 13 of the Complaint cites a Deutsche Bank report following the June 6, 2017 earnings announcement that noted that the company's failure to meet its planned profit trajectory caused issues with management's credibility.  However, the profit miss was due to the issues unrelated to the allegations in the Complaint (as discussed in §V(D) of this report), meaning that the credibility issues that arose with the June 6, 2017 earnings announcement are not attributable to the allegations in the Complaint.  The Complaint even quotes that Deutsche Bank report as stating concern that it was "unclear when the new elevated spending might subside, and could instead go on for years."  As noted above, that new elevated spending was for the new growth initiatives unrelated to the supply-chain recovery, as further clarified by HD Supply in July 2017.

[32] Hartzmark *Finisar* Rebuttal, ¶3d.  (Emphases in original; internal footnote omitted.)

spending was described and recognized as dealing with new growth opportunities, not as expenditures related to the previous supply-chain issues.

### D. FM's EBITDA Miss in 1Q17 Is Explained by Issues Other than the Previous Supply-Chain Problems

30. While the Hartzmark Report lists only the costs related to the supply-chain recovery as a factor in HD Supply's stock-price decline following the June 6, 2017 news, the Complaint speculates that on June 6, 2017, HD Supply "disclosed … that the FM supply chain was in much worse shape than Defendants had previously acknowledged, materially impacting the Company's operating results, including its most important financial metric. On that day, the Company announced that, for Q1 2017, FM's Adjusted EDITDA had deteriorated dramatically from the same period of the prior year—a drop from $134 million to $117 million, or 13%—the largest decline in HD Supply's history as a public company, precisely because of the supply chain issues."[33]

31. Contrary to what the Complaint says, HD Supply did not disclose that the FM supply chain was "in much worse shape" than previously acknowledged and thus negatively affected the company's operating results such as EBITDA. The statement about the decline in FM EBITDA to $117 million was as follows:[34]

> Facilities Maintenance's adjusted EBITDA for the first quarter of 2017 was $117 million, down $17 million from the first quarter of 2016. This performance includes approximately $3 million of incremental facility costs, approximately $5 million in incremental previously incurred freight costs to expedite product movement that was capitalized in the 2016 ending inventory costs and approximately $2 million of incremental surge labor to accelerate distribution center execution. ***This was in line with the guidance given on the fourth quarter earnings call.***

---

[33] Complaint, ¶85.

[34] 1Q17 earnings call. (Emphasis added.)

32. A decline in EBITDA consistent with previously provided guidance should not be the source of a stock-price decline.[35]  Beyond the $10 million in expected costs, HD Supply explained that "this really was a story about vertical mix, product mix and some other kind of nuances around the business as opposed to anything structural."[36]  Again, the EBITDA decline is attributed solely to issues other than the previous supply-chain difficulties.

_____

[35] While it could be the cause of a stock-price decline if the previous guidance was believed to be too conservative (i.e., if the market believed that HD Supply had overstated expected costs), it is my understanding that truthful and accurate guidance by defendants could not be a basis for a securities-fraud claim.

[36] The complete answer by Mr. Stengel is as follows: "WILLIAM P. STENGEL: Dave, I would just add on the gross margin in Facilities Maintenance. We continue to feel very good about category management and what we're doing from a controllable execution standpoint there and seeing very nice results. So this really was a story about vertical mix, product mix and some other kind of nuances around the business as opposed to anything structural."  "Vertical mix" refers to different product lines or categories.

Also relevant are comments by Mr. DeAngelo in the 4Q16 earnings call, where Mr. DeAngelo stated, "We estimate that there was approximately 200 basis points of sales growth headwind for Facilities Maintenance during the fourth quarter [of 2016] associated with the legacy supply chain interruption and an additional 200 basis points of headwinds associated with property improvement slowdown and the industry-wide government-mandated R-22 phase-out, which is consistent with the commentary and guidance we previously disclosed in December.  We expect this impact to continue in the first quarter of 2017 before we begin to see a return to market outgrowth for the balance of the year.  Our February performance at Facilities Maintenance was also in line with our expectations."  Thus, the company disclosed that the impact of headwinds that had been affecting 4Q16 FM revenues would "continue in the first quarter of 2017" and that performance in February 2017, the first month of 1Q17, was in line with these negatively affected expectations.  See also "Downgrade to Hold Post 1Q on a Lower Earnings Forecast," *Drexel Hamilton*, June 7, 2017, finding that 1Q17 sales growth was below that of the maintenance, repair, and overhaul market, as expected from the 4Q16 earnings call.  ("FM reported disappointing quarterly sales and operating margin.  Revenue was $682M, up 0.7% from 1QFY16 and below the MRO end market growth of 1% to 2%. (in line with the previous view from the 4Q call). We expect revenue growth to return to 3.4% in 2Q, considering preliminary average daily sales growth in May was 5.2%.")

33. With regard to the status of the supply chain, in the 1Q17 earnings call, William Stengel, Facilities Maintenance President and CEO, stated that the supply-chain issues "are all legacy issues for us, so we're very focused on moving forward.   All of our operating metrics are as good or better than they were in the past."  This is not the same as the Complaint's characterization of the supply chain being "in much worse shape than Defendants had previously acknowledged."

34. The sole point that the Complaint brings up here is that, purportedly, "during an exchange with an unidentified analyst, Stengel <u>admitted</u> that the Company's prior representations about its supply chain recovery process had been false, and that, contrary to prior representations, the supply chain's performance had only improved, at earliest, by May 2017, as the Company 'exited' the first quarter of 2017[.]"[37]   However, the earnings call transcript shows that this conversation between Mr. Stengel and analyst Keith Brian Hughes of SunTrust Robinson Humphrey (not an "unidentified analyst") is not as the Complaint describes.

35. Mr. Stengel did not admit anything about representations of the supply-chain recovery process being false.  The relevant question asked by Mr. Hughes immediately followed Mr. Stengel's statement that "[a]ll of our operating metrics are as good or better than they were in the past."  Following this, Mr. Hughes asked, "Okay. And was that the case in the first quarter? Did you perform at these levels? Or did you get there kind of exiting the quarter?" and Mr. Stengel replied, "I would say we got there exiting the quarter."  That is, the supply-chain metrics were as good *or better* than in the past as HD Supply exited the quarter.  This does not indicate that the supply-chain metrics were not overall roughly as good as in the past throughout the quarter.  Moreover, even if the supply-chain metrics were worse than at some point in the past during 1Q17, there is no indication that any such issues were "materially impacting the Company's operating results, including its most important financial metric[,]" as the Complaint speculates.

---

[37] Complaint, ¶87.  (Emphasis in original.)

36. In fact, I am not aware of any analyst who attributed FM's EBITDA decline in 1Q17 to supply-chain problems (though analysts did note the previously disclosed $10 million in supply-chain recovery costs that they were aware of from the March 17, 2017 earnings call). Instead, analysts gave other reasons for the disappointing FM financial results. For example, Robert W. Baird stated:[38]

> Management noted 20bp of mix-related gross margin headwinds impacted operating leverage this quarter, as growth from lower-margin hospitality products outpaced other FM verticals. In addition, the majority of the sales shortfall this quarter was attributed to the core multi-family portion of the business (~two-thirds of segment sales) which was flattish in spite of continued favorable macroeconomic trends for multifamily housing, while the property improvement (up high single digits) and hospitality (up double digits) portions of the business saw relatively higher growth rates.

37. Notably, there is no reference to supply-chain recovery issues in this discussion. Given that the analyst is describing the reasons for the FM financial results, one would expect that if he believed that those results were negatively affected by the previous supply-chain issues, he would have at least mentioned them.[39]

---

[38] "Downgrading to Neutral," *Robert W. Baird*, June 7, 2017.

[39] Examining and counting references to certain ideas is known as "content analysis." Properly implemented, content analysis can be useful in understanding what factors may have affected the price of a security. Content analysis was endorsed in an opinion by the First Circuit in the context of a securities fraud case. See *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 n.12 (1st Cir. 2014) ("[Plaintiffs' expert] could also have used content analysis. *See, e.g., David Tabak, Making Assessments About Materiality Less Subjective Through the Use of Content Analysis* (2007), *available at* http://www.nera.com/67_5197.htm; Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients,* 35 J. Corp. L. 11, 25 (2009) ("'[C]ontent analysis" is now part of the tool kit for determining which among a number of simultaneous news events had effects on the stock price.').")." The failure of analysts to reference the supply-chain difficulties (other than the previously announced $10 million in costs) as a factor in FM's disappointing performance is therefore strong evidence that the market did not attribute any portion of that disappointing performance to newly disclosed issues with FM's supply chain.

38. Similarly, J.P. Morgan stated that "targeted outgrowth is costing more as customer expectations are rising. This cut to the core FM business[.]"[40]  Again, there is no reference to supply-chain issues.  In another report, J.P. Morgan stated, "While supply chain costs at FM were in line with expectations (-$10mm y/y), management said gross margin contracted on vertical/product mix headwinds (not price), and sales growth was not enough to overcome SG&A investments."[41]

39. One analyst who did discuss the decline in margins, and thus EBITDA, due to the supply-chain issues referenced the already-known $10 million costs discussed in HD Supply's March 14, 2017 earnings call.  Drexel Hamilton stated, "The FM margin decrease was due to ~$3M of incremental facility costs, ~$5M in incremental previously incurred freight costs to expedite product movement that was capitalized in the 2016 ending inventory costs, and ~$2M of incremental surge labor to accelerate distribution center execution."[42]  These are the same figures discussed earlier in this report.  (See ¶¶ 17-20.)

40. Finally, after the company provided additional detail on the new spending initiatives, RBC stated, "Sizes incremental FM investment spending at $15-$25 million in total from F2017 through F2018, modestly below fears that spending could creep into the +$30 million range. HD Supply noted it already spent $2 million in F1Q17 and that it expects to spend another roughly $3 million in F2Q17."[43]  In other words, while the $10 million in expenditures on supply-chain recovery had been anticipated, there were $2 million in expenditures on new initiatives that had not been anticipated and that had an

---

[40] "1Q Wrap," *J.P. Morgan*, June 22, 2017.

[41] "Our Take on Conf Call and Quick Summary of Details – ALERT," *J.P. Morgan*, June 6, 2017.

[42] "Downgrade to Hold Post 1Q on a Lower Earnings Forecast," *Drexel Hamilton*, June 7, 2017.

[43] "HDS – Reaffirmed Guidance and More Clarity on Strategic Investments Should be a Modest Positive," *RBC Capital Markets*, July 19, 2017.  (Emphasis omitted.)

unexpected negative effect on FM EBITDA.[44]  I also note that before the earnings call, RBC speculated that "FM sales were stubbornly subdued around up 1% or less during the quarter, perhaps due to ongoing supply chain issues[.]"[45]  However, after the earnings call, RBC put out a report that did not suggest that supply-chain issues were a cause of low FM sales but did list four reasons "Why HDS Sales Sold Off on June-6[,]" none of which included FM sales during 1Q17.[46]

### E.  An Event-Study Analysis Indicates That The Market Perceived the June 6, 2017 HD Supply News as Negative For Competitors, Contrary to What Would Be Expected if HD Supply Disclosed Additional Supply-Chain Issues

41. In addition to reviewing the Hartzmark Report's event-study examination of HD Supply, I performed an event-study examination of the companies that the Hartzmark Report uses to reflect industry effects.  To do this, I first recreated the Hartzmark Report's analysis of the "excess industry return," or how much the index of the industry companies moved once one accounts for broader market movements.  My results using the regression period used in the Hartzmark report matched those found in that report.  I also ran the analysis over just the 120 previous trading days, the same procedure that the Hartzmark Report uses for its event studies of individual events.  See Exhibit 3 for these two sets of results, known as market models.

42. I then examined the excess industry return on June 6, 2017 and compared it to the Hartzmark regression period and to the immediately preceding 120 excess industry returns.  In both cases, the excess industry return on June 6, 2017 is statistically significant at the standard 5% level.  See Exhibit 4 for the two event studies on June 6,

---

[44] Moreover, another explanation for HD Supply's stock-price decline after the June 6, 2017 announcement beyond the product-mix shift discussed above would be the expected future costs of these new initiatives.

[45] "HDS – Misses F1Q by 3c, Sells Waterworks for Reasonable $2.5 bil, to Buy back 6% of Shares," *RBC Capital Markets*, June 6, 2017, 9:40 AM ET.

[46] "Skittish Distributor Investors Spooked by F1Q Miss," *RBC Capital Markets*, June 7, 2017.

2017.  Based on these, one may informally expect that there was news that affected the industry overall.[47]  This news appears to be a reaction to HD Supply's June 6, 2017 earnings announcement, with one analyst covering Fastenal (one of the members of the industry index) stating, "Shares are weak this morning, but this is probably more a reaction to HD Supply's (HDS $34.63; Outperform) soft quarter and guidance creating fears that competition is increasing."[48]

43. If HD Supply's soft quarter and guidance were perceived as due to supply-chain issues at HD Supply, that would be good news for competitors, and their stock prices should increase.   Instead, the analysts' (and, by extension, the market's) view that "competition is increasing" indicates an understanding that the decline in HD Supply's stock price was due to competitive effects rather than negative company-specific performance.  In other words, the negative movement in HD Supply's stock price on June 6, 2017 is not tied to the allegations in this matter, but to fears of increased competition.

---

[47] An event study does not allow for this type of formal inference.  Notably, the Hartzmark Report repeatedly misinterprets its event-study results, engaging in what is known as the Prosecutor's Fallacy or as the "transposition fallacy" when it makes statements such as that Dr. Hartzmark "can say with 99% confidence that the price impact on March 14, 2017 from the disclosure on March 14, 2017 was not due to a random price movement or chance." (Hartzmark Report, ¶87.  See also Hartzmark Report, ¶92, for a similar misstatement.)  See, for example, the *Reference Guide on Statistics* in the *Reference Guide on Scientific Evidence*, published by the Federal Judicial Center, 2011, pp. 250-251.  See also Harvey, Campbell R., "Presidential address: The scientific outlook in financial economics," *The Journal of Finance* 72.4 (2017), p. 1410. ("It is also incorrect to interpret the test as providing [99%] confidence that the effect being tested is true."  That is, what the Hartzmark Report does, interpreting its statistical test as providing a certain degree of confidence that the effect is true as opposed to being false or due to chance, is incorrect.)

[48] "Fastenal Company[:] May ADS Solid as Demand Continues to Improve; Summary of Management Conversation," *William Blair*, June 6, 2017.  The statement that Fastenal's price movement was "more a reaction to HD Supply's … soft quarter" reflects that Fastenal also released May sales data on June 6.

### *F.   Summary*

44. To summarize, at best, the Complaint focuses on one comment by Facilities Maintenance's CEO and President stating that FM achieved supply-chain metrics as good as *or better* than those previously achieved as it exited the quarter.  This does not mean that the supply chain did not supply metrics that indicated a full recovery on average throughout the quarter.  Moreover, even if the supply chain had not fully recovered, that would not necessarily mean that any supply-chain recovery issues negatively affected FM's financial results.  Notably, while the Complaint attempts to blame alleged undisclosed supply-chain issues for FM's low EBITDA in 1Q17, a review of analyst reports rejects that speculation.  Analysts blamed either previous accurately forecast supply-chain costs or factors unrelated to the supply-chain issues for the FM EBITDA results.  This is consistent with analysts finding that the June 6, 2017 HD Supply news reflected negative information for competitors, the opposite of what would be expected if HD Supply disclosed additional or ongoing problems with its supply chain.

## VI.   Conclusion

45. The Hartzmark Report's conclusion that there is "no evidence of a lack of price impact when one examines the reaction of HD Supply's common stock price to the alleged corrective disclosures"[49] is unsupported, speculative, and misleading because Dr. Hartzmark never actually examines the corrective disclosures but merely examines all the information, whether corrective or not, disclosed on those dates.  Notably, Dr. Hartzmark has opined recently in another matter that without examining the corrective portion (if any) of a disclosure, one cannot opine on whether there is evidence of a lack of price impact from a corrective disclosure.

46. An examination of the June 6, 2017 disclosure shows that there was, in fact, no corrective component to that disclosure.   The costs associated with the supply-chain

---

[49] Hartzmark Report, ¶23.  Emphasis omitted.

recovery that were mentioned by HD Supply on that date were previously disclosed, both in aggregate and for each of the three constituent parts, on March 14, 2017. Thus, there was no newly announced additional spending related to the supply-chain recovery disclosed on June 6, 2017 and no related corrective disclosure. Instead, the FM-related expenditures disclosed on June 6, 2017 were for new initiatives to expand FM's selling capabilities. Furthermore, the negative FM financial results disclosed on June 6, 2017 were due to the previously disclosed expenditures and to changes in product mix, not due to newly disclosed supply-chain recovery issues.

47. As there was no corrective information disclosed on June 6, 2017, there was no price impact due to the allegations on that date. This implies that any artificial price inflation in HD Supply's stock would have ended no later than March 13, 2017, immediately preceding the other alleged corrective disclosure date. With no artificial inflation after that point, to the extent that a class should be certified in this matter, it should be limited to the period November 9, 2016 through March 13, 2017, inclusive.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

David I. Tabak
June 17, 2019



**David I. Tabak**
Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 2176
david.tabak@nera.com
www.nera.com

# EXHIBIT 1
# DAVID I. TABAK
## MANAGING DIRECTOR

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology.  While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, Delaware Chancery, and bankruptcy courts, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, the International Dispute Resolution Centre, and the International Chamber of Commerce International Court of Arbitration.  He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*.  Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals.  His publications have covered topics such as commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses.  Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for accountants and valuation professionals.

Dr. Tabak has been retained as an expert to address issues including allegations of valuations, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, analysis of potential insider trading for a financial institution, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

David I. Tabak

## Education

**Harvard University**
Ph.D., Economics, 1996
M.A., Economics, 1992

**Massachusetts Institute of Technology**
B.S., Economics, 1990
B.S., Physics, 1990

## Professional Experience

**NERA Economic Consulting**

2005-    *Managing Director (f/k/a Senior Vice President)*
Provide written and oral testimony. Conduct and supervise economic analyses, with a focus on securities litigation and valuation cases.

2001-2005    *Vice President*
1998-2001    *Senior Consultant*
1996-1998    *Senior Analyst*

**Harvard University**

1991-1996    *Teaching Fellow in Economics*
Participated in teaching various courses from introductory principles of economics to graduate macroeconomics. Ran coursewide tutorial program for the largest class at Harvard for two academic years, with a staff of over fifty part-time employees.

**Worth Publishers**

1991, 1993    *Research Assistant/Independent Contractor*
Worked on data collection, software analysis, and creation of a problem bank for an educational economics software package.

**National Bureau of Economic Research**

1991    *Research Assistant*
Performed data collection and econometric analysis for a project on comparisons of international growth rates.

## Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009, 2011, 2012, 2015

David I. Tabak

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

David I. Tabak

## Expert Reports and Testimony

Expert Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois in *George Hedick Jr. v. The Kraft Heinz Company, et al.* and in *Iron Workers District Council (Philadelphia and vicinity) Retirement and Pension Plan v. The Kraft Heinz Company, et al.*, May 15, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, April 8, 2019.

Deposition before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 29, 2019.

Deposition before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 27, 2019.

Deposition before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, March 20, 2019.

Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 8, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 7, 2019.

Expert Declaration of David I. Tabak before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, February 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, February 11, 2019.

Testimony before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., June 12, 2018.

Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., June 4-5, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., May 14, 2018.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, April 6, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., March 23, 2018.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 9, 2018.

Expert Report of David I. Tabak, Ph.D. before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., February 21, 2018.

Expert Report of David I. Tabak, Ph.D. before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., February 16, 2018.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, November 17, 2017.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, October 26, 2017.

Report of David I. Tabak, PhD in *Babscay Pty Ltd v. Slater & Gordon Limited*, Federal Court Proceeding VID 659 / 2017, Australia, October 26, 2017.

Deposition testimony before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 28, 2017.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 20, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, September 14, 2017.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, August 24, 2017.

Supplement to Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 9, 2017.

Deposition Testimony before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 1, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., June 15, 2017.

Sur-Reply Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., May 31, 2017.

David I. Tabak

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., May 26, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., May 8, 2017.

Deposition Testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., April 21, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., April 13, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., March 23, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., March 16, 2017.

Supplement to Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, February 21, 2017.

Deposition Testimony before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, February 8, 2017.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, January 17, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, December 12, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., December 9, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, December 8, 2016.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, November 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, October 7, 2016.

David I. Tabak

Rebuttal Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, May 6, 2016.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, February 11, 2016.

Deposition Testimony before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 9, 2016.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, January 29, 2016.

Expert Report of David Tabak, Ph.D. before the Securities and Exchange Commission in *In the Matter of Arthur F. Jacob, CPA and Innovative Business Solutions, LLC,* January 29, 2016.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Symbol Technologies, Inc. Securities Litigation*, January 28, 2016.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, December 23, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Symbol Technologies, Inc. Securities Litigation*, December 11, 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, December 2, 2015.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, November 16, 2015.

Expert Report of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, November 12, 2015.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, September 2, 2015.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, July 20, 2015.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 15, 2015.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 1, 2015.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 30, 2015.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *George Byrun et al. v. Salix Pharmaceuticals et al.*, 30 January 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, January 13, 2015.

Expert Report of David Tabak before the Securities and Exchange Commission in the matter of *Airtouch Communications, Inc., Hideyuki Kanakubo, and Jerome Kaiser, CPA*, December 16, 2014.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Puda Coal Securities et al. Litigation*, November 13, 2014.

Deposition Testimony before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, July 2, 2014.

Testimony before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 16, 2014.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, June 11, 2014.

Supplemental Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 3, 2014.

Deposition before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 31, 2014.

Cross Examination in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation et al. before the Ontario Superior Court of Justice (Commercial List), March 19, 2014.

Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. *against AriZona Beverages USA LLC et al.*, March 11, 2014.

Report of David I. Tabak in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation *et al.* before the Ontario Superior Court of Justice (Commercial List), February 28, 2014.

David I. Tabak

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2013.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, September 4, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2013.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, June 27, 2013.

Deposition Testimony before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, May 10, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, April 11, 2013.

Declaration of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, March 21, 2013.

Reply Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2012.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, November 6, 2012.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2012.

Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, May 3, 2012.

Written Direct Testimony of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, April 17, 2012.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, April 10, 2012.

Rebuttal Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, January 30, 2012.

David I. Tabak

Expert Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, December 5, 2011.   (Affidavits testifying to the report executed on December 9, 2011 and December 20, 2011.)

Deposition Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, August 1, 2011.

Expert Report of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, July 8, 2011.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, February 3, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, January 11, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Securities and Exchange Commission v. Alfred S. Teo, et al.*, November 4, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 29, 2010.

Deposition Testimony before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 7, 2010.

Expert Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, September 16, 2010.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, August 30, 2010.

Rebuttal Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., April 25, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., March 12, 2010.

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., October 19, 2009.

David I. Tabak

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition Testimony before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

David I. Tabak

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund,* et al. *vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007.  (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

David I. Tabak

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, June 19, 2003.

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

David I. Tabak

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

David I. Tabak

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 25, 2000.

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

David I. Tabak

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

David I. Tabak

## Publications

"Testing Securities Market Efficiency With Cammer Factors," *Law360.com*, February 5, 2019.

"Securities Class Actions Appear to Be Largely 'Price-Maintenance' and Omissions Cases," *NERA Working Paper*, April 10, 2017.

"Further Insight into 'What Should We Expect When Testing for Price Response to News in Securities Litigation?'," *Oxford Business Law Blog*, September 27, 2016.

"Gauging Share-Price Response to News in Securities Litigation," *The CLS Blue Sky Blog, Columbia Law School's Blog on Corporations and the Capital Markets*, September 8, 2016.

"What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Working Paper*, August 11, 2016.

"Should Solvency Tests Give the Same Answer?" *NERA Working Paper*, July 28, 2015

"Implications for Market Efficiency and Damages Analysis of Plaintiff Interpretations of *Halliburton II's* Statement that 'market efficiency is a matter of degree,'" *Loyola University Chicago Law Journal*, Spring 2015.

"The Solvency Two-Step," Guest Post on the Weil Bankruptcy Blog.  March 2013.

"Do Courts Count *Cammer* Factors?" NERA Working Paper, republished in the Harvard Law School Forum on Corporate Governance and Financial Regulation.  Also published in modified form as "Counting Cammer Factors – A Review of Case Law" at Law360.com, August 2012.

"Settlement reasonableness from negotiations to coverage disputes," *Litigation and Dispute Resolution 2012 Global Reference* Guide.  A prior version of this was published as a NERA Working Paper, February 2012.

"Guesstimating Loss for Sentencing," published in Law360.com, February 2012.  (Originally published with the title "Estimating Loss For Sentencing Purposes."  Retitled by Law360.com after initial publication on its website.)

"Economic Analysis of Loss in the United States Sentencing Commission's Proposed Methodologies," NERA Working Paper, February 2012.

"Guideline Companies in Valuation: A Careful View of the Market Approach," *Journal of Business Valuation*, 2011 Volume 1.  (A previous version appeared as a NERA working paper entitled "Guideline Companies in Valuation: The Economist's View of the Market Approach" in October 2008.)

"The Matrixx of Materiality and Statistical Significance in Securities Fraud Cases," (co-authored with Frederick Lee of Boies, Schiller & Flexner) NERA Working Paper, December 2010.

"Materiality and Statistical Significance Explained" (co-authored with Frederick Lee of Boies, Schiller & Flexner), published in Law360.com, December 2010.

"Satisfying Fiduciary Duty Under ERISA," *Employment Law Strategist*, June 2010.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 2010.  (A previous version appeared in September 2009, and a condensed version appeared as a Guest Column, "On the Misuse of Event Studies to Examine Market Efficiency," in May 2010 on www.securitiesdocket.com.)

 "Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

 "Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,"* Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006.  (Previously published as a NERA Working Paper.)

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004.  (Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.)

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003.  (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

 "Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. (Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.)

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

David I. Tabak

## Selected Presentations

Panelist, "Emerging Issues in Securities Class Actions," Duke Law Center for Judicial Studies, New York, NY, July 20, 2017.

Panelist, "Keeping Or Closing The Employer Stock Fund: A *Dudenhoeffer*-Based Process," American Bar Association Section of Taxation, Chicago, IL, September 19, 2015.

Presenter, "Multiple Comparisons and the Known or Potential Error Rate," National Association of Forensic Economics session at the Eastern Economics Association, New York, NY, 27 February 2015.

Panelist, Annual Institute for Investor Protection Conference at Loyola University Chicago Law School, 24 October 2014.

Panelist, 2014 Business Law Section Annual Meeting, American Bar Association, Chicago, 11 September 2014.

Moderator, New York University Ross Roundtable, April 7, 2014.

Commentator, Institute for Law and Economic Policy Conference: "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court," April 4, 2014.

Panelist, "The Supreme Court's Decision in Amgen and Other Recent Cases," Securitiesdocket.com; July 24, 2013.

Panelist, "Securities Law: Fraud-on-the-Market Theory Demystified," The Knowledge Congress; July 23, 2013.

Moderator, New York University Ross Roundtable, April 15, 2013.

Panelist, 1st Annual Securities Litigation & Enforcement Institute; New York City Bar; New York, NY; December 11, 2012.

Panelist, The Litigation Summit and Exposition; Washington DC; November 12, 2012.

Panelist, The Society of Corporate Secretaries on materiality issues in determining corporate disclosures, October 18, 2012; New York, NY.

Panelist, Symposium in honor of Nobel Prize Winner Daniel Kahneman at Loyola University, Chicago, IL; October 5, 2012.

Panelist, Practising Law Institute, "Taking and Defending Expert Depositions"; New York, NY June 27, 2012.

Discussant, National Association of Forensics Economics; Chicago IL; January 7, 2012.

David I. Tabak

Panelist, Advanced eDiscovery Institute (session: Statistics and Sampling for Lawyers: How to Apply a Well-Accepted Methodology in the World of eDiscovery); Washington DC; November 17, 2011.

Presenter, Securities Regulation Committee of the New York State Bar Association; New York, New York; July 20, 2011.

Panelist, 2nd Annual Law Firm Marketing U& Business Development Leadership Forum, sponsored by *The American Lawyer* (session: Macro Economic Industry-by-Industry Overview – a power-packed session exploring the sectors that will shape 2011 and beyond); New York, NY; May 24, 2011.

Presenter in webinar on "Fair Value Measurement Consideration for 2010 and Beyond," The Knowledge Congress, July 13, 2010.

Panelist, Forum for Institutional Investors, sponsored by Bernstein Litowitz Berger & Grossman LLP; New York, NY; October 24, 2008.

Presenter, Office of Litigation Support, Securities and Exchange Commission; Washington, DC; May 20, 2008.

Presenter, IQPC Subprime Litigation Conference; New York, New York; February 27, 2008.

Presenter, IQPC Securities Litigation Conference; New York, New York; May 18, 2007.

Presenter, "Everything You Were Afraid To Know About Experts," Fordham University; January 19, 2006.

Presenter, *Eugene P. and Delia S. Murphy Conference on Corporate Law,* Fordham University; November 4, 2005.

Panel Member, *Directors & Officers Under Fire: Protecting Your Interests in this Hostile Environment*, a Directors Roundtable seminar; Washington, D.C.; June 8, 2004.

Guest Lecturer, Fordham University; New York, New York; March 8, 2004.

Panel Member, Business Valuation Resources audio conference on discounts for lack of marketability; May 14, 2003.

Presenter, *Third Annual Law and Business Conference*, Vanderbilt University Law School, ("Inflation Methodologies in Securities Fraud Cases: Theory and Practice"); March 28, 2003.

Guest Lecturer, Middlebury College; Middlebury, Vermont; January 28, 2003.

Panel Member, *Second Annual Grant & Eisenhofer Institutional Investor Conference;* New York, New York; December 9, 2002.

Guest Speaker, Deutsche Bank institutional investor conference call; November 22, 2002.

David I. Tabak

Panel Member, *Key Issues Facing Board Members: The Coming Tide in Securities Class Actions,* a Directors Roundtable seminar; Chicago, Illinois; February 22, 2001.

Panel Member, *Securities Litigation: Risk Management and Avoidance, Emerging Challenges for CXOs*, a seminar sponsored by Jones, Day, Reavis and Pogue and PriceWaterhouseCoopers; Reston, Virginia; September 20, 2000.

"When the Litigation Comes In and the Money Goes Out: What Determines Settlement Values?" presented at *Balancing Disclosure and Litigation Risks for Public Companies (or Soon-to-Be Public Companies)*, a seminar sponsored by Alston & Bird and RR Donnelley Financial; Raleigh, North Carolina; November 10, 1999.

April 2019

**Exhibit 2**
**HD Supply Holdings, Inc.**
**Materials Considered**

### *Academic Literature*

Harvey, Campbell R., "Presidential address: The scientific outlook in financial economics," *The Journal of Finance* 72.4 (2017), p. 1410.

Kaye, David H., and David A. Freedman, "Reference guide on statistics." *Reference manual on scientific evidence,* (2011): 211-302.

### *Analyst Reports*

"1Q Wrap," *J.P. Morgan*, June 22, 2017.

"2Q17 Preview," *Morgan Stanley*, September 1, 2017.

"Downgrade to Hold Post 1Q on a Lower Earnings Forecast," *Drexel Hamilton*, June 7, 2017.

"Downgrading to Neutral," *Robert W. Baird*, June 7, 2017.

"F2Q17 Preview: In-line Results Would Feel Like a Beat," *RBC Capital Markets*, August 29, 2017.

"Fastenal Company[:] May ADS Solid as Demand Continues to Improve; Summary of Management Conversation," *William Blair*, June 6, 2017.

"HDS – Misses F1Q by 3c, Sells Waterworks for Reasonable $2.5 bil, to Buy back 6% of Shares," *RBC Capital Markets*, June 6, 2017.

"HDS – Reaffirmed Guidance and More Clarity on Strategic Investments Should be a Modest Positive," *RBC Capital Markets*, July 19, 2017.

"Our Take on Conf Call and Quick Summary of Details – ALERT," *J.P. Morgan*, June 6, 2017.

"Skittish Distributor Investors Spooked by F1Q miss," *RBC Capital Markets*, June 7, 2017.

"Visceral Post-1Q Stock Reaction Leaves HDS Shares Below Peer Values," *Raymond James*, June 7, 2017.

"Waterworks Sale Overshadowed by Continued Growth Investment," *William Blair*, June 7, 2017.

**Exhibit 2**
**HD Supply Holdings, Inc.**
**Materials Considered**

*Case Law*

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 n.12 (1st Cir. 2014).

*FindWhat Investor Group v. FindWhat.Com*, 658 F.3d 1282, 1310 (11th Cir. 2011).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2405 (2014).

*Data*

Price data obtained from Bloomberg L.P.

*Depositions*

Deposition of Michael Hartzmark, Ph.D., *In re HD Supply Holdings, Inc. Securities Litigation,* dated May 2, 2019, and all exhibits.

*Expert Reports*

Expert Report of Michael L. Hartzmark, Ph.D., *In re HD Supply Holdings, Inc. Securities Litigation*, dated March 1, 2019, and all backup materials.

Rebuttal Report of Michael L. Hartzmark, Ph.D., *In re Finisar Corporation Securities Litigation*, dated November 3, 2017.

*Pleadings in This Matter*

Consolidated Amended Class Action Complaint, dated November 16, 2017.

Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class and Liaison Class Counsel, dated March 1, 2019.

*Other*

HD Supply 4Q 2016 Earnings Call Transcript, dated March 14, 2017.

HD Supply 1Q 2017 Earnings Call Transcript, dated June 6, 2017.

**Exhibit 2**
**HD Supply Holdings, Inc.**
**Materials Considered**

***Other (continued)***

Plaintiffs' Opposition to Defendants' Administrative Motion for Leave to File Sur-Reply, in *In re Finisar Corporation Securities Litigation,* dated November 1, 2017.

**Exhibit 3**
**HD Supply Holdings, Inc.**
**Statistical Model of Daily Percent Returns of the S&P 500 Trading**
**Companies & Distributors Sub Industry Total Return Index**
**Using Estimation Periods from the Expert Report of Michael L. Hartzmark, Ph.D.**

| Period (1) | Constant[1] (2) | Coefficient for the S&P 500 Total Return Index[2] (3) | Observations (4) | R-Squared[3] (5) | Adjusted R-Squared[4] (6) | Standard Error[5] (7) |
|---|---|---|---|---|---|---|
| **A.** May 19, 2016 to June 6, 2017[6] | (0.00) *(1.40)* | **1.44** *12.67* | 264 | 37.98% | 37.74% | 0.01 |
| **B.** December 12, 2016 to June 5, 2017[7] | **(0.00)** *(2.25)* | **1.58** *7.11* | 120 | 30.01% | 29.42% | 0.01 |

**Notes and Sources:**

Data obtained from Bloomberg L.P. Estimation periods obtained from the Expert Report of Michael L. Hartzmark, Ph.D., dated March 1, 2019.
t-statistics are shown in *italics*. Statistically significant coefficients (at the 5% level) are shown in **bold**.

[1] The constant is the expected value of the dependent variable (S&P 500 Trading Companies & Distributors Sub Industry Total Return Index percent returns) if the independent variable (S&P 500 Total Return Index percent returns) equals 0.

[2] This coefficient measures the change in the dependent variable (S&P 500 Trading Companies & Distributors Sub Industry Total Return Index percent returns) associated with a one unit change in the independent variable (S&P 500 Total Return Index percent returns).

[3] R-squared is the percent of the variance in the dependent variable (S&P 500 Trading Companies & Distributors Sub Industry Total Return Index percent returns) that is explained by the variance of the independent variable (S&P 500 Total Return Index percent returns).

[4] Adjusted R-squared is the percent of the variance in the dependent variable (S&P 500 Trading Companies & Distributors Sub Industry Total Return Index percent returns) that is explained by the variance of the independent variable (S&P 500 Total Return Index percent returns), adjusted for the number of predictors in the market model.

[5] Denotes the standard error of the regression model, which is a statistical measure of the variability of predictions made with the regression model.

[6] Market model regression is run over the period May 19, 2016 to June 6, 2017. This period represents the same period used to calculate the excess industry returns in Appendix D of the Hartzmark report (see note [6]).

[7] Market model regression is run over the period December 12, 2016 to June 5, 2017. This period represents the same 120 trading day period used to calculate the HD Supply excess returns in Appendix D of the Hartzmark report (see notes [7] through [9]).

**Exhibit 4**
**HD Supply Holdings, Inc.**
**Summary of Excess Returns for the S&P 500 Trading Companies & Distributors**
**Sub Industry Total Return Index[1]**
**June 6, 2017**

| Market Model Regression Period (1) | Actual Return (2) | Predicted Return[1] (3) | Excess Return (4) (2) - (3) | t-statistic[2] (5) | P-Value[3] (6) |
|---|---|---|---|---|---|
| **A.** May 19, 2016 to June 6, 2017[4] | (2.91) % | (0.50) % | (2.42) % | (2.18) | 0.03 |
| **B.** December 12, 2016 to June 5, 2017[5] | (2.91) % | (0.66) % | (2.25) % | (2.11) | 0.04 |

**Notes and Sources:**

Data obtained from Bloomberg L.P. Estimation periods obtained from the Expert Report of Michael L. Hartzmark, Ph.D., dated March 1, 2019.

[1] Predicted returns are calculated using a market model regression of the percent returns of the S&P 500 Trading Companies & Distributors Sub Industry Total Return Index on the percent returns of the S&P 500 Total Return Index. The regression was run over two different time periods. See Exhibit 3 for more information.

[2] Excess return t-statistics are calculated as the daily excess return divided by the standard error of the regression over the estimation period.

[3] The p-value represents the probability of measuring a test statistic as or more extreme than the calculated test statistic assuming that the null hypothesis is true.

[4] Market model regression is run over the period May 19, 2016 to June 6, 2017. This period represents the same period used to calculate the excess industry returns in Appendix D of the Hartzmark report (see note [6]).

[5] Market model regression is run over the period December 12, 2016 to June 5, 2017. This period represents the same 120 trading day period used to calculate the HD Supply excess returns in Appendix D of the Hartzmark report (see notes [7] through [9]).