# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| IN RE HD SUPPLY HOLDINGS, INC. SECURITIES LITIGATION | CONSOLIDATED CASE NO. 1:17-CV-02587-ELR |

# MEMORANDUM OF LAW IN SUPPORT
# OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL
# OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................1

II.    THE SETTLEMENT WARRANTS FINAL APPROVAL ............................4

     A.     Plaintiffs and Lead Counsel Adequately Represented the Class ..........6

     B.     The Settlement is the Product of Arm's-Length Negotiations..............7

     C.     The Relief Provided to the Settlement Class Is Adequate ...................9

          1.     The Size of the Settlement Supports Approval..........................9

          2.     The Risks of Continued Litigation Support Approval..............10

          3.     The Proposed Method for Distributing Relief to the
               Settlement Class is Effective ....................................................15

          4.     Lead Counsel's Fee Request is Fair and Reasonable ..............16

          5.     There are no "Side Agreements" other than the Opt-Out
               Agreement ..................................................................................17

     D.     All Settlement Class Members Are Treated Equitably......................17

     E.     The Remaining Eleventh Circuit Factors are Satisfied......................18

          1.     The Likelihood of Success at Trial Supports Final
               Approval of the Settlement .......................................................18

          2.     The Settlement Amount is Reasonable Considering the
               Range of Possible Recoveries...................................................18

          3.     The Stage of Proceedings at Which Settlement was
               Achieved Strongly Supports Final Approval............................20

          4.     The Favorable Response to the Settlement from the Class
               Supports Final Approval ...........................................................21

III.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE ...............21

IV.   NOTICE TO THE SETTLEMENT CLASS SATISIFED RULE 23
     AND DUE PROCESS ........................................................................23

V.     CONCLUSION..................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Sentinel Offender Servs., LLC,*
  2018 WL 2148372 (N.D. Ga. May 10, 2018)......................................................20

*Bennett v. Behring Corp.,*
  737 F.2d 982 (11th Cir. 1984) ................................................. 4, 5, 18

*Carpenters Health & Welfare Fund v. Coca-Cola Co.,*
  2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ...................................... 13, 19, 22

*Christine Asia Co., Ltd. v. Yun Ma,*
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)...................................... 15, 17

*Columbus Drywall & Insulation, Inc. v. Masco Corp.,*
  2008 WL 11319971 (N.D. Ga. Mar. 4, 2008) ........................................4

*Columbus Drywall & Insulation, Inc. v. Masco Corp.,*
  2012 WL 12540344 (N.D. Ga. Oct. 26, 2012) ....................................16

*Dakota Med., Inc. v. RehabCare Grp., Inc.,*
  2017 WL 4180497 (E.D. Cal. Sept. 21, 2017) .......................................9

*Deas v. Russell Stover Candies, Inc.,*
  2005 WL 8158201 (N.D. Ala. Dec. 22, 2005) ............................... 18, 20

*Guevoura Fund Ltd. v. Sillerman,*
  2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ............................... 11, 14

*Gunthert v. Bankers Standard Ins. Co.,*
  2019 WL 1103408 (M.D. Ga. Mar. 8, 2019).......................................21

*Howard v. Chanticleer Holdings, Inc.,*
  2014 WL 12600501 (S.D. Fla. Aug. 14, 2014) ...................................21

*In re Auto. Parts Antitrust Litig.,*
  2019 WL 7877812 (E.D. Mich. Dec. 20, 2019) .................................22

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .....................................................15

*In re BellSouth Corp. Sec. Litig.*,
2007 WL 9676400 (N.D. Ga. Apr. 9, 2007)........................................................16

*In re China Med. Corp. Sec. Litig.*,
2014 WL 12581781 (C.D. Cal. Jan. 7, 2014) ......................................................8

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
2020 WL 256132 (N.D. Ga. March 17, 2020)........................................... *passim*

*In re Flowers Foods, Inc. Sec. Litig.*,
2019 WL 6771748 (M.D. Ga. Dec. 11 .............................................................24

*In re Friedman's Inc. Sec. Litig.*,
2009 WL 1456698 (N.D. Ga. May 22, 2009) ......................................................7

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ..............................................................13

*In re Healthsouth Corp. Sec. Litig.*,
334 F. App'x 248 (11th Cir. 2009) .....................................................................17

*In re NetBank, Inc. Sec. Litig.*,
2011 WL 13353222 (N.D. Ga. Nov. 9, 2011) ...............................................2, 11

*In re Rayonier Inc. Sec. Litig.*,
2017 WL 4542852 (M.D. Fla. Oct. 5, 2017) ......................................... 9, 10, 16

*In re Sunbeam Sec. Litig.*,
176 F. Supp. 2d 1323 (S.D. Fla. 2001) ........................................................ 19, 21

*Ingram v. The Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001).........................................................................7

*Lowry v. Andrx Corp.*,
2008 WL 11331829 (S.D. Fla. Apr. 4, 2008) ....................................................24

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015) .................................................................22

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019)............................................................................6

*Nelson v. Mead Johnson & Johnson Co.*,
    484 F. App'x 429 (11th Cir. 2012) ......................................................................19

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ..........................................................................15

*Rosner v. United States*,
    2005 WL 8155968 (S.D. Fla. Oct. 3, 2005)........................................................11

*Smith v. Floor and Decor Outlets of America, Inc.*,
    2017 WL 11495273 (N.D. Ga. Jan. 10, 2017)................................................5, 10

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ............................................ 10, 18

*Wal-Mart Stores, Inc.  v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005)...................................................................................23

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)....................................................3, 8

**STATUTES**

15 U.S.C. § 78u-4(a)(7) .............................................................................................24

**RULES**

Fed. R. Civ. P.
    23(c) ............................................................................................................ 23, 24
    23(e) ............................................................................................................. *passim*

Pursuant to Federal Rule of Civil Procedure 23(e), Lead Plaintiffs respectfully submit this memorandum of law in support of their motion for final approval of the Settlement, and approval of the proposed Plan of Allocation.[1]

## I.   **INTRODUCTION**

After more than two years of hard-fought litigation, Lead Plaintiffs have agreed to settle this Action for a cash payment of $50 million for the benefit of the Settlement Class. As discussed in greater detail below, Lead Plaintiffs respectfully submit that final approval of the Settlement is strongly warranted in light of the following factors.

The Settlement is Exceptional: Under any measure, the $50 million Settlement is extraordinary, as it represents the fourth largest securities class action settlement of all time in this District, and the second largest in the last ten years. Indeed, this recovery far exceeds the inflation adjusted median of $6.3 million in securities class action settlements in the Eleventh Circuit from 2010 through 2019. Moreover, the Settlement allows Class members to recover between 14% and 50.4% of their estimated recoverable damages—dwarfing the median recovery of 2.1% in

---

[1] Lead Plaintiffs respectfully refer the Court to the accompanying Declaration of Joseph E. White, III in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("White Decl."), filed herewith, for a detailed description of the case and the Settlement. Unless otherwise indicated, all capitalized terms have the same meanings as in the Stipulation and Agreement of Settlement, dated January 30, 2020 (Dkt. No. 93-2), or the White Decl. "¶" references are to the White Declaration. Unless otherwise indicated, all emphasis has been added, and all internal citations and quotation marks have been omitted.

similarly-sized actions in 2019.

The Risks and Difficulties Involved:   Courts in this District have recognized the risks of securities class actions as "notably difficult and notoriously uncertain." *In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011) (Batten, J.).   Here, there were substantial risks of either a reduced recovery or no recovery at all had the litigation continued, as Plaintiffs faced formidable arguments from Defendants regarding falsity, scienter and loss causation.

Specifically, Plaintiffs alleged that Defendants' statements concerning the status of the Company's supply chain operations during the Class Period were false and misleading.   However, Defendants would have continued to maintain that none of their challenged statements were actionable, arguing that these representations were true when made and purportedly supported by contemporaneous data. Moreover, even if Defendants' statements were found actionable, Defendants would have vigorously argued that virtually all of the stock price decline at the end of the Class Period was not related to Plaintiffs' allegations, but rather to myriad other factors unrelated to the alleged fraud, including the sale of an important business unit and infrastructure spending that had nothing to do with the supply chain problems implicated in the Action. Significantly, had the Court or a jury accepted these arguments, either in whole or in part, damages in the case would have been dramatically reduced, or even eliminated.   In the face of these obstacles, Plaintiffs secured an extraordinary recovery of $50 million on behalf of the Settlement Class.

Extensive Litigation Efforts: The Settlement is the product of years of diligent and complex work by Lead Plaintiffs and Lead Counsel, including: (i) a thorough investigation, which included locating and interviewing numerous confidential witnesses who provided Plaintiffs with significant information relevant to their claims; (ii) filing a highly detailed amended complaint; (iii) consultation with various industry experts; (iv) defeating Defendants' motion to dismiss; (v) engaging in extensive class certification briefing and discovery; (vi) engaging in comprehensive fact discovery, including obtaining and analyzing over 265,000 pages of documents produced by Defendants and several key third parties; (vii) submitting detailed mediation statements setting forth Lead Plaintiffs' positions on the hotly disputed issues in the case; and (viii) engaging in two day-long mediation sessions before a renowned mediator involving extensive negotiations. Accordingly, by the time the Parties agreed to the Settlement, Lead Plaintiffs had gained an in-depth knowledge of the strengths and weaknesses of the Action.

Arm's-Length Settlement Negotiations: The Settlement is the product of the Parties' extensive, arm's-length negotiations, comprising two full-day sessions before Jed Melnick of JAMS, a "highly qualified mediator" whose involvement "strongly supports a finding that negotiations were conducted at arm's length and without collusion." *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014). Mr. Melnick fully supports the Settlement as fair, reasonable and adequate and in the best interests of the proposed Settlement Class

members.

In sum, Lead Plaintiffs and Lead Counsel have vigorously prosecuted the Action and approve the Settlement, believing it to be an excellent result for the Settlement Class.  Based upon their evaluation of the facts and law, their recognition of the substantial and immediate benefits of the Settlement, and the considerable risk and expense of protracted litigation against Defendants, Lead Plaintiffs and Lead Counsel respectfully request that the Court grant final approval of the proposed Settlement as fair, reasonable and adequate.

## II.    THE SETTLEMENT WARRANTS FINAL APPROVAL

The Eleventh Circuit and courts nationwide recognize that there is a "strong judicial policy favoring settlement."  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  Indeed, "particularly in class action suits, there is an overriding public interest in favor of settlement," and thus "class-action settlements [should] be disapproved only upon considerable circumspection."  *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2008 WL 11319971, at *3 (N.D. Ga. Mar. 4, 2008).

Rule 23(e)(2) of the Federal Rule of Civil Procedure governs final approval of settlements.  Under that rule, courts examine whether a proposed settlement is "fair, reasonable, and adequate," examining factors including whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the

method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *5 (N.D. Ga. March 17, 2020) (Thrash, J.) (quoting Fed. R. Civ. P. 23(e)(2)).  In conjunction with these factors, courts in the Eleventh Circuit particularly examine: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the anticipated complexity, expense and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Id.*, 2020 WL 256132, at *10 (quoting *Bennett,* 737 F.2d at 986).[2]

This Court has already made a preliminary finding that the Settlement is "fair, reasonable, and adequate to the Settlement Class" under these factors in issuing the Court's Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order") (subject to further consideration at the Settlement Hearing).  *See* Dkt. No. 94 at ¶4.  As set forth below, the $50 million Settlement readily satisfies each of the applicable factors.

---

[2] *See also Smith v. Floor and Decor Outlets of America, Inc.,* 2017 WL 11495273, *2 (N.D. Ga. Jan. 10, 2017) (Ross, J.) ("The Court has considered the complexity, expense, and likely duration of the litigation if the settlement is not approved; the odds of the plaintiffs succeeding at trial balanced by the risks of continued litigation; the range of possible recovery if the case is tried; the opinions of class counsel and the class representatives; and the degree of opposition to the settlement.").

### A.    Plaintiffs and Lead Counsel Adequately Represented the Class

In evaluating the adequacy of representation, courts in this District consider "(1) whether [the class representatives] have interests antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Equifax*, 2020 WL 256132, at *5. Lead Plaintiffs and Lead Counsel easily meet both of these criteria.

First, Plaintiffs "purchased [HD Supply] common stock at market prices during the Class Period and were allegedly injured by the same alleged material misrepresentations and omissions that injured all proposed [Settlement] Class members," meaning that "Plaintiffs' interests in establishing Defendants' liability and maximizing the recovery are aligned with the interests of absent [Settlement] Class members." *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 379 (N.D. Ga. 2019) (Ray, J.). In other words, Plaintiffs "share the same interests as absent class members, assert claims stemming from the same event that are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class." *Equifax,* 2020 WL 256132, at *5.

Second, Plaintiffs' chosen counsel are highly experienced in securities litigation, and have a long and successful track record of representing investors in such cases. *See* Ex. 3 to White Decl. Ex. 6A (Saxena White firm resume). As set forth in further detail in the White Declaration, Lead Counsel vigorously prosecuted the Settlement Class's claims and expended significant time and effort throughout

the litigation.  *Inter alia*, Lead Counsel conducted an extensive investigation in which they interviewed numerous former HD Supply employees about Class Period events; drafted a detailed, 79-page Amended Complaint; defeated Defendants' motion to dismiss their complaint; reviewed 265,000 pages of documents; subpoenaed several third-parties (including Defendants' outside supply chain consultants and logistics providers); consulted extensively with various experts; briefed class certification in full (including deposing Defendants' class certification expert, and defending the depositions of their market efficiency expert and Lead Plaintiffs' representatives), opposed Defendants' motion to exclude portions of their expert's testimony, and prepared for numerous fact witness depositions.  ¶¶20-78.

Moreover, as discussed further, *infra*, at sec. II(c)(2), the outstanding recovery obtained in this case—in the face of numerous legal and factual obstacles—attests to the skill and vigor with which Lead Counsel prosecuted this action.  *See, e.g., In re Friedman's Inc. Sec. Litig.*, 2009 WL 1456698, at *3 (N.D. Ga. May 22, 2009) ("It is…well-settled that one of the primary determinants of the quality of the work performed is the result obtained.").

Finally, the Court has previously found that Plaintiffs and Lead Counsel have adequately represented the Settlement Class.  *See* Dkt. No. 94 at ¶4.

## B.    The Settlement is the Product of Arm's-Length Negotiations

Rule 23(e)(2)(B) is satisfied where a Settlement was "negotiated at arm's length, and [] there was no fraud or collusion in reaching the settlement."  *Equifax*,

2020 WL 256132, at *6. The "presence of [a] highly experienced mediator" makes the likelihood of collusion "remote." *Equifax,* 2020 WL 256132, at *6; *see also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001).

Here, the Parties and Defendants' directors' and officers' liability insurance carriers engaged in two full-day mediation sessions before Jed Melnick of JAMS, a "highly qualified mediator" whose involvement "strongly supports a finding that negotiations were conducted at arm's length and without collusion." *Yang*, 2014 WL 4401280, at *5. Mr. Melnick is an acclaimed, widely-respected JAMS mediator who has mediated hundreds of complex disputes with aggregate values in the billions of dollars—including numerous securities class actions against Fortune 500 companies. He is also the Managing Mediator for the Weinstein Melnick Team, which includes the Hon. Daniel Weinstein (Ret.), one of the nation's preeminent mediators of complex civil disputes. *See In re China Med. Corp. Sec. Litig.,* 2014 WL 12581781, at *5 (C.D. Cal. Jan. 7, 2014) ("Mr. Melnick's involvement in the settlement supports the argument that it is non-collusive").

In connection with these sessions, the Parties exchanged multiple detailed written submissions that addressed, among other things, issues related to liability, loss causation, and damages. *See* Declaration of Jed Melnick ("Melnick Decl"), Ex. 1 to White Decl., at ¶6. Following the second mediation on October 22, 2020, Mr. Melnick submitted for the Parties' approval a mediator's proposal to settle and release all claims asserted against the Defendants in the Action in return for a cash

payment of $50,000,000, which the Parties accepted. *Id*. at ¶8. Accordingly, the advanced posture of this case, and the deliberative nature of the negotiations evidence a fair process involving good-faith arm's-length bargaining.  Thus, there can be no doubt that the Settlement satisfies Rule 23(e)(2)(B).

### C.    The Relief Provided to the Settlement Class Is Adequate

#### 1.    The Size of the Settlement Supports Approval

Plaintiffs and Lead Counsel have achieved an outstanding benefit for the Settlement Class, whether measured in absolute terms or as a percentage of estimated recoverable damages.  The $50,000,000 cash Settlement represents (i) the fourth largest securities class action settlement of all time in this District; (ii) the second largest in the last ten years; and (iii) is multiples higher than the inflation-adjusted median of $6.3 million in securities class action settlements in the Eleventh Circuit from 2010 through 2019,[3] which weighs strongly in favor of approval.  *See, e.g., In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *2 (M.D. Fla. Oct. 5, 2017) (fact that settlement—achieved by same Lead Counsel as in this action—was second largest recovery in district favored approval); *Dakota Med., Inc. v. RehabCare Grp., Inc.*, 2017 WL 4180497, at *5 (E.D. Cal. Sept. 21, 2017) (third largest settlement of its kind in circuit in decade favored approval).

This result is also remarkable as a percentage of estimated maximum

---

[3] *See* Cornerstone Research, *Securities Class Action Settlements, 2019 Review and Analysis* (2020) at 20.

recoverable damages, which Plaintiffs—after consulting with Chad W. Coffman of Global Economics Group, a highly experienced damages expert—have estimated to range from $99 million to $364 million. ¶3, n. 2.  Accordingly, the $50 million Settlement represents anywhere from 14% to 50.4% of the realistic maximum recoverable damages, and, thus, is roughly seven to twenty-five times larger—as a percentage of damages—than the average securities class action recovery in 2019, which was just 2.1% of damages.[4]  Moreover, as discussed further below, even assuming success at trial, Plaintiffs' chances of achieving a judgment anywhere near the upper end of its damages range would be remote.  Indeed, settlements valued at much lower percentages of damages are routinely not only approved but praised by courts.  *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *3 (S.D. Fla. Oct. 17, 2016) (settlement worth 5.5% of maximum damages "an excellent recovery").  Thus, the Settlement is an exceptional recovery for the Settlement Class.

## 2.    The Risks of Continued Litigation Support Approval

In assessing whether the proposed Settlement is fair, reasonable, and adequate, the Court should view the Settlement "in light of the risks of continued litigation." *Equifax,* 2020 WL 256132, at *7.  In particular, this Court has focused

---

[4] *See* Janeen McIntosh and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review (NERA Feb 12, 2020) at 20, fig. 13, available at https://www.nera.com/content/dam/nera/publications/2020/PUB_Year_End_Trends _012120_Final.pdf

on factors such as "the complexity, expense, and likely duration of the litigation if the settlement is not approved [and] the odds of the plaintiffs succeeding at trial balanced by the risks of continued litigation." *Smith*, 2017 WL 11495273, at *2. There is no question that continued litigation here would have been costly, risky, and protracted. Indeed, as courts in this District have recognized, "the complexity of securities class action litigation is notably difficult and notoriously uncertain." *NetBank*, 2011 WL 13353222, at *3; *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *7 (S.D.N.Y. Dec. 18, 2019) (same).

Here, although Plaintiffs prevailed in part at the pleading stage, the Court's decision regarding Plaintiffs' motion for class certification was pending at the time the Settlement was reached. While Plaintiffs believe the motion was meritorious, Defendants raised arguments that presented a risk that the Class would either not be certified, or else would be cut to a shorter class period encompassing significantly reduced damages. Had Plaintiffs failed to obtain class certification, or had the Court certified a shorter Class Period, any potential benefit to the Settlement Class would have been drastically reduced or eliminated altogether. Thus, the risks presented by the class certification process support approval of the Settlement in this case. *See, e.g, Rosner v. United States*, 2005 WL 8155968, at *4 (S.D. Fla. Oct. 3, 2005), amended, 2009 WL 10697241 (S.D. Fla. Jan. 22, 2009) ("risk of not certifying a litigation class" supported settlement).

Furthermore, even if Plaintiffs had prevailed at the class certification stage,

11

they would still have to prove their claims, as Defendants vigorously denied that their public statements contained any material misstatements or omissions, and denied allegations of fault, liability, wrongdoing, and damages.  For instance, Plaintiffs challenged Defendants' public representations concerning the state of HD Supply's operations and supply chain during the Class Period.  Defendants argued throughout the litigation that their public statements were not false or misleading because such statements accurately reflected the then-current state of the Company's supply chain operations—including several metrics that were cited in the statements that Plaintiffs challenged—and that that their assertions were supported by contemporaneous internal documents and data.  Defendants also would have argued that, based on these circumstances, Plaintiffs could not have proven the required mental state of Defendants and therefore could not have established a strong inference of Defendants' scienter.  While Plaintiffs believe that they would have made strong arguments for falsity and scienter based on the evidence reviewed to date, there is no guarantee that a jury would have agreed.

Finally, Defendants would have vigorously disputed loss causation. Specifically, virtually all of Plaintiffs' damages are attributable to the disclosure on June 6, 2017 that marks the end of the Class Period, after which the stock price dropped 17.5%.  Defendants argued that none of that stock price decline was related to the alleged fraud. For example, the Company also announced on this date (i) the sale of its Waterworks division, which analysts specifically cited as "dilutive"; (ii)

reduced profit margins due to factors unrelated to prior supply chain issues, including increased industry competition; and (iii) additional new infrastructure spending, which Defendants argued was not at all related to the prior supply chain problems, and was instead related to "new and distinct competitive pressures" apart from the alleged fraud. Accordingly, Defendants argued that the June 6, 2017 disclosure could not be linked to any past statements about the recovery of the Company's supply chain, therefore defeating loss causation. *See* Dkt. No. 78 (Defs. Class Cert. Opp.) at 23; Dkt. No. 78 Ex. O (Tabak Rpt.). In addition, even if Plaintiffs could prove that *some* of the June 6, 2017 stock price drop could be linked to a prior misrepresentation, proving that the *entirety* of that price decline was tied to Plaintiffs' allegations would have been extraordinarily difficult, thereby potentially dramatically reducing the Class's damages that could be recovered at trial.[5]

While Plaintiffs believe they had credible counterarguments on each of these points, the fact remains that the Court at class certification or summary judgment, or the jury at trial, could have lent such arguments substantial weight, thereby

---

[5] While the Court found Plaintiffs had adequately pleaded loss causation at the motion to dismiss stage, it did not find that all of the June 6, 2017 stock drop resulted from the alleged fraud. Rather, it found only that "a factfinder could infer at this stage that it was more probable than not that the corrective disclosure caused at least a substantial amount of the [June 6, 2017] price drop." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1365 (N.D. Ga. 2018) (emphasis added).

significantly reducing or eliminating recoverable damages and undermining the viability of the entire Action.  Courts in this District have recognized that, even with the aid of expert testimony, disputes over damages amounts present a substantial risk before a jury even in a successful trial outcome. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.,* 2008 WL 11336122, at *8 (N.D. Ga. Oct. 20, 2008) ("The reaction of a jury to such expert testimony is highly unpredictable and [i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants,' and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs contended").

In addition, moving forward, the Action would have continued to present significant cost and risks, as pre-trial proceedings would further involve "preparation of complex expert reports and discovery of the expert witnesses; the negotiation and completion of a complex and voluminous pre-trial order; and extensive briefing on motions for summary judgment, motions to strike experts and other motions in limine likely to be made," and a costly and labor intensive trial would be followed by "inevitable post-trial motions and appellate proceedings." *Guevoura Fund Ltd.*, 2019 WL 6889901, at *7.  Consequently, at "[e]ach step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members" if the litigation was to continue.  *Id.*

In sum, even after a successful trial, there was no guarantee that Plaintiffs would have obtained a judgment greater than or even equivalent to the $50 million

Settlement, and, indeed, there was a very significant risk that years of continued litigation might yield a smaller recovery—or no recovery at all—after trial or the inevitable appeals.[6]  These risks strongly support approval of the Settlement.

### 3. The Proposed Method for Distributing Relief to the Settlement Class is Effective

Under Rule 23(e)(2)(C)(ii), courts consider "the effectiveness of [the] proposed method of distributing relief to the class."  Here, as demonstrated below in Section III, the method for processing Settlement Class Members' claims and distributing relief to eligible claimants include well established, effective procedures for processing claims submitted by potential Settlement Class Members and efficiently distributing the Net Settlement Fund.  Epiq, the Court-approved Claims Administrator, will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of their claims, and, lastly, mail Authorized Claimants their pro rata share of the Net Settlement Fund (per the Plan of Allocation), after Court approval.  Claims processing like the method proposed here is standard in securities class action settlements as it has been long found to be effective.  *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *14 (S.D.N.Y. Oct. 16, 2019), *appeal withdrawn sub nom. Tan Chao v. William*, 2020 WL 763277 (2d Cir. Jan. 2, 2020).

---

[6] *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *38 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict).

### 4.    Lead Counsel's Fee Request is Fair and Reasonable

Lead Counsel has applied for a fee of 30% of the Settlement Fund.  As set forth in more detail in the Memorandum of Law in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, such a fee is highly reasonable in light of the work performed and the results obtained, and is comparable to other settlements in complex class actions approved in the Eleventh Circuit and nationwide.  *See, e.g., Rayonier*, 2017 WL 4542852, at *1 (awarding 30% of $73 million settlement obtained while class certification motion was pending); *In re BellSouth Corp. Sec. Litig.,*, 2007 WL 9676400, at *1 (N.D. Ga. Apr. 9, 2007) (30% of $35 million settlement reached during discovery); *see also Equifax*, 2020 WL 256132, at *34 (noting that "[a]wards of up to 33% of the common fund are not uncommon in the Eleventh Circuit" in complex class actions, and that, in Eleventh Circuit, average fee was 30% and median fee was 33% between 2009 and 2013).

Moreover, although this Circuit does not primarily rely on the lodestar method to calculate fees, the requested fee represents a 2.26 multiplier of Lead Counsel's lodestar, which is well within the range commonly found to be reasonable both in this Circuit and elsewhere. *See, e.g., Columbus Drywall*, 2012 WL 12540344, at *5 ("the requested fee would represent a multiplier of approximately four times lodestar, which is well within the range of approved fees.").

5. **There are no "Side Agreements" other than the Opt-Out Agreement**

The Parties have entered into a confidential agreement establishing certain conditions under which HD Supply may terminate the Settlement if a certain number of potential Settlement Class Members request exclusion (or "opt-out") of the Settlement. Stipulation, Dkt. No. 93-2, ¶36. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See In re Healthsouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009) (approving of similar agreement and noting that "[t]he threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out.")

D. **All Settlement Class Members Are Treated Equitably**

As set forth in the Stipulation (¶¶18-30) and *infra*, at Sec. III, the Plan of Allocation—which was developed in consultation with Lead Plaintiffs' damages expert—treats all Settlement Class Members equitably. Under the Plan of Allocation, the Authorized Claimants shall receive their *pro rata* share of the Net Settlement Fund based upon their recognized claim compared to the total recognized claims of all Authorized Claimants. *See* Notice, Dkt. No. 93-2, Ex. A-1 at ¶¶ 53-70. *See Christine Asia Co.*, 2019 WL 5257534, at *15 (finding similar plan of allocation to treat all class members equitably).

### E.    The Remaining Eleventh Circuit Factors are Satisfied

In addition to the factors set forth in Rule 23, courts in the Eleventh Circuit are further guided by the factors set forth in *Bennett*, 737 F.2d at 986. *Equifax,* 2020 WL 256132, at *10.  Many of these factors overlap substantially with those in Rule 23.  *See id.*  Each of these factors supports final approval of the Settlement.

### 1.    The Likelihood of Success at Trial Supports Final Approval of the Settlement

The "first and most important *Bennett* factor is the likelihood of success at trial."  *Thorpe*, 2016 WL 10518902, at *2-*3.  This factor "is evaluated in the context of the relief proposed by the settlement."  *Id.* at *3.  As set forth, *supra*, at section II(c)(2), the many risks Plaintiffs would face before, during, and after trial weigh in favor of final approval of the Settlement.  Defendants would have vigorously contested falsity, scienter and loss causation at class certification, summary judgment, and trial.  Defendants' success on any one of these bases would have presented the risk of a substantially reduced recovery, or no recovery whatsoever.  Accordingly, this factor strongly weighs in favor of final approval.

### 2.    The Settlement Amount is Reasonable Considering the Range of Possible Recoveries

"The second and third factors in the Eleventh's Circuit's *Bennett* analysis call for the Court to determine 'the possible range of recovery' and then ascertain where within that range 'fair, adequate, and reasonable settlements lie.'" *Deas v. Russell Stover Candies, Inc.,* 2005 WL 8158201, at *11 (N.D. Ala. Dec. 22, 2005); *see also*

18

*In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1331 (S.D. Fla. 2001) (these factors "are easily combined").

As set forth above, the $50,000,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement and the issuance of notice to the Settlement Class. Realistic maximum damages in the case ranged from $99 million to $364 million, and Defendants raised a number of credible arguments concerning falsity, scienter, loss causation and damages throughout the litigation that—if accepted—would have substantially reduced or eliminated altogether recoverable damages, further underscoring the valuable benefits obtained through the proposed Settlement. *See Carpenters Health & Welfare Fund*, 2008 WL 11336122, at *8 ("the determination of loss causation and damages is a complicated and uncertain process" with "highly unpredictable" results at trial). Indeed, particularly in light of the falsity, scienter, loss causation and damages risks described further *supra* at section II(c)(2), the $50 million Settlement—estimated to be anywhere from 14% to 50.4% of maximum damages— is likely "in the high range of what could have been obtained had the parties continued to litigate." *Equifax,* 2020 WL 256132, at *10.

In assessing the reasonableness of the settlement, the Court can "rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Carpenters Health & Welfare Fund*, 2008 WL 11336122, at *8; *see also Nelson v. Mead Johnson & Johnson Co.*, 484 F.

App'x 429, 434 (11th Cir. 2012) (same).    Here, "the extent of the factual development, the knowledge of [Lead Counsel] regarding the case, and the extensive settlement negotiations render [Lead Counsel] fully capable of arriving at the proposed Settlement." *NetBank*, 2011 WL 13176646, at *4.

### 3.    The Stage of Proceedings at Which Settlement was Achieved Strongly Supports Final Approval

In assessing the stage of the proceedings at which a settlement is achieved, the "relevant inquiry is whether the parties have conducted sufficient discovery to assess the strengths and weaknesses of their claims and defenses." *Deas*, 2005 WL 8158201, at *12; *see also Adams v. Sentinel Offender Servs., LLC*, 2018 WL 2148372, at *8 (N.D. Ga. May 10, 2018) (Duffey, J.) (purpose of this factor is to "ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.")

Here, the Settlement was reached after over more than two years of hard-fought litigation, and after Plaintiffs conducted an extensive investigation and substantial fact and expert discovery, including a review and analysis of over 265,000 pages of documents.    ¶¶ 42-65.    Plaintiffs also successfully opposed Defendants' motion to dismiss, filed a motion for class certification and a detailed expert report on market efficiency, deposed Defendants' class certification expert, opposed Defendants' motion to exclude Plaintiffs' expert, and participated in extensive settlement negotiations.  White Decl. ¶¶ 29-41, 42-78.  In sum, by the time

the Settlement was reached, Lead Plaintiffs had sufficient information to assess the strengths and weaknesses of their claims, and were "well aware of the other side's position and the merits thereof." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1332.

### 4. The Favorable Response to the Settlement from the Class Supports Final Approval

The "positive response from the Class Members" to the Settlement "further evidences the fairness, reasonableness, and adequacy of the Settlement." *Gunthert v. Bankers Standard Ins. Co.*, 2019 WL 1103408, at *4 (M.D. Ga. Mar. 8, 2019). The deadline for submitting objections and requests for exclusions is June 30, 2020. *See* Dkt No. 94 at ¶13. To date, no objections to the Settlement have been received, and only a single shareholder has requested exclusion from the Settlement Class. Decl. of Jaime Firenze ("Epiq Decl."), filed herewith as Ex. 2 to the White Decl., at ¶¶19-20. *See Gunthert*, 2019 WL 1103408, at *4 ("a low number objections suggests that the settlement is reasonable" and that the "terms are satisfactory."). Plaintiffs will file reply papers on July 14, 2020, after the exclusion and objection deadline has passed, to further address this factor.

### III. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

As with settlements, courts in this Circuit assess whether plans of allocation are "fair and reasonable." *Howard v. Chanticleer Holdings, Inc.*, 2014 WL 12600501, at *5 (S.D. Fla. Aug. 14, 2014). Under this analysis, the Court's "principal obligation in approving a plan of allocation is simply to ensure that the

fund distribution is fair and reasonable as to all participants in the fund." *In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812, at *1 (E.D. Mich. Dec. 20, 2019). Moreover, a plan of allocation "need not be perfect," and "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015).

Here, the proposed Plan of Allocation, which has been preliminarily approved by the Court, fairly and reasonably distributes the Net Settlement Fund on a *pro rata* basis among claimants based on their respective Recognized Losses. In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated alleged amount of artificial inflation in the per share closing price of HD Supply common stock, which allegedly was proximately caused by Defendants' false and misleading statements and omissions. Notice, Dkt. No. 93-2, Ex. A-1, ¶¶ 53-70.

In calculating the estimated alleged artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered price changes in HD Supply common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. Similar plans of allocation are commonly used and approved in class actions and represent a widely recognized means of fairly distributing settlement funds to class members. *See, e.g. Carpenters Health &*

*Welfare Fund*, 2008 WL 11336122, at *5 (similar plan of allocation developed by damages expert found fair and reasonable because it "treats all Settlement Class Members in a similar manner—ensuring that everyone entitled to a distribution under the Plan of Allocation who submits a valid and timely claim gets a *pro rata* share of the Net Settlement Fund in the proportion that his, her, or its Recognized Claim bears to the total of all Recognized Claims").

Moreover, to date, after mailing 49,736 copies of the Notice Packet, no Settlement Class Member has objected to the Plan of Allocation. This fact supports approval.

## IV.    NOTICE TO THE SETTLEMENT CLASS SATISIFED RULE 23 AND DUE PROCESS

The Notice to the Settlement Class—the form of which has already been preliminarily approved by this Court—satisfied the requirements of Rule 23, which requires the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc.  v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005).  Put another way, the Notice satisfies the requirements of Rule 23 and due process because it "clearly and concisely explains the nature of the

action and the rights of class members, thereby satisfying the requirements of Rule 23 and due process." *Equifax,* 2020 WL 256132, at *27.

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, Epiq began mailing copies of the Notice and Claim Form to potential Class Members on March 20, 2020. *See* Epiq. Decl. at ¶5. As of June 12, 2020, Epiq had disseminated 49,736 copies of the Notice Packet to potential Class Members and nominees. *See id.* ¶10. In addition, Lead Counsel caused the Summary Notice to be published in *Investors' Business Daily* and transmitted over the PR Newswire on March 30, 2020. *See id.* ¶12. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). *In re Flowers Foods, Inc. Sec. Litig.*, 2019 WL 6771748, at *2 (M.D. Ga. Dec. 11, 2019) (approving substantially similar notice method); *see also Lowry v. Andrx Corp*., 2008 WL 11331829, at *2 (S.D. Fla. Apr. 4, 2008) (same).

## V.   <u>CONCLUSION</u>

For all the foregoing reasons, Lead Plaintiffs respectfully submit that the proposed Settlement and Plan of Allocation readily meet all of the requirements under Rule 23, the PSLRA, and Eleventh Circuit precedent.   Accordingly, Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.[7]

Respectfully submitted this 16th day of June 2020.

<u>/s/ Joseph E. White, III</u>

Maya Saxena
Joseph E. White, III
Lester R. Hooker
Kathryn W. Weidner
**SAXENA WHITE P.A.**
7777 Glades Rd., Suite 300
Boca Raton, FL 33434
Tel: 561-394-3399
Fax: 561-394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
kweidner@saxenawhite.com

-and-

Steven B. Singer
Joshua H. Saltzman
Sara DiLeo
10 Bank Street, 8th Floor

---

[7] A proposed order granting final approval of the proposed Settlement and Plan of Allocation will be submitted with Lead Plaintiffs' reply brief in further support of this motion, which will be filed on July 14, 2020.

White Plains, NY 10606
Tel: 914.437.8551
Fax: 888.631.3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com

*Counsel for Lead Plaintiffs and the Settlement Class*


**LINDSEY & LACY, PC**
W. Thomas Lacy
2002 Commerce Dr. N. Suite 300
Peachtree City, GA 30269
Telephone: (770) 486-8445
Facsimile: (770) 486-8889
tlacy@llptc.com

*Liaison Counsel for Lead Plaintiffs and the Settlement Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
Stuart Kaufman
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiffs*

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with

one of the font and point selections approved by the Court in Local Rule 5.1(c).


*/s/ Joseph E. White, III*
Joseph E. White, III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of June 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing all counsel of record.

*/s/ Joseph E. White, III*
Joseph E. White, III
